UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
THE LAW OFFICE OF RICHARD E. LERNER, P.C.

                    Plaintiff,

      -against-

JUDI GHEDINI a/k/a JUDITH GHEDINI and
JONAS GAYER,
                   Defendants.
----------------------------------------------------------------------X

18-cv-113 (ENV)

**Motion to Remand
28 U.S.C. §1447**

      Plaintiff, The Law Office of Richard E. Lerner, P.C., now moves this Court to remand this case to the state court from which it was removed. Remand is required because there is no basis for this Court to exercise jurisdiction over the plaintiffs' claims, as there is neither complete diversity among defendants nor federal question raised by plaintiff. Upon ordering remand, plaintiff should be as well granted costs and attorney's fees in an amount deemed appropriate by the court.

      In support of this motion, the plaintiff incorporates the accompanying memorandum of law and the proposed complaint annexed thereto as exhibit "1."

Dated:  Queens County, New York
         February 7, 2018

                                Respectfully submitted,

                                The Law Office of Richard E. Lerner, P.C.

                                Richard E. Lerner, through which
                                plaintiff appears *pro se*
                                69-46 Harrow Street
                                Forest Hills, New York 11375
                                    -and-
                                122 West 27th Street, 10th Floor
                                New York, New York 10001
                                (917) 584-4864
                                richardlerner@msn.com

Service via ECF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Note: Redactions proposed
by defendant Ghedini

-----------------------------------------------------------------------X

THE LAW OFFICE OF RICHARD E. LERNER, P.C.

18-cv-113 (ENV)

                      Plaintiff,

**Memorandum in Support
of Motion to Remand**

    -against-

JUDI GHEDINI a/k/a JUDITH GHEDINI and
JONAS GAYER,
                    Defendants.

-----------------------------------------------------------------------X

### Procedural History

Unique in the United States (with the exception of certain Indiana courts), New York allows commencement of a civil action by filing a summons with notice, which need contain only a bare statement of the nature of the claims which plaintiff intends to make against defendant by a subsequent plenary pleading that plaintiff must file upon defendant's demand.

Plaintiff, The Law Office of Richard E. Lerner, P.C. ("Lerner"), commenced this action by filing such a summons with notice in Supreme Court, Queens County, New York on November 27, 2017, bearing the same caption as above. Defendant Gayer was served on December 12, 2017, and defendant Ghedini was served on December 20, 2017.

Plaintiff sent a courtesy addendum to counsel for Ghedini providing more detail about the claims it would raise in its forthcoming complaint.

Rather than demand a complaint, Ghedini removed to this court by notice filed January 8, 2018, claiming diversity jurisdiction, even though plaintiff and Gayer are New York residents, asserting that Gayer was named as a defendant (1) solely to defeat diversity jurisdiction; and (2) improperly, because (she says) there is no possibility that plaintiff can recover from Gayer.

That is, she removed the case to federal court on a theory of fraudulent joinder.

1

**The Gravamen of the Case**

Regardless of the papers containing them, which will be discussed shortly, the basis for plaintiff's claim against Ghedini and Gayer depends on common nuclei of fact and law. Indeed, *as will prove nearly dispositive in determining remand*, Gayer can't be liable to plaintiff for the primary gravamen unless Ghedini is liable, though liability would be joint and several with hers.

As to Ghedini, this is an action in *quantum meruit* to recover attorney's fees. Plaintiff alleges (or will) that (1) Ghedini hired him, or his incorporated firm, to sue Arthur Shapolsky, a natural person to whom she had lent $500,000 at interest and who in time ceased repaying her, under a contingency fee contract entitling him to 33% of any recovery plus costs and disbursements; (2) plaintiff commenced work and won a judgement of some $810,000 in her favor, the entire amount she had any basis to have sought; (3) plaintiff obtained a favorable settlement offer worth at least $625,000 which Ghedini declined; (4) after declining that offer she discharged plaintiff, without cause; thus (5) plaintiff is entitled to legal fees, to the extent earned, in an amount to be determined by the trier of fact, but at a minimum about $225,000, inclusive of costs, expenses, and prejudgment interest to date.

As to Gayer, the case is just as simple. Ghedini has maintained since the discharge that it was for cause, that plaintiff's alleged misconduct in her representation was so outside the pale that it forfeited any claim to a fee. Plaintiff alleges, however, that her claim of cause was pretextual and that the discharge, including the claim of cause, was a result of Gayer's tortious interference with its contract with Gedini, that by defamation and deception Gayer wrongfully induced her to discharge plaintiff and fabricate cause so that she ███████████████

██████████████████████████████████████████

2

███████████████████████████████████████

██████████.

  There are two aspects of this motion sequence that merit special, even premature attention in this introduction. The first is that, perhaps startlingly, Supreme Court precedent absolutely bars this court from entertaining in any way, thus from receiving any submissions that would propound, the possibility that Ghedini's discharge of plaintiff was for cause. For all aspects of the adjudication of remand, this court must presume it was not. Thus, the predictable cascade of submissions that can be expected from her attempting to tarnish plaintiff's competence and fealty will be subject to motions to strike and *in limine*, among others.

  Quite literally, all that is before this court – all that can be before this court – at this stage is whether, given the required *presumption* that Ghedini owes plaintiff a fee and thus has breached her contract of representation by wrongfully refusing to pay it, *is there any possibility* that plaintiff can recover against the non-diverse defendant Gayer.

  Indeed, there is.

  The second such aspect relates to the issue of plaintiff's motive for pleading in joinder, or more precisely the absolute constitutional prohibition against this court's inquiring of it or entertaining submission in respect of it. As will be shown, not only has the Supreme Court held for over a hundred years that plaintiff's choice to plead in joinder is exclusively his, even if the motive was to defeat diversity, and even if he could as well have pled separately, but in the decades since that holding, the *Noerr-Pennington* doctrine,[1] protecting the filing of a civil suit as

---

[1] *Eastern Railroad PreAsidents Conference v. Noerr Motor Freight, Inc.* , 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

core petitioning activity protected by the First Amendment prohibits any inquiry into the motive, even if it be in bad faith, without a precedent determination upon full constitutional adversarial due process that the suit as commenced was absolutely, utterly devoid of merit.

### General Principles

28 U.S.C. § 1332(a) conditions diversity jurisdiction on the existence, as jurisdictional fact, of *complete* diversity, that plaintiff's state citizenship be diverse from that of *all* defendants. See, e.g., *St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80 (2d Cir. 2005) ("Diversity is not complete if any plaintiff is a citizen of the same state as any defendant.") (citing *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 373-74 (1978)).

Such complete diversity "must exist at the time the action is commenced," *Universal Licensing Corp. v. Lungo*, 293 F.3d 579, 581 (2d Cir. 2002), here November 27, 2017.

Ghedini, having removed this case to this federal court, bears the burden of proving by clear and convincing jurisdictional evidence that this court has subject matter jurisdiction in this matter. As stated in *Standard, Inc. v. Oakfabco, Inc.*, 498 F.Supp.2d 711 (SDNY 2007):

> [A] party asserting jurisdiction bears the burden of proving that a case is properly in federal court…. "Where, as here, jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper"…. Moreover, "removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand."

This is why attempts to remove cases from state to federal court are appropriately viewed with suspicion, and why *cases must be remanded if there is any* doubt whether the federal court has subject matter jurisdiction. See, e.g., *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999); *In re Bus. Men's Assurance Co. of Am.*, 992 F.2d 181, 183 (8th Cir. 1993) (per curiam); *Jones v. Gen. Tire & Rubber Co.*, 541 F.2d 660, 664 (7th Cir. 1976). This is because state courts are fora of general jurisdiction empowered to hear cases arising under federal or state

law, but federal courts are of limited jurisdiction so may resolve civil disputes only if the plaintiff's claims arise under federal law or are between completely diverse parties.

**Fraudulent Joinder Principles**

As noted *supra*, when a plaintiff moves to remand, the removing defendant has the burden to establish jurisdiction. There has been a substantial body of precedential decisional law developed on this subject, some by the Supreme Court, and some by the circuits. We begin with the former.

– ***Supreme Court Precedent***

The Supreme Court has referenced the fraudulent joinder doctrine on several occasions, and while it has made only limited holdings as to its contours of the doctrine, three are of particular importance here, indeed one practically assures remand without doubt.

**First**, **the court may not question plaintiff's election to *properly* join Gayer.** The Supreme Court has prohibited attempts by removing defendants to alter the structure of the lawsuit as pled by the plaintiff. Generally, "a plaintiff is master of her complaint and thus is permitted to preclude removal in some circumstances." See Monahan, *Defrauding the System: Sham Plantiffs and the Fraudulent Joinder Doctrine*, 110 Mich. L. Rev. 1341, 1349 (2012) (noting that a plaintiff may manipulate the forum that hears his suit and intentionally prevent removal when such is not fraud).

The Supreme Court has said that "a defendant has no right to say that an action shall be several which the plaintiff seeks to make joint …. [I]t cannot deprive a plaintiff of his right to prosecute his suit to final decision in his own way." *Ala. Great S. Ry. Co. v. Thompson*, 200 U.S. 206, 214-15 (1906) (quoting *Powers v. Chesapeake & Ohio Ry. Co.*, 169 U.S. 92, 97 (1898)).

The Court explained that the question of removability must be decided based on the plaintiff's pleadings at the time of removal. *Thompson* at 215. A defendant's showing that liability is several could not alter the case pleaded by the plaintiff. The Court would later explain that "the fact that the defendants might have been sued separately affords no ground for removal," *Pullman Co. v. Jenkins*, 305 U.S. 534, 538 (1939), again giving deference to the plaintiff's decision to pursue defendants jointly.

Accordingly, the court must ignore the entirety of any claim that because plaintiff withdrew a removed petition to fix an attorney's lien, and quickly then sued in state court the instant case with a non-diverse defendant, plaintiff somehow did something wrong, or, if not wrong, that it is evidence of *something*. The only thing it is evidence of is plaintiff's determination that it would like to (1) litigate the case in state court; (2) avoid removal; and (3) seek recovery out of other pockets (Gayer's) against which to obtain a judgment. Its motive may not be questioned.

It is crucial that this be scrupulously observed. The question before the court, and as Ghedini would have the court improperly view it, runs to the filing of a lawsuit. To belabor the point, it runs to the filing of an initiating document invoking the authority of a court. That in this case the court is confronted with a summons with notice instead of a summons with a complaint is immaterial.

The initiation of a lawsuit is petitioning activity protected by both the New York State Constitution and by the United States Constitution, which applies here through Fourteenth Amendment incorporation. It is the ultimate protected form of expression, for at least in the federal constitution petitioning is more protected than speech, as protection afforded speech is

6

applied across a spectrum that includes, commercial speech, less protected than political speech critical of government, the most protected of all, while petitioning is protected equally even if merely for parochial commercial interest.

Pursuant to the *Noerr-Pennington* doctrine, the commencement of litigation may not be subject to any sanction or penalty whatsoever unless it is an utter sham. In particular, the motive of the attorney (or pro se plaintiff) in filing the complaint may never be questioned or examined as to good faith, bad faith, or no faith, unless and until the court – if it has been properly tasked to do so at all – has first concluded to a constitutional, clear-and-convincing standard of certainty, that the litigation commenced is so utterly devoid of possible merit that it is, again, a pure sham. Only then may the motive of the plaintiff or counsel acting in plaintiff's behalf be considered.

To be sure, even if the motive for the filing is in absolute, pure bad faith, nevertheless, if the suit is not a sham, then that motive may not be examined, lest doing so produce the chilling effect that every plaintiff or plaintiff's counsel may expect to be examined as to his subjective good faith, in contravention of *Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995).

Whether the New York State Constitution provides even greater protection to a plaintiff commencing suit need not be addressed here, since New York cases applying *Noerr-Pennington* routinely cite to the federal constitution. See *I.G. Second Generation Partners, L.P. v. Reade*, 17 A.D.3d 206 (1st Dep't 2005); *Singh v. Sukhram*, 56 A.D.3d 187 (2d Dep't 2008).

**Second, the Supreme Court holds that Ghedini has the burden of proving fraudulent joinder.** That is, no matter how the lower court cases may cite each other, the source for this allocation of burden is binding Supreme Court precedent. *See, e.g., Pullman Co. v.*

*Jenkins*, 305 U.S. 534, 541 (1939) (remanding the case upon finding that the removing defendant did not satisfy this burden).

**Third, the Supreme Court prohibits this court, while deciding remand, from conducting any inquiry into any cause for plaintiff's discharge, and requires it to presume that plaintiff is entitled to a fee.** In *Chesapeake & Ohio Railway Co. v. Cockrell*, 232 U.S. 146, 149-54 (1914), an estate administrator brought suit in state court against a diverse railway company and its non-diverse employees after a train struck and killed the decedent. The railway argued that its employees were not negligent and therefore had been fraudulently joined. The Court explained that the liability of the railway company depended on the liability of its two employees; therefore, the railway's claim that its employees were not negligent was no different than saying that the plaintiff 's case was "ill-founded as to all the defendants." The Court held that this argument went to the merits of the *entire* action, not to the joinder of the individual defendants; therefore, a finding of fraudulent joinder was improper.

This has been interpreted as articulating a "common-defense rule," *i.e.*, that a defendant cannot prove fraudulent joinder of individual defendants by raising a "common defense" negating the case against all of them. A "common defense" may indicate the case as a whole has no merit, but does not prove that a particular defendant was fraudulently joined to the case. See, *e.g., Smallwood v. Ill. Cent. R.R. Co*., 385 F.3d 568, 575 (5th Cir. 2004) ("When the only proffered justification for improper joinder is that there is no reasonable basis for predicting recovery against the in-state defendant, and that showing is equally dispositive of all defendants rather than to the in-state defendants alone, the requisite showing has not been made."); *In re New Eng. Mut. Life Ins. Co. Sales Practices Litig.*, 324 F. Supp. 2d 288, 300 (D. Mass. 2004).

("[F]raudulent joinder does not exist when an argument offered to prove the fraudulent joinder of non-diverse defendants simultaneously shows that no case exists against the diverse defendant or defendants. In those circumstances, no legitimate reason exists to label the non-diverse defendants as fraudulently joined.")

The importance of this cannot be overstated. Because plaintiff claims liability against Ghedini for breach of covenant to pay him in *quantum meruit* on discharge, and claims the same monetary liability against Gayer for inducing her breach, then if Ghedini did not (breach because, for example, there *was* cause justifying complete fee forfeiture), Gayer would not be liable because Ghedini would not be liable, so *Cockrell* bars this court from considering in any way whether Ghedini has a defense, inasmuch as any defense would run to Gayer as well, and thus not to the issue of his presence as a supposedly fraudulently joined defendant.

–   ***Second Circuit Precedent***

While the burden of sustaining removal is always on the removing defendant, the circuits apply three dissimilar standards by which courts are to decide whether the defendant has met it. They are, in increasing order of difficulty to the defendant, (1) the no-reasonable-basis standard; (2) the no-reasonable-possibility-of-recovery standard; and (3) the no-possibility-of-recovery standard.

**Ghedini must show that Gayer cannot possibly be liable, given the assumption that she herself is.** Unfortunately for Ghedini, the Second Circuit sits in the third camp, and so she must demonstrate by clear and convincing evidence that there was either outright fraud in plaintiff's pleading of jurisdictional facts about Gayer or that there is no possibility that plaintiff would be able to establish a cause of action against him in state court under the assumption,

9

compelled by *Cockrell*, that she is liable to plaintiff, so "bears a heavy burden of proving fraudulent joinder and all factual and legal issues must be resolved in favor of" plaintiff. *Pampillonia v. RJR Nabisco*, 138 F.3d. 459, 461 (2d Cir. 1998).

And, in this circuit, to the extent that there are properly made evidentiary submissions, which should not be the case here to begin with, the evidentiary burden on defendant is both of production and persuasion, the latter subject to *clear and convincing* standards, with all factual (and legal) ambiguities or contests resolved in favor of plaintiff. See *Bounds v. Pine Belt Mental Health Care Res.*, 593 F.3d 209, 215 (2d Cir. 2010).

The court should not need to look beyond the four corners of plaintiff's pleading. Of course, all this leads to the question, What may the court consider in resolving remand – The face of plaintiff's pleading or perhaps material extrinsic to it? This implicates the problem of the inherent fungibility of jurisdictional and merits facts; for example, and taken to *reductio ad absurdum* to make the point, if a court may only hear cases and controversies, and A invokes the power of the court for remedy for breach of contract against B, and B says there was no contract, if there was no contract there was no breach, thus no controversy, so the court's power was improperly invoked.

Clearly, we do not allow jurisdictional adjudication to swallow the merits, which would be a constitutional usurpation in a removed case. See, e.g., *Am. Tobacco Co.*, 168 F.3d at 411 ("A presumption in favor of remand is necessary because if a federal court reaches the merits of a pending motion in a removed case where subject matter jurisdiction may be lacking it deprives a state court of its right under the Constitution to resolve controversies in its own courts.")

Even without considering constitutional issues, fundamental fairness requires this same wariness to employ jurisdictional fact-finding. See *DeBoer v. South Dakota*, No. Cir. No. 93-4021, 1993 WL 603761, at \*4 (D.S.D. 1993) ("The basis for this rule is 'the inexpediency, if not unfairness, of exposing the plaintiff to the possibility that he will win a final judgment in federal court, only to have it determined [on appeal] that the court lacked jurisdiction'." (quoting 14A Wright, Miller & Cooper, *Federal Practice & Procedure: Jurisdiction* 2D § 3721 at 218 (2d ed. 1992).

**The scope of inquiry is strictly limited to jurisdictional matters.** Fortunately (that is, for plaintiff, but unfortunate for Ghedini), this circuit stands with the Third, Fourth, Seventh, Tenth, and Eleventh in applying the so-called "strictly jurisdictional" standard of adjudication, and eschews the "quasi-12(b)(6)" standard of the other circuits.

This is not to say that the court is prohibited from looking outside the pleading; it is not. It is however very much to say that it must exhaust examination of the pleading first and only if after that it has not been able to decide may it "go extrinsic." See *Whitaker v. AM. Telecasting, Inc.* 261 F.3d 196, 206 (2d. Cir. 2001) (looking first to the complaint to determine fraudulent joinder); *Pampillonia v. RJR Nabisco, Inc*., 138 F.3d 459, 461-62 (2d. Cir. 1998) (looking first to the complaint to determine fraudulent joinder, then to affidavits submitted by the parties).

**Facts pled in the complaint are presumed to be true**. See *Fed. Ins. Co. v. Tyco Int'l Ltd.*, 422 F. Supp.2d 357, 391 (SDNY 2006) ("When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff." (internal citations omitted)).

11

**While "capable of surviving a 12(b)(6) motion to dismiss" is sufficient to compel remand, it is not necessary.** As noted, while some circuits approach the analysis as if deciding a 12(b)(6) motion (which creates a choice-of-law issue, as notice pleading in state court is not always compatible with FRCP 8 and 9 pleading), this isn't one of those circuits. In *DNJ Logistic Group, Inc. v. DHL Express*, 727 F. Supp.2d 160, 164-165 (EDNY 2010), Magistrate Trager stated (erroneously describing the circuit standard as "no reasonable possibility" rather than "no possibility"):

> "[I]f it can be determined that the complaint would likely survive a motion to dismiss in state court, the inquiry ends and remand is appropriate." [*Kuperstein v. Hoffman-Laroche, Inc.*, 457 F. Supp. 2d 467, 471 (SDNY 2006)]. However, even if there is doubt as to whether a complaint would survive a motion to dismiss in state court, this doubt does not preclude remand. To the contrary, given the heavy burden on a party advocating removal on the ground of fraudulent joinder, it is only in the situation where "state case law or legislation removes all reasonable possibility that the plaintiff would be permitted to litigate the claim" that remand should be denied. *Id.*

The Magistrate then went on to address the choice-of-law issue, resolving it in favor of the state standard, whence the case arose (note this time he gets it right and refers to "possibly" rather than "reasonably possibility"):

> [D]etermination of whether a plaintiff may possibly have stated a claim turns on an analysis of the pleadings; however, there is a question as to which pleading standards — New York or federal — should govern. "[C]ourts in this Circuit have referenced both state and federal pleading standards when testing the sufficiency of a plaintiff's pleading" in the fraudulent joinder context. *Id.* at 471 & n. 28 (collecting cases). The more logical choice, though, is to apply state pleading standards, because "the purpose of a fraudulent joinder analysis is to determine whether a *state* court might permit a plaintiff to proceed with his claims...." *Id.* at 471-72.

In this case it is a clear matter of ontological and metaphysical necessity that the proposed complaint be evaluated under state law standards because no such complaint can exist in a federal court. As noted elsewhere herein, for plaintiff to have a summons with notice that

articulates against Gayer only pure state law claims interpreted according to federal pleading standards is nonsensical because the court has no authority to adjudicate such a pleading, and if it stripped out Gayer it would have nothing to evaluate.

To avoid confusion, this may be stated alternatively as follows: In a removed case that is staying removed, it is reasonable to apply federal pleading standards to the operative complaint even though a lesser, state standard might have applied on the initial filing in such court, because the case is in, and will remain in, federal court.

But, where that has not yet been determined, and especially as the presumption is against removal and in favor of remand, the court cannot insist on any particular standard of pleading of state law claims against Gayer when any such claims could never be adjudicated in this court. It would be subjecting plaintiff to a pleading standard before adjudication of jurisdiction which he could never be subject to afterwards, either because the court found no jurisdiction and so never had anything proper to do with the merits or because the court found jurisdiction by fraudulent joinder and so Gayer necessarily was no longer in the case.

Unlike the recent practice of courts in other circuits, use of *Iqbal*[2] standards for determining the "no possibility" is inappropriate, not only because the use of federal standards is inappropriate, but because "not plausibly stating" is not the same as "there is no possibility."

–    **Commencement of Suit by Summons with Notice**

Where, as here, a case was commenced by the filing of a summons with notice, without a complaint, two questions arise: (1) May the summons with notice constitute an initial pleading for determining removal jurisdiction? and (2) May the federal court consider a proposed

---

[2] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

complaint in determining whether claims which could have been brought against the non-diverse

defendant (Gayer) had there been a demand for a complaint, have any possibility of producing

relief?

(It is impossible to compel plaintiff to file a complaint, as plaintiff, for example here, (1)

would be invoking the court's Article III authority, arguably waiving the right to move for

remand; (2) would be invoking its jurisdiction while presumably believing it did not exist, thus

violating FRCP 11 *per se*; and (3) it would be compelled speech [more properly, compelled

petitioning. Thus, the complaint is submitted herewith as a proposed complaint, which the court

may consider as extrinsic evidence.)

In *MBIA Ins. Corp. v. Royal Bank of Canada*, 2009 U.S. Dist. LEXIS 126910 (SDNY

2009), the court, faced with just such question, wrote:

> In *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196 (2d Cir. 2001), the
> Second Circuit held that a summons with notice filed in accordance with New
> York State law "may constitute an initial pleading for purposes of the federal
> removal statute." … [T]he court further explained that [a] case is removable when
> the initial pleading enables the defendant to intelligently ascertain removability
> from the face of such pleading, so that in its petition for removal[, the] defendant
> can make a short and plain statement of the grounds for removal as required [by]
> 28 U.S.C. § 1446(a)." Id. at 205-06 (internal quotation marks and citation
> omitted) (first alteration in original); see also P*inson v. Knoll, Inc.*, No. 07-CV-
> 1739, 2007 WL 1771554, at *2 (S.D.N.Y. June 18, 2007) (explaining that an
> "initial pleading" is defined as "'any pleading (and not necessarily the complaint)
> containing sufficient information to enable the defendant to intelligently ascertain
> the basis for removal'" (quoting *Whitaker*, 261 F.3d at 198)). "A pleading enables
> a defendant to intelligently ascertain removability when it provides the necessary
> facts to support" removal; for diversity cases, the facts required include the
> parties' addresses and the amount in controversy. *Whitaker*, 261 F.3d at 206
> (internal quotation marks omitted).

The *MBIA* court then held that a proposed complaint would be reviewable, if the

summons with notice was inconclusive. Citing *In re Consol. Fen-Phen Cases*, No. 03-C3081,

2003 WL 22682440, at *3 (EDNY 2003), the court stated that when undertaking a fraudulent-

joinder analysis, "courts can look beyond the pleadings to determine if the pleadings can state a

cause of action." See also *Pampillonia v. RJR Nabisco, Inc*., 138 F. 3d 459, 461-62 (2d Cir.

1998) (considering affidavit to decide if i defendant fraudulently joined); *Audi of Smithtown, Inc.*

*v. Volkswagen of Am., Inc*., No. 08-CV-1773, 2009 WL 385541, at *3 (EDNY 2009) ("In

analyzing the fraudulent joinder issue, the court is permitted to look beyond the pleadings to

resolve this jurisdictional question."); *Sherman v. A.J. Pegno Constr. Corp*., 528 F.Supp.2d 320,

327 n. 10 (SDNY 2007) (court permitted to look beyond pleadings to resolve jurisdictional

question of fraudulent joinder).

Accordingly, submitted herewith is plaintiff's proposed complaint, should this court

deem the summons with notice in any respect, in itself, "inconclusive."

Nonetheless, plaintiff notes that if the summons with notice *is* deemed "inconclusive,"

that *should* warrant the immediate remand of the case, for the defendant would be thus, *ipso*

*facto*, unable to meet her "heavy burden" of demonstrating, by clear and convincing evidence,

that this court – had the summons with notice been filed in this court on November 27, 2017

rather than in the state court – would have had jurisdiction on *that* date.

### Ghedini Cannot Establish That Gayer was "Fraudulently Joined" Because There Are Pellucidly Clearly Viable Claims Against Him.

As noted, Ghedini must establish that, assuming, as *Cockrell* holds must be assumed, she

is indeed liable to plaintiff Lerner for wrongfully failing to pay it in *quantum meruit*, there is

absolutely no possibility that Gayer can be liable to plaintiff on the theory that he tortiously

insinuated himself into Ghedini's relationship with plaintiff and then wrongfully induced her to

breach her contract with plaintiff as part of his scheme to defraud her by pretending to have

superior skills to that of plaintiff insofar as ███████████████████████████

████████████████████████████████

She must fail as such a claim has long been recognized by the New York Court of Appeals. In *Lurie v. New Amsterdam Ins. Co.*, 270 N.Y. 379, 1 N.E.2d 472 (1936), plaintiff, an attorney, had been retained, pursuant to a contingency-fee retainer agreement, to sue the owner of a vehicle that had injured his client. The defendant-owner's insurer contacted the plaintiff-client directly and induced him to repudiate the retainer agreement. He did, then settled with the insurer. Lurie then sued, not his client, but *the insurer* in *quantum meruit*, claiming that by inducing his client to breach his obligation to pay in *quantum meruit*, the insurer had liability to him, which liability was equal to that which his client had.

*Lurie*, which remains the law in this state, was most recently cited by Judge Korman as his basis for denying a motion to dismiss. In a decision and order of December 21, 2017 in *Polito v. City of New York*, 15-cv-2301 (EDNY), ECF 71, where plaintiff alleged that municipal defendants pressured her employer, a city contractor, to fire her, defaming her to cause her to be discharged. Judge Korman held that under *Lurie* such allegations are sufficient to withstand dismissal.

Also following *Lurie*, allegations similar to those in the summons with notice herein were held sufficient to withstand a motion to dismiss in *Realuyo v. Diaz*, 2000 U.S. Dist. LEXIS 3686 (SDNY 2000). There, plaintiff attorney Realuyo was retained to represent an individual, Diaz, to recover money from a company for whom he had provided services. According to a complaint that the attorney eventually filed in his own behalf against his former client Diaz and the company, the company had tortiously induced Diaz to discharge him, then settled with Diaz for a

confidential sum. Though the court dismissed the complaint against Diaz because the attorney had failed to plead *quantum meruit*, it granted leave to replead such a claim. But importantly, the court held that the complaint had stated a proper claim of tortious interference with the relationship between the attorney-plaintiff and his former client Diaz.[3]

In this case, plaintiff's claims – in a manner that need only make recovery against Gayer possible, and not needing to satisfy the 12(b)(6) standards of the above cases – that Gayer tortiously insinuated himself into the contractual relationship between Lerner and Ghedini, and wrongfully induced her to discharge Lerner on pretext of cause to take advantage ███████████ ████████████████████████████████████████████████████████████████████████ ████████████

## Conclusion

**In general**. For all the above reasons, plaintiff respectfully asks that this court (1) remand this case back to the Queens County New York Supreme Court for lack of jurisdiction; (2) order Ghedini to pay such costs and expenses, including attorney fees, incurred as a result of the removal;[4] and (3) order such other relief as may be just and proper.

---

[3] Also see *Herron v. State Farm Mutual Ins.*, 56 Cal. 2d 202, (1961), where California's high court surveyed the law on the issue, citing *Lurie* and cases from other states for this principle.

[4] Under 28 U.S.C. § 1447, "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." The reasona- bleness of a defendant's actions no longer is an essential element when determining whether to award fees. See, e.g., *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 971 F.2d 917, 923 (2d Cir. 1992); *Gardner v. Allstate Indem. Co.*, 147 F. Supp. 2d 1257, 1259 (M.D. Ala. 2001). Accordingly, upon granting remand, it is respectfully submitted that the court should impose an award of attorney's fees in favor of the plaintiff, and against defendant Ghedini, who filed the removal notice, as well as against defendant Gayer, who joined in the removal by consenting thereto.

**No waiver**. The proposed complaint contains allegations that Ghedini made inculpatory admissions to co-counsel Frederick M. Oberlander and his legal assistant Dina Lax. Because those admissions run almost entirely to refutation of her claims of cause, and those claims may not in any way be considered in this motion sequence, plaintiff respectfully reserves the right to submit them and other refutations in reply if this court should disagree about the issue preclusion of fee liability or in any event Ghedini or Gayer should submit affidavit that may be countered by those of Oberlander, Lax, or any other person. It is impossible to avoid that insofar as the burdens of persuasion and production are on the respondent and thus cannot be refuted except on reply.

Dated: Queens County, New York
        February 7, 2018

Respectfully submitted,

The Law Office of Richard E. Lerner, P.C.

Richard E. Lerner, through which
plaintiff appears *pro se*
69-46 Harrow Street
Forest Hills, New York 11375
        -and-
122 West 27th Street, 10th Floor
New York, New York 10001
(917) 584-4864
richardlerner@msn.com

Service via ECF

18

Exhibit "1"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Redactions proposed by
defendant Ghedini

-------------------------------------------------------------------X

THE LAW OFFICE OF RICHARD E. LERNER, P.C.,

                         Plaintiff,

Docket No. 18-cv-113

          -against-

JUDI GHEDINI a/k/a JUDITH GHEDINI and
JONAS GAYER,

**Proposed Complaint**
**Jury Trial Demand**

                       Defendant.

-------------------------------------------------------------------X

     Plaintiff, The Law Office of Richard E. Lerner, P.C. ("Lerner"), *pro se* by and through its

principal Richard E. Lerner, Esq., alleges the following:

### Introduction

### As to Defendant Ghedini

    1.     This is a plenary action at law, in *quantum meruit*,[1] seeking money damages for

the non-payment of legal fees for work plaintiff performed for defendant Judi Ghedini under a

contingency-fee engagement. Such fees became due in *quantum meruit* immediately upon

Ghedini's discharge of plaintiff without cause and remain so by her failure to pay for the legal

services plaintiff provided up to the time of that discharge.

### As to Defendant Gayer

    2.     This is a plenary action at law for his (1) tortiously inducing Ghedini to discharge

plaintiff for fabricated cause, part of a scheme to defraud her by ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████, part of his

scheme being the disparagement of plaintiff and the work plaintiff did; and (2) inducing Ghedini

---

[1] Where "plaintiff sought only money damages on the theory of *quantum meruit*, as
compensation for the work performed," the claim is legal. *TY Elec. Corp. v Delmonte*, 101
A.D.3d 1626 (4th Dep't 2012), citing *Hudson View II Assocs. v Gooden*, 222 A.D.2d 163, 167
(1st Dep't 1996).

not to pay plaintiff; and (3) interfering with plaintiff's prospective relations with Ghedini, viz. the expectation that he would remain engaged as her attorney through completion of the matter in all aspects.

### Parties

3.  Plaintiff, The Law Office of Richard E. Lerner, P.C. ("Lerner"), is a duly constituted New York corporation licensed to engage in the practice of law in this state, appearing *pro se* by speaking through Richard E. Lerner, a natural person who is plaintiff's president and is an attorney admitted to the bar of this court.

4.  Defendant Judi Ghedini is a natural person residing in Florida.

5.  Defendant Jonas Gayer is a natural person residing in New York.

### Claims

\-\-  *As to Defendant Ghedini*

6.  From on or about 2013 into 2017, plaintiff represented Ghedini in a litigation, *Ghedini v. Shapolsky*, New York County Index No. 653461/2013, seeking recovery of $500,000, plus interest, which Ghedini, in or about 2007, had lent to one Arthur Shapolsky, a natural person, who had defaulted on his repayments to her.

7.  In or about March 2016, plaintiff won summary judgment for Ghedini, the entire principal of $500,000 plus the entire interest owed. Judgment was subsequently and properly entered in the County Clerk's office on or about October 17, 2016.

8.  By now, as no repayment or accord has occurred, close to $1,000,000 is due.

9.  Ghedini engaged plaintiff on a one-third contingent-fee basis, so, for example only, assuming exactly $930,000 was due today and Shapolsky paid it today in full, plaintiff's

contract with Ghedini for legal services, if it had not been terminated, would have entitled plaintiff to a fee of $310,000 (not counting costs and disbursements).

10.     But, if Shapolsky were to pay $930,000, the $430,000 of interest would be subject to federal alternative minimum tax, creating some $100,000 of tax liability to Ghedini, who would thus net only $520,000 after the legal fees and such tax. There would also be other adverse income tax consequences for her, such as causing her Social Security payments to be 85% taxable.

11.     An accord and satisfaction for less than $930,000, or paid out over several years, would almost surely have similar, if not entirely proportional, adverse tax consequences.

12.     For one thing, in view of the preceding paragraphs, and what she represented to be her financial condition, Ghedini could not accept payment in kind. For example, if Shapolsky were to turn over to her a hypothetical estate  – call it "Whiteacre" – in fee simple, and if Whiteacre were worth $930,000, she would instantly incur that $100,000 tax liability, and the $300,000 legal fee liability, but would have no cash with which to pay either, and no way to fund those payments by any means other than monetization of Whiteacre. Even if plaintiff agreed to take its fee in kind, if appropriate portions of Whiteacre were severable, the tax bill would still be "cash only."

13.     Accordingly, given Shapolsky's sworn denial of possession of any significant amount of cash, but his willingness (asserted through counsel) to arrange payment by means other than purely cash, any workable collection for Ghedini would likely have to be "structured."

14.     During the months after entry of judgment up to the discharge triggering this law suit, plaintiff Lerner duly and diligently attempted to collect on the judgment from Shapolsky.

3

Such collection efforts included investigation of Shapolsky's assets, service of information subpoenas and restraining notices, and orders to show cause, and investigation and analysis of structured means to satisfy the judgment, as well as by satisfaction of the judgment with cash, subject to Ghedini's directives issued from time to time.

15. In mid-2017, after Ghedini at an in-person meeting on or about May 16, 2017, at 2:30 pm, in Palm Beach, Florida ███████████████ (as was personally witnessed by Ms. Dina Lax, Oberlander's assistant) Frederick M. Oberlander, an attorney specializing in tax and financial law who, with her acquiescence, had been co-counsel in the case to plaintiff, ███████

███████████

16. Several days later, at a meeting conducted in the office of Shapolsky's counsel Roberto Cardenas, which meeting was attended by Messrs. Shapolsky, Cardenas, Oberlander and Lerner, Mr. Shapolsky, through counsel and in the presence of all attendees, did offer such a structured settlement, with a present value of $625,000 to $650,000.

17. Ghedini ████████████████████████ even if she was misguided or she suffered from misapprehension. Which she did.

18. One example ████████████████████████

████████████████████████████████

19. Another, more serious example was her ████████████████████

████████████████████████████████

4



20.

21.

22.

23.

24.

25.    And she could not be ███████████████████████████████████████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

26.    Yet while Ghedini maintains that ███████████████████████████

███████████████████████████████████████████████████████████████████
████████████████████████████████████████████

27.    At about the same time she was ████████████████████████

███ soon after the May 16, 2017 meeting, ¶15, Ghedini discharged plaintiff, or began what would result in discharge, notifying plaintiff that she had told Judge Ramos, who presided over *Ghedini v. Shapolsky* matter in New York County, that the discharge had been "for cause," a letter to follow.

28.    Ghedini has, *inter alia*, ████████████████████████████ and eventually decided that "cause" included plaintiff's meeting with Shapolsky and counsel in May 2017 to a discuss the possibility of a structured conclusion, though it took place mere days after

████████████████████████████████████████████

29.    In sum, Ghedini fabricated "cause" where there was none to evade paying plaintiff. Or perhaps she believed (wrongly) that there was "cause" when there was not.

30.    Plaintiff denies the existence of "cause."

6

31. Four things became true upon that discharge: First, as to payment, Ghedini breached the contract whereby she had agreed to pay plaintiff, *inter alia*, one-third of any recovery.

32. Second, per New York law, plaintiff became vested with several cumulative rights, including the right to bring this plenary action in *quantum meruit*.

33. Third, Ghedini, by herself raising and interposing the issue of "cause," took this dispute out of the province of Part 137, eliminating any requirement that plaintiff send her a statement of rights to arbitrate and wait 30 days to see if she'd demand it before commencing suit.[3,]

34. Fourth, Lerner became entitled, pursuant to New York Rule of Professional Conduct 1.6, to reveal confidential information he reasonably believed necessary to defend

---

[3] *Wenig Saltiel, LLP v. Secord*, 2013 N.Y. Slip Op. 23104; 2013 WL 1337266 (App. Term 2nd, 11th and 13th Judicial Districts 2013) (defendant-client sent letter terminating attorney for cause and malpractice and put papers in court asserting there had been misconduct or malpractice, held, attorney properly pled dispute fell into substantial legal question exception Part 137.1(b)(3).

Here, after discharge plaintiff tried without success to have the court which heard the underlying case against Shapolsky resolve the fee issue, filing an Order to Show Cause to that effect and for that relief, which was opposed by Ghedini through new counsel. In her papers, she stated:

As Ghedini, on her own and through her chosen replacement counsel, claims to have discharged plaintiff for cause, the exception to 137 for substantial legal question (misconduct or malpractice) applies and notice of rights to arbitrate is not required.

himself against the claim he was discharged for cause; collect his fee; and ▮▮▮▮▮▮▮

▮▮▮▮▮▮

35. As well, insofar as plaintiff pleads that no fee owed him could be plausibly less than $225,000, let alone less than $50,000, notice of right to arbitrate is further excused.[4]

36. Plaintiff now demands of Ghedini payment in full of such amount as is determined by the trier of fact to be the fair value of its legal services up to and including the date of discharge, plus as all costs and fees reasonably incurred in the prosecution of the *Ghedini v. Shapolsky* action, and other relief the court may hold or the trier of fact may find just and reasonable. Based on plaintiff's reconstructed time sheets and records, and the settlement offer that plaintiff Lerner obtained from Shapolsky, plaintiff asserts that any such amount would have to be at least $225,000.

-- *As to Defendant Gayer*

37. From 1972 to 1982, Gayer was an employee of the federal government, an agent of the Internal Revenue Service, but then left for private practice.

38. Subsequently, Gayer became controller of a Mafia criminal enterprise, cooking the books to mask the fraud, helping evade $10 million in tax, an evasion which then-United States Attorney Andrew Maloney, EDNY, when those involved (but for Gayer) were hit with a

---

[4] See also *Eiseman Levine Lehrhaupt & Kakoyiannis, PC v. Torino Jewelers, Ltd.*, 2007 NY Slip Op 08117; 2007 N.Y. Misc. LEXIS 3146807 (1st Dep't 2007) (Where amount disputed by attorney was over $50,000 and amount disputed by client less than $50,000 but was not uncontroverted fact, Part 137 did not apply. Parties did not agree to arbitrate fee disputes where more than $50,000 was in dispute and as amount is in excess of $50,000, Part 137 did not apply.)

As plaintiff's *ad damnum* more than plausibly demands a fee in *quantum meruit* no less than $225,000, representing approximately one-third of the $625,000 to $650,000 value of the settlement offer procured plus expenses, there can be no doubt that *Eiseman* applies here.

58-count indictment, called "the largest tax-evasion scheme of its kind ever brought in the United States."

39.     Gayer pled guilty on October 10, 1991 in the Eastern District of New York (Docket No. 89-cr-470 before the Honorable Eugene H. Nickerson, USDJ) to a misdemeanor charge, brought without indictment, of submitting false information to the IRS, 26 U.S.C. § 7207, avoiding a felony record and, subsequently, avoiding prison by "flipping," turning on his former clients.

40.     Fortunately for Gayer, this all occurred before enactment of the Mandatory Victims Restitution Act, so it was up to the sound discretion of the sentencing judge whether to order him to pay restitution. (The sentencing judge did not so order restitution by Gayer).

41.     Nevertheless, although he avoided prison, restitution and a felony conviction, still the misdemeanor conviction for defrauding the government was an "act discreditable," a serious crime which by its nature justifies suspension or revocation of a CPA license.

42.     One would think he'd have learned his lesson. And indeed he did. He learned that if caught, he could sell out his clients to avoid prison.

43.     Hence, he again avoided prison when he turned on another client, a madam for whom he again cooked the books, again helping launder $10 million of proceeds, again finding himself on the wrong side of money laundering and, for a change, promoting prostitution. On information and belief (based upon news reports), he was convicted earlier this decade for promoting prostitution and possibly money laundering. (See "Former IRS Worker Jonas Gayer is Money Man in Manhattan Madam Scandal," *New York Daily News*, March 16, 2012 (Ex. A), "Disgraced Accountant Connected to 'Millionaire Madam' Anna Gristina," *DNAinfo*, March 16,

9

2012 (Ex. B), "'Madam' Was Set Up By 'Money-Launderer': Sources," *New York Post*, March 24, 2012) (Ex. C).

44.    In sum Gayer is a serially convicted fraudster, and con man, and that's before considering the last 10 or 15 years of federal and state stock fraud:

45.    Thirty-five years ago in *Securities and Exchange Commission v. Scott*, 565 F.Supp. 1513 (SDNY 1983), a district court upheld the SEC's imposition of a lifetime ban from the securities industry on the CEO of a small insurance company that had floated a minor issue. His offense? He had failed to disclose a then-20 year old fraud conviction in Canada.

46.    Since then, the SEC has been steadfast: repeatedly citing *Scott* for the proposition that failure to disclose a fraud conviction of a principal or otherwise significant officer or control person of an offeror is a material omission under federal securities law.

47.    For example, *In Matter of Hershman*, Admin. Proc. File No. 3-14218, the SEC took action against an outside attorney for Wextrust because he had helped write private placement memoranda for the firm despite knowing that Wextrust had failed to disclose that one of its principals, one Shereshevsky, had been convicted of fraud, writing:

> Sections 17(a)(2) and 17(a)(3) of the Securities Act make it unlawful for any person in the offer or sale of any securities to obtain money or property by means of any material misrepresentations or omissions, or to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon the purchaser…"[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted).

> Proof of scienter is not required to establish violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act. Negligence alone is sufficient. *Aaron v. SEC*, 446 U.S. 680, 697 & 701-02 (1980). Negligence is defined as the failure to exercise reasonable care. Weiss at 19.

**In view of Shereshevsky's central role in managing Wextrust and the positive description of his business and civic accomplishments in Wextrust PPMs, his prior conviction for conspiracy to commit bank fraud in June 2003 was a material fact that Wextrust should have disclosed to investors.** *SEC v. Scott,* 565 F. Supp. 1513, 1527 (S.D.N.Y. 1983) (principal's prior fraud conviction was material information that should have been disclosed to investors).

48.    Other than such facts that are material *per se*, New York's Martin Act looks to federal securities laws for guidance on whether an omitted fact is material. *State v. Rachmani Corp.*, 71 N.Y.2d 718 (1988) ("We believe that the objective test for materiality of an omission as articulated by the Federal courts construing Federal securities laws is equally appropriate in determining liability in this action and, accordingly, we adopt it for that purpose.").

49.    So what are we to make of Ex. D, a May 2014 SEC Form 1-A Offering Statement of BioSculpture Technology, Inc., listing "Jonas Gayer, CPA" as its Treasurer and Director, and going on to extol his prior professional accomplishments, omitting however any mention of how he had hidden $20 million of tax liability, first for the mafia, then for a call-girl ring?

50.    How is this not civil and criminal securities fraud for its failure to mention his conviction for defrauding the IRS (the conviction in *Scott* was 20 years old but still a material fact) and not only omitting his pending sentencing and conviction for the call girl money laundering but overtly lying by stating, "[n]one of our directors or executive officers has, during the past three years … (2) been convicted in any criminal proceeding or subject to any criminal proceeding….?"

51.    How long before those responsible for that offering document, especially outside counsel, decide to bail on this, claiming that they were shocked, shocked, to learn the truth about him?

11

52.     It also appears there was a second material misrepresentations in the SEC filing –
that he is a CPA, for he is not listed in New York's or Florida's online licensing websites as
such.

53.     And, if the media reports of his prostitution-related conviction(s) are correct, then
how is this not a clear violation of what we may assume, pending disclosure, must be an absolute
prohibition in his 2011 to 2013 plea agreement or five-year probation sentence that he would not
commit crime during its tenor or face revocation and trial?

54.     So this paragon of financial probity and virtue managed to insinuate himself into
Ghedini's life – on information and belief having done so long before, ingratiating himself on her
family, especially her father – and then proceed to commit multiple, serial federal and state
felony offenses to defraud her of the money she could expect to receive from Shapolsky.

55.     First (though not necessarily speaking chronologically, for plaintiff cannot know
the sequence of events at this time),

56.     When

                                he was disparaging plaintiff by

12

57.     But it hardly stopped with that: Incredibly,

58.     Impersonating an IRS agent to defraud someone of money is a felony, 18 U.S.C. § 912. And there is no doubt Gayer perpetrated these deceits on Ghedini to obtain money;

59.     Needless to say, Gayer is not an IRS agent; he has not been in the employ of the IRS since 1982.

60.     At least, that's what he himself represents in his CV in that offering document, ¶49.

61.     Then, Gayer represented to Ghedini that

62.     Thus Gayer, to gain her trust,

63.     One would think that no matter how desperate Ghedini was, she might have found someone to prepare her taxes who had not made a career out of committing tax fraud for his clients and then turning on them to save himself when he's caught.

13

64.     Plaintiff limns that observation because, sadly,

65.     Whether this is indicative of naivete and gullibility on her part

66.     However, Gayer is a long-term acquaintance of Ghedini and her family, so perhaps it is because of this that                                                This is, after all, exactly how Shapolsky got her to lend him $500,000; in her own pleadings in that case she said that she felt that he was for decades a trusted family friend and advisor.

67.     All of this came to light, "coincidentally" right before Ghedini discharged plaintiff, at the meeting on or about May 16, 2017, ¶15, between Ghedini, attorney Oberlander, and his assistant Lax.

68.     By itself that might plausibly have been innocent, but that proved not the case when, days later, on or about May 17-19, 2017, Ghedini forwarded.



69.     Needless to say, no attorney

70.     When Ghedini

reaction was to discharge plaintiff and notify Judge Ramos that plaintiff had been discharged "for cause."

71.     Ghedini has also falsely accused plaintiff of being in collusion with Shapolsky and that discussing settlement with Shapolsky's counsel constituted disloyalty.

15

72.    It is more than clear that

73.    By wrongful means, Gayer caused or induced Ghedini's discharge of plaintiff to protect his scheme, inducing interference with plaintiff's prospective economic advantage in staying on to conclude the representation in all aspects, including not only Gayer's impersonation of an IRS agent but also

74.    Indeed, Gayer (1) knew, intended, or both, that; or (2) was recklessly indifferent to or deliberately put his head in the sand to "ignore," the substantial likelihood that; or (3) was grossly inattentive, or "ordinarily" inattentive, to the foreseeable outcome that, as a proximate result of his actions, that Ghedini would discharge plaintiff without cause.

75.    And, Gayer (1) knew, intended, or both, that; or (2) was recklessly indifferent to or deliberately put his head in the sand to "ignore," the substantial likelihood that; or (3) was grossly inattentive, or "ordinarily" inattentive, to the foreseeable outcome that, as a proximate result of his actions, Ghedini would refuse to pay plaintiff by claiming there was cause when there was not.

16

76.     For the avoidance of ambiguity, Gayer willfully, intentionally, knowingly, recklessly, grossly negligently, or negligently, as the case may be, caused or induced Ghedini's discharge of, and false claims of misconduct against plaintiff and thus her concomitant breach of her obligation to pay plaintiff in *quantum meruit* for reasons including preserving that much more of the money Ghedini would receive for himself and keeping undetected his fraud on her.

77.     Plaintiff demands that Gayer be adjudged jointly and severally liable to plaintiff in such *quantum meruit* amount as may be adjudged in plaintiff's behalf against Ghedini.

### Ad Damnum

Wherefore, plaintiff, The Law Office of Richard E. Lerner, P.C., demands judgment against each of the defendants, jointly and severally, in an amount to be determined by the factfinder, but no less than $225,000, plus interest at a rate of 9% as measured from the date of discharge, and costs and disbursements incurred in the prosecution of defendant Judi Ghedini's lawsuit against Arthur Shapolsky.

Dated: February 5, 2017
       Queens, New York

                    The Law Office of Richard E. Lerner, P.C.

                    _____
                    By Richard E. Lerner
                    69-46 Harrow Street
                    Forest Hills, New York 11375

                            -and-

                    122 West 27th Street, 10th Floor
                    New York, New York 10001
                    917.584.4864  Tel.
                    347.824.2006  Fax.
                    richardlerner@msn.com

Exhibit "A"

Case 1:18-cv-00113-ENV-RLM   Document 14   Filed 02/07/18   Page 39 of 104 PageID #: 339

# Former IRS worker Jonas Gayer is money man in Manhattan madam scandal

BY MELISSA GRACE     JOANNA MOLLOY     TRACY CONNOR

NEW YORK DAILY NEWS     Friday, March 16, 2012, 3:09 PM



Sources say Jonas Gayer is the money man behind Gristina's upper East Side brothel. (SAM COSTANZA/NEW YORK DAILY NEWS)

The secrecy-shrouded money man in the Manhattan madam case is an art-loving former IRS accountant once convicted in a tax-evasion scheme, sources told the Daily News.

Jonas Gayer, 68, has made at least 10 appearances since being indicted in 2010, under the name John Doe, on charges of money laundering and promoting prostitution, sources say.

Gayer denies any connection to the sex-for-sale case but appears to be cooperating and may be able to answer a key question: Where is the $10 million that prosecutors say accused madam Anna Gristina made?

"That's completely crazy," he told the Daily News at the door of his Beekman Place apartment recently.

He admitted knowing Gristina — who counts him among her Twitter pals — but pleaded ignorance about everything else.

"I have no dealings with her business," he said.

The business was an elite call-girl operation servicing rich and powerful johns from an upper East Side condo, prosecutors

PAID CONTENT BY COMPARISONS.ORG



**New York Residents In Heavy Credit Card Debt Are In For Big Surprise**

Gristina and her alleged aide, Jaynie Mae Baker — who is a Facebook friend of Gayer — have been indicted on charges of promoting prostitution.

By using this site after 5/2/18, you agree to our updated Privacy Policy and Central Terms of Service. Please click here for more information.



Sources say Jonas Gayer is the money man behind Gristina's upper East Side brothel. (JEFFERSON SIEGEL FOR NEW YORK DAILY NEWS)

Two other women, Catherine DeVries and Mhairiangela Bottone, have been charged with prostituting themselves at the E. 78th St. condo on July 27, court records show.

An online profile under Bottone's name describes her as a Brit who was "living it up" in New York while attending college on a student visa.

She described her interests as "my male model toy boy, graphic artwork and design, my hot girlfriends, live music, the hamptons."

The owner of a Manhattan interior design firm said Bottone was an intern at her shop for "a super-short time" and didn't know much about her.

Both Bottone, 30, and DeVries, 31, pleaded not guilty and may be cooperating with prosecutors to build a case against

When Gayer was busted in 2010, he was charged with money laundering and promoting prostitution between June 2003 and June 2008.



Sources say Jonas Gayer is the money man behind Gristina's upper East Side brothel. (MARC A. HERMANN FOR NEW YORK DAILY NEWS)

Gayer, who was born in Russia and raised in Poland and Belgium, was indicted in 1989 in a $10 million tax evasion scheme by a Brooklyn trucking company.

He pleaded guilty to a misdemeanor count of lying to the feds and was sentenced to probation in 1992.

An online bio shows Gayer worked for the Internal Revenue Service from 1972 to 1982, then joined a private accounting firm before going into business for himself in 1990.

He has a home on Shelter Island, where he indulges his "lifelong passion" of painting.

He claims to have worked on the books of "many prominent New York businesses and clients." A 2000 gossip column item had him out on the town with Jocelyn Wildenstein, an art-world socialite infamous for her extreme plastic surgery.

With John Marzulli, John Doyle and Jacqueline McGhie

## Sign up for BREAKING NEWS Emails

Case 1:18-cv-00115-ENV-RLM   Document 12-4   Filed 02/07/18   Page 42 of 104 PageID #: 342

Enter your email

Sign Up

privacy policy

Exhibit "B"

Case 1:18-cv-00213-ENV-RLM Document 14 Filed 02/07/18 Page 44 of 104 PageID #: 344

DNAinfo has closed.
Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)

MANHATTAN (//WWW.DNAINFO.COM/NEW-YORK/MANHATTAN) · Courts (//www.dnainfo.com/new-york/topics/courts)
Crime & Mayhem (//www.dnainfo.com/new-york/topics/crime-mayhem)

# Disgraced Accountant Connected to 'Millionaire Madam' Anna Gristina

By DNAinfo Staff on March 16, 2012 11:27am | *Updated on March 16, 2012 1:24pm*

  



Jonas Gayer, who is accused of working with "Millionaire Madam" Anna Gristina.

Case 1:18-cv-00213-ENV-RLM   Document 1a   Filed 02/07/18   Page 45 of 104 PageID #: 345

**By Murray Weiss, Shayna Jacobs and Adam Nichols**                                    www.jonasgayer.com

DNAinfo has closed.

**DNAinfo Staff** Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)

MANHATTAN — A disgraced accountant and former IRS agent has been accused of helping "Millionaire Madam" Anna Gristina (http://www.dnainfo.com/people/anna-gristina), DNAinfo has learned.

Jonas Gayer (http://www.dnainfo.com/people/jonas-gayer), 67, was arrested in 2010 and charged with promoting prostitution and money laundering, but his case has been shrouded in secrecy. Court papers identify him only as "John Doe."

His last court appearance was on Feb. 22, the same day Gristina was arrested (http://www.dnainfo.com/20120305/upper-east-side/millionaire-madam-arrested-five-year-public-corruption-investigation).

Gayer's involvement with alleged madam Gristina and her co-defendant, Jaynie Mae Baker (http://www.dnainfo.com/people/jaynie-mae-baker), was one of the main reasons the Manhattan District Attorney's office launched a five-year investigation into the vice ring that was allegedly operated out of East 78th Street, sources said.

His name had surfaced five years ago as a close confidant of Gristina when another prostitute began informing on Gristina after she was arrested in an unrelated criminal case.

His arrest followed months of undercover investigation that included his phones being wiretapped for as many as four years, sources added.

The balding, bespectacled man brought attention to Gristina's alleged operation when investigators watching him noticed he was a regular fixture in her social calendar, attending dinner parties with Gristina and wealthy businessmen and executives.

In 1989, Gayer was controller for a company called J-Ro Trucking Corporation, which was owned and operated by Albert M. Goldstein, who was exposed as one of the city's most infamous tax cheats.

At the time, Goldstein's company had a fleet of 60 trucks and was the sole distributor for Key Foods. Goldstein, Gayer, and three others were arrested and hit by a 58-count indictment for running a massive $10 million federal tax fraud case.

"This is believed to be the largest evasion-of-payment scheme of its kind ever brought in the United States," said Andrew J. Maloney, the former US Attorney in Brooklyn.

Gayer, who had worked as a revenue agent with the IRS from 1972 until 1982, "cooked" the books to mask the fraud, sources said. He pleaded guilty, but didn't serve any jail time.

Sources said on Thursday that the scammers laundered much of the $10 million by creating shell companies, which Gayer was involved in, and by betting on horses, where one of the suspects lived out his degenerate gambling fantasies.

When Gayer was grabbed by federal agents outside his Forest Hills home, he began screaming for his wife, one of the agents told DNAinfo, yelling "Eva! Eva! Eva!"

Gristina was arrested on Feb. 22 and charged with one count of promoting prostitution. Her alleged accomplice, Baker, turned herself in to authorities on Tuesday after spending nearly three weeks on the lam. She claimed she had been on vacation in Mexico.

Baker was also charged with promoting prostitution. She was released on $100,000 bail (http://www.dnainfo.com/20120313/manhattan/millionaire-madams-alleged-partner-court) while Gristina, a mother of four from upstate Monroe, N.Y., is being held in Rikers Island jail on $2 million bail.

Case 1:18-cv-00213-ENV-RLM Document 1-1 Filed 02/07/18 Page 46 of 104 PageID #: 346

Gayer, contacted at his Beekman Place home Friday, denied knowing Gristina or being involved in the case.

DNAinfo has closed.

He also denied knowing Baker, and after being confronted further, said he (https://assets.dnainfo.com/news-page.html) with a restaurant account he had worked on.

Calls to Gayer's lawyer were not immediately returned.

# 503 Service Temporarily Unavailable

   

---

✏️ **Recommended**

PROSPECT HEIGHTS » (HTTPS://WWW.DNAINFO.COM/NEW-YORK/BROOKLYN/CROWN-HEIGHTS-PROSPECT-HEIGHTS-PROSPECT-LEFFERTS-GARDENS)
**'Affordable' Apartments End Up on StreetEasy After Housing Lottery Flops** (https://www.dnainfo.com/new-york/20171102/prospect-heights/vacant-affordable-units-pacific-park-atlantic-yards)

UPPER WEST SIDE » (HTTPS://WWW.DNAINFO.COM/NEW-YORK/MANHATTAN/UPPER-WEST-SIDE-MORNINGSIDE-HEIGHTS)
**What You Need to Know Before Sending Your Child to a Dual Language Program** (https://www.dnainfo.com/new-york/20141117/upper-west-side/what-you-need-know-before-sending-your-child-dual-language-program)

MIDTOWN » (HTTPS://WWW.DNAINFO.COM/NEW-YORK/MANHATTAN/MIDTOWN-THEATER-DISTRICT)
**Here Are Free Tax Help Resources in New York City** (https://www.dnainfo.com/new-york/20160327/midtown/here-are-free-tax-help-resources-new-york-city)

FOREST HILLS » (HTTPS://WWW.DNAINFO.COM/NEW-YORK/QUEENS/FOREST-HILLS-REGO-PARK-JAMAICA)
**2-Bedroom Apartments at Luxury Forest Hills Condo Surge to $1M** (https://www.dnainfo.com/new-york/20150109/forest-hills/2-bedroom-apartments-at-luxury-forest-hills-condo-surge-1m)



(https://www.dnainfo.com/new-york/20150109/forest-hills/2-bedroom-apartments-at-luxury-forest-hills-condo-surge-1m)

---

 NEW YORK

(https://www.dnainfo.com/new-york)

DNAinfo is New York's leading neighborhood news source. We deliver up-to-the-minute reports on entertainment, education, politics, crime, sports, and dining. Our award-winning journalists find the stories - big or small - that matter most to New Yorkers.

Terms of Use (/www.dnainfo.com/new-york/about-us/terms)

Privacy Policy (//www.dnainfo.com/new-york/about-us/privacy-policy)

Copyright © 2009-2018, DNAinfo.

All Rights Reserved.

**DNAinfo has closed.**

Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)

**NEWS**   **FEATURES**   **DNAinfo**   **FOLLOW US**

Arts & Entertainment (//www.dnainfo.com/new-york/topics/arts-and-entertainment)

Crime & Mayhem (//www.dnainfo.com/new-york/topics/crime-mayhem)

Education (//www.dnainfo.com/new-york/topics/education)

Food & Drink (//www.dnainfo.com/new-york/topics/food-drink)

Health & Wellness (//www.dnainfo.com/new-york/topics/health-wellness)

Parenting & Schools (//www.dnainfo.com/new-york/topics/parenting-schools)

Politics (//www.dnainfo.com/new-york/topics/politics)

Real Estate (//www.dnainfo.com/new-york/topics/real-estate)

Transportation (//www.dnainfo.com/new-york/topics/transportation)

Urban Animals (//www.dnainfo.com/new-york/topics/urban-animals)

Weather (//www.dnainfo.com/new-york/topics/weather)

Terms of Use (//www.dnainfo.com/new-york/about-us/terms)

Privacy Policy (//www.dnainfo.com/new-york/about-us/privacy-policy)

Copyright © 2009-2018, DNAinfo.

All Rights Reserved.

Exhibit "C"

Case 1:18-cv-00113-ENV-RLM Document 14 Filed 02/07/18 Page 49 of 104 PageID #: 349

METRO

# 'Madam' was set up by 'money-launderer': sources

By Laura Italiano

March 24, 2012 | 4:00am



Anna Gristina set up by tax man.

AP

Case 1:18-cv-00113-ENV-RLM  Document 14  Filed 02/07/18  Page 50 of 104 PageID #: 350

Her trusted tax man turned out to be a traitor.

Anna Gristina's longtime accountant, accused money-launderer Jonas Gayer, cooperated against her as a confidential informant — then helped set her up for arrest outside the office of a Morgan Stanley investment banker, sources told The Post.

The Russian-born Gayer, 67, lured the accused Upper East Side madam to the Feb. 22 meeting with the promise of an investment infusion from a mystery multimillionaire.

The money was earmarked for a legitimate high-end "sugar-daddy" matchmaking service Gristina was starting, sources said.

Gayer and his big-bucks buddy were slated to sit down with Gristina and Morgan Stanley investment man David Walker to map out a business plan.

But "Gayer and the other guy never showed up," one source said.

Instead, investigators with the Manhattan District Attorney's Office arrested Gristina as she left the aborted meeting.

Gayer — who was arrested in March 2010 and is charged with money laundering and promoting prostitution — has been cooperating with prosecutors under the name "John Doe."

Records show he has business ties to Gristina going back at least a decade, and sources said the two were longtime friends.

Walker was not arrested or charged. He is on administrative leave from Morgan Stanley while the case continues.

Gristina's lawyer disputed that Gayer was used as a ruse, noting that the DA could have arrested her at her own home and didn't need to lure her out.

"The meeting was for an absolutely legitimate reason, a matchmaking business which did not in anyway involve prostitution," said lawyer Gary Greenwald.

"It is my understanding that Mr. Gayer was bringing in an investor because Anna had no money to invest," he said. "There was no need to lure her to this location since she was generally in Monroe, home taking care of her children, one of whom is only nine."

"It is quite obvious that, if they had allowed this meeting to proceed, it would have been apparent that Anna had no money and needed an investor to help start her legitimate business," Greenwald said.

The lawyer also said his client is close to putting together a package to post the $2 million bond that could spring her from Rikers Island as early as next week.

"She's anxious to get home to her family," said co-counsel Joanna Greenwald. "She wants to get back to the structure and routine of being a loving mom to her children."

Also yesterday, sources said a woman claiming to have worked for Gristina as an escort went to law enforcement in 2004 — after a bitter dispute with the alleged madam — and revealed that an NYPD police sergeant's wife was working as an assitant to Gristina. The lawman and his wife were friends of Gristina's, sources said.

After the revelation, the woman stopped working for Gristina. Her husband remained on the police force.

Recommended by

Exhibit "D"



14005327

OFFERING CIRCULAR

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

Received SEC

MAY 06 2014

Washington, DC 20549

# FORM 1-A

REGULATION A OFFERING STATEMENT

UNDER THE SECURITIES ACT OF 1933

# BioSculpture Technology, Inc.

**Commission File Number: 0001606799**

*Delaware*

UNITED STATES:

BioSculpture Technology, Inc.

C/O: Alternative Securities Markets Group

9107 Wilshire Blvd.

Suite 450

Beverly Hills, California 90210

Phone: (213) 407-4386

3845– Electromedical and Electrotherapeutic Apparatus      45-266608

(Primary Standard Industrial                              (I.R.S. Employer Identification Number)
Classification Code Number)

## PART I - NOTIFICATION UNDER REGULATION A

**Item 1.    Significant Parties**

**(a) (b)   Directors and Officers.**

| Name and Address | Position(s) Held |
|---|---|
| Mr. Robert L. Cucin, MD JD | President & Chief Executive Officer, Chairman |
| BioSculpture Technology, Inc, 1701 South Flagler Drive, Suite 607, West Palm Beach, Florida 33401 | |
| Ms. Deborah Salerno | CFO, Director |
| BioSculpture Technology, Inc, 1701 South Flagler Drive, Suite 607, West Palm Beach, Florida 33401 | |
| Mr. Jonas Gayer CPA | Treasurer, Director |
| BioSculpture Technology, Inc, 1701 South Flagler Drive, Suite 607, West Palm Beach, Florida 33401 | |
| Ms. Julia Cucin | Secretary, Director |
| BioSculpture Technology, Inc, 1701 South Flagler Drive, Suite 607, West Palm Beach, Florida 33401 | |
| Mr. Ralph Prosceno | Director, N.E. Sales Manager |
| BioSculpture Technology, Inc, 1701 South Flagler Drive, Suite 607, West Palm Beach, Florida 33401 | |

None of our directors or executive officers has, during the past three years, (1) had any bankruptcy petition filed by or against any business of which such person was a general partner or executive officer either at the time of the bankruptcy or within three years prior to that time; (2) been convicted in a criminal proceeding or subject to a pending criminal proceeding; (3) been subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining, barring, suspending or otherwise limiting his involvement in any type of business, securities, futures, commodities or banking activities; or (4) been found by a court of competent jurisdiction (in a civil action), the SEC or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated.

There are no arrangements or understandings between any two or more of our directors or executive officers. There is no arrangement or understanding between any of our directors or executive officers and any other person pursuant to which any director or officer was or is to be selected as a director or officer, and there is no arrangement, plan or understanding as to whether non-management shareholders will exercise their voting rights to continue to elect the current board of directors. There are also no arrangements, agreements or understandings between non-management shareholders that may directly or indirectly participate in or influence the management of our affairs.

**(c) General Partners of the Issuer    N/A**

**(d) (e) Recorded and Beneficial owners of 5 percent or more of any class of the issuer's equity securities.**

2

The following provides the names and addresses of each of the BioSculpture Technology, Inc., Inc. affiliates who own 5% or more of any class of our preferred or common stock:

| Name and Address of Record Owner | Shares of Voting Stock of Record Owned | Percentage of Total Voting of Record Owned |
|---|---|---|
| Dr. Robert L. Cucin | Preferred | 0% |
| (1) (2) | Common | 90% |

   (1)  Dr. Robert Cucin is the Founder, President and Chief Executive Officer of BioSculpture Technology, Inc.
   (2)  Address: BioSculpture Technology, Inc, 1701 South Flagler Drive, Suite 607, West Palm Beach, Florida 33401

**(f) Promoters of the issuer**

BioSculpture Technology, Inc.
1701 South Flagler Drive
Suite 607
West Palm Beach, Florida 33401
Phone: (561) 651-7816
http://www.BioSculptureTechnology.com

Alternative Securities Markets Group
9107 Wilshire Blvd.
Suite 450
Beverly Hills, California 90210
Phone: (213) 407-4386
http://www.AlternativeSecuritiesMarket.com

**g) Affiliates of the issuer.**  None

**(h)  Counsel for Issuer and Underwriters.**

Mr. Simon Taylor, Esq.
777 South Flagler Drive
Suite 800 West Tower
West Palm Beach, Florida 33401
Phone: (415) 601-1415

At this time of this filing there is no underwriter(s) in connection with this offering.

**(i) through (m)**   None

**Item 2.  Application of Rule 262.**

No persons identified in response to Item 1 are subject to any of the disqualification provisions as set forth in Rule 262.

**Item 3. Affiliate Sales.**

None of the proposed offering involves the resale of securities by affiliates of the issuer. The issuer has not had a net income from operations of the character in which the issuer intends to engage for at least one of its last two fiscal years. The Company has spent expenditures in excess of revenues the past two years developing its' products and marketing plans.

**Item 4.  Jurisdictions in which Securities are to be offered.**

The Securities to be offered in connection with this proposed offering shall not be offered by underwriters, dealers or salespersons.

The Securities in this proposed offering shall be offered in the following jurisdictions (but not limited to), subject to qualification in each State.

Although the Company is not using a selling agent or finder in connection with this Offering, it will use a website as an online portal and information management tool in connection with the Offering. The Website is owned and operated by Alternative Securities Markets Group, a California Stock Corporation, an equity partner of the Company, can be viewed at http://www.AlternativeSecuritiesMarket.com.

This Offering Circular will be furnished to prospective Investors upon their request via electronic PDF format and will be available for viewing and download 24 hours per day, 7 days per week on the website.

In order to subscribe to purchase the Units, a prospective Investor must complete, sign and deliver the executed Subscription Agreement, Investor Questionnaire and Form W-9 to BioSculpture Technology, Inc. and wire or mail funds for its subscription amount in accordance with the instructions included in the Subscription Package.

The Investing Section of the Website Hosting this Offering will be coded to only allow access to invest to those prospective Investors that reside in jurisdictions where the Offering is registered and meet any State-Specific Investor Suitability Standards.

**Item 5.  Unregistered Securities Issued or Sold Within One Year.**

An option pool of 872,688 shares, equal to the size of 15% of the common outstanding after conversion of the bond holders principal and interest from the Company's Convertible Note Offering of 2010 was authorized as the Stock Issue / Stock Option Plan of 2011. Options for 643,000 Shares (10.7% of current float) have been issued this far and options remain for the remaining 243,731 shares in the pool. The current option awards, the nature of the option, and its vesting are tabulated below.

| Option Holders* | Grant | Shares | % Float | Vesting | Exercise Price | Type | Class |
|---|---|---|---|---|---|---|---|
| Robert Cucin | 11/16/2011 | 174,000 | 2.9% | 11/16/2012 | $2.18 | Installment | NSO |
| Jack Meskunas | 11/16/2011 | 116,000 | 1.9% | 11/16/2012 | $2.18 | Installment | NSO |
| Jonas Gayer | 11/16/2011 | 58,000 | 1.0% | 11/16/2012 | $2.18 | Installment | NSO |
| Peter Ciriscioli | 11/16/2011 | 58,000 | 1.0% | 11/16/2012 | $2.18 | Installment | NSO |
| Ralph Prosceno | 11/16/2011 | 58,000 | 1.0% | 11/16/2012 | $2.18 | Installment | NSO |
| Debbie Salerno | 11/16/2011 | 58,000 | 1.0% | 11/16/2013 | $2.18 | Installment | NSO |
| Simon Taylor | 11/16/2011 | 58,000 | 1.0% | 11/16/2014 | $2.18 | Installment | NSO |
| Dick Yules | 11/16/2011 | 58,000 | 1.0% | 11/16/2014 | $2.18 | Installment | NSO |
| Tom Guy | 09/20/2013 | 5,000 | 0.1% | 09/20/2018 | $2.18 | Installment | NSO |

(*) Granted under BioSculpture Technology, Inc's 2011 Stock Option / Stock Issue Plan

**Item 6.  Other Present or Proposed Offerings.**

In May of 2014, the Company issued a Regulation "S" Securities Offering to Non-Citizens of the United States for 2,083,333 Shares of the Company's Common Stock at a sales price of $2.40 per share. The Company believes this Common Stock Offering will be closed and fully capitalized prior to this Securities Registration Statement being deemed effective.

4

**Item 7.  Marketing Arrangements.**

There are no marketing arrangements with respects to this offering. The Offering is on a "Best Efforts" basis and is being offered directly by the Company through its Officers and Directors.  There are no plans to stabilize the market for the securities to be offered.  The Company will be selling these Securities directly, and no underwriter or dealer is responsible for the distribution of this offering.

**Item 8.  Relationship with Issuer of Experts Named in Offering Statement.**  None.

**Item 9.  Use of a Solicitation of Interest Document.**  None used.

**REMAINDER OF PAGE LEFT BLANK INTENTIONALLY**

# BioSculpture Technology, Inc.

**Corporate:**

**BioSculpture Technology, Inc.**

**1701 South Flagler Drive, Suite 607**

**West Palm Beach, Florida 33401**

http://www.BioSculptureTechnology.com

**Phone: (561) 651-7816**


**Offering / Investors:**

**BioSculpture Technology, Inc.**

**C/O: Alternative Securities Markets Group**

**9107 Wilshire Blvd., Suite 450**

**Beverly Hills, California 90210**

http://www.AlternativeSecuritiesMarket.com

**(213) 407-4386**


**Best Efforts Offering of *2,083,333* Shares of Common Stock**

**Common Stock Shares having a market value of up to**

**$5,000,000**


**Offering Price per Common Stock Unit:**

**Units 1 – 2,083,333 = $5,000,000 USD**


See: Details of the Offering


Maximum Offering: 2,083,333 Common Stock Units

**6**

Investing in the Company's Common Stock Units involves risks, and you should not invest unless you can afford to lose your entire investment. See "Risk Factors" beginning on **page 10.**

We are offering a maximum of 2,083,333 Common Stock Units (the "Securities"). **The proposed sale will begin upon receipt of qualification from the SEC.** The offering will begin on the effective date and continue until the Company has sold all of the Securities offered hereby or on such earlier date as the Company may close or terminate the Offering. The Securities offered hereby are offered on a "best efforts" basis.

**There is, at this time, no public market for the Securities.**

**THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE SECURITIES AND EXCHANGE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES BEING OFFERED ARE EXEMPT FROM REGISTRATION. THE SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING CIRCULAR OR OTHER SELLING LITERATURE.**

**THE SECURITIES OFFERED HEREBY ARE HIGHLY SPECULATIVE, AND AN INVESTMENT IN SECURITIES INVOLVES A HIGH DEGREE OF RISK AND IMMEDIATE AND SUBSTANTIAL DILUTION FROM THE OFFERING PRICE. SEE "RISK FACTORS" AND "DILUTION."**

**THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR APPLICABLE STATE SECURITIES LAWS, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THESE LAWS. THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE REGULATORY AUTHORITY NOR HAS THE COMMISSION OR ANY STATE REGULATORY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

## UNITS 1 – 2,083,333

|  | Number of Securities Offered (1) | Offering Price | Selling Commissions (2) | Proceeds to Company |
|---|---|---|---|---|
| **Per Security** | ―― | $2.40 | $0.00 | $2.40 |
| **Total Minimum** | 1 | $2.40 | $0.00 | $2.40 |
| **Total Maximum** | 2,083,333 | $5,000.00 | $0.00 | $5,000,000 |

1) We are offering a maximum of 2,083,333 Common Stock Units at the price indicated. See "Terms of the Offering."
(2) We do not intend to use a placement agent or broker for this Offering.

**THIS OFFERING CIRCULAR CONTAINS ALL OF THE REPRESENTATIONS BY THE COMPANY CONCERNING THIS OFFERING, AND NO PERSON SHALL MAKE DIFFERENT OR BROADER STATEMENTS THAN THOSE CONTAINED HEREIN. INVESTORS ARE CAUTIONED NOT TO RELY UPON ANY INFORMATION NOT EXPRESSLY SET FORTH IN THIS OFFERING CIRCULAR.**

This Offering Circular, together with Financial Statements and other Attachments, consists of a total of **50** pages.

7

## The date of this Offering Circular is May 1st, 2014.

INVESTMENT IN SMALL BUSINESSES INVOLVES A HIGH DEGREE OF RISK, AND INVESTORS SHOULD NOT INVEST ANY FUNDS IN THIS OFFERING UNLESS THEY CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT. IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUERER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THE OFFER MADE BY THIS OFFERING CIRCULAR, NOR HAS ANY PERSON BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION OTHER THAN THOSE CONTAINED IN THIS OFFERING CIRCULAR, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON. THIS OFFERING CIRCULAR DOES NOT CONSTITUTE AN OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICIATION WOULD BE UNLAWFUL OR ANY PERSON TO WHO IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICIATION. NEITHER THE DELIVERY OF THIS OFFERING CIRCULAR NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE AS HAS BEEN NO CHANGE IN THE AFFAIRS OF OUR COMPANY SINCE THE DATE HEREOF.

THIS OFFERING CIRCULAR MAY NOT BE REPRODUCED IN WHOLE OR IN PART. THE USE OF THIS OFFERING CIRCULAR FOR ANY PURPOSE OHER THAN AN INVESTMENT IN SECURITIES DESCRIBED HEREIN IS NOT AUTHORIZED AND IS PROHIBITED.

THIS OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION, OR MODIFICATION BY THE COMPANY AT ANY TIME AND WITHOUT NOTICE. THE COMPANY RESERVES THE RIGHT IN ITS SOLE DISCRETION TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART NOTWITHSTANDING TENDER OF PAYMENT OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE NUMBER OF SECURITIES SUBSCRIBED FOR BY SUCH INVESTOR.

THE OFFERING PRICE OF THE SECURITIES IN WHICH THIS OFFERING CIRCULAR RELATES HAS BEEN DETERMINED BY THE COMPANY AND DOES NOT NECESSARILY BEAR ANY SPECIFIC RELATION TO THE ASSETS, BOOK VALUE OR POTENTIAL EARNINGS OF THE COMPANY OR ANY OTHER RECOGNIZED CRITERIA OF VALUE.

### NASAA UNIFORM LEGEND:

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY THE FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

### FOR FLORIDA RESIDENTS ONLY:

EACH FLORIDA RESIDENT WHO SUBSCRIBES FOR THE PURCHASE OF UNITS HEREIN HAS THE RIGHT, PURSUANT TO SECTION 517.061(11) (A) (5) OF THE FLORIDA SECURITIES ACT, TO WITHDRAW HIS

8

SUBSCRIPTION FOR THE PURCHASE AND RECEIVE A FULL REFUND OF ALL MONIES PAID WITHIN THREE (3) BUSINESS DAYS AFTER THE EXECUTION OF THE SUBSCRIPTION AGREEMENT OR PAYMENT FOR THE PURCHASE HAS BEEN MADE, WHICHEVER, IS LATER. WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A LETTER OR TELEFAX TO THE COMPANY AT THE ADDRESS SET FORTH IN THIS OFFERING CIRCULAR INDICATING HIS/HER INTENTION TO WITHDRAWAL.

SUCH LETTER OR TELEFAX SHOULD BE SET AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY. IT IS ADVISABLE TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME IT WAS MAILED. IF THE REQUEST IS MADE ORALLY, IN PERSON OR BY TELEPHONE TO AN OFFICER OF THE COMPANY, A WRITTEN CONFIRMATION THAT THE REQUEST HAS BEEN RECEIVED SHOULD BE REQUESTED.

THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER 517.061 OF THE FLORIDA SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA.

FOR NEW YORK RESIDENTS:

THIS OFFERING CIRCULAR HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS PRIVATE OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

FOR ALL RESIDENTS OF ALL STATES:

THE UNITS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF CERTAIN STATES AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE INTERESTS ARE SUBJECT IN VARIOUS STATES TO RESTRICTION ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE OFFERING CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

## PART II — OFFERING CIRCULAR

### ITEM 3.  SUMMARY INFORMATION, RISK FACTORS AND DILUTION

*Investing in the Company's Securities is very risky.  You should be able to bear a complete loss of your investment.  You should carefully consider the following factors, including those listed in this Securities Offering.*

#### *Medical Technology and Device Industry Risks*

The Medical Technology and Device Industry investments are subject to varying degrees of risk.  The yields available from equity investments in Medical Technology and Device Industry Companies depends on the amount of income earned and capital appreciation generated by the company as well as the expenses incurred in connection therewith.  If any of the Company's products or assets does not generate income sufficient to meet operating expenses, the Company's Common Stock value could adversely be affected.  Income from, and the value of, the Company's Products and Assets may be adversely affected by the general economic climate, the General Medical Technology and Device Market Conditions such as oversupply of related products or a reduction in demand for Medical Technology and Device products in the areas in which the Company's Products and Assets are located, competition from other Medical Technology and Device Companies, and the Company's ability to provide adequate Medical Technology and Device Products.  Revenues from the Company's Products and Assets are also affected by such factors such as the costs of product production and operations, as well as global and national market conditions.

Because Medical Technology and Device Industry investments are relatively illiquid, the Company's ability to vary its asset portfolio promptly in response to economic or other conditions is limited.  The relative illiquidity of its holdings could impede the Company's ability to respond to adverse changes in the performance of its Products and Assets.  No assurance can be given that the fair market value of the Products Produced or Assets Acquired by the Company will not decrease in the future.  Investors have no right to withdrawal their equity commitment or require the Company to repurchase their respective Common Stock interests and the transferability of the Common Stock Units is limited.  Accordingly, investors should be prepared to hold their investment interest until the Company is dissolved and its assets are liquidated.

#### *Regulatory Approvals*

The medical device industry is a highly regulated industry.  Approval of our current and future products require FDA inspection of our facilities and FDA clearance for sale of new products and their indications.  This involves expense with no guarantee such approval or indication for sale will be granted.  Sale in European Community requires CE for medical device sales and other countries have similar agencies from which approval must be sought.  These approvals require the assistance of paid consultants and certain testing which result in additional expenses.

#### *Building Manufacturing Capacity and Certification*

In order to commercialize our products in volume, we need to either build additional internal manufacturing capacity or contract with one or more manufacturing partners, or both. Our technology and the manufacturing process for our products is highly complex, involving a larger number of unique parts, and we may encounter unexpected difficulties in manufacturing our products. There is no assurance that we will be able to continue manufacturing our products. There is no assurance that we will be able to continue to build manufacturing partners, or both, to meet the volume and quality requirements necessary to be successful in the market. Manufacturing and product quality issues may arise as we increase the scale of our production. If our products do not consistently meet our customers' performance expectations, our reputation may be harmed, and we may be unable to generate sufficient revenue to become profitable. Any delay or inability in establishing or expanding our manufacturing capacity could diminish our ability to develop or sell our products, which could result in lost revenue and seriously harm our business, financial condition and results of operation.

We rely on other companies for the manufacture of devices, components and sub-assemblies. We may not be able to successfully scale the manufacturing process necessary to build and test multiple products on a full commercial basis, in which event our business would be materially harmed.

Our Products are complex and involve a large number of unique components, many of which require precision manufacturing. The nature of the products requires customized components that are currently available from a limited number of sources, and in some cases, sole or single sources. If we are unable to secure a sufficient supply of these product components, we will be unable

to manufacture and sell our products in a timely fashion or in sufficient quantities or under acceptable terms. Additionally, for those components that are currently purchased from a sole or single source supplier, we have not yet arranged for alternative suppliers. It might be difficult to find alternative suppliers in a timely manner and on terms acceptable to us.

For international sales it is imperative that BioSculpture Technology, Inc. obtain CE certification as the device regulatory agencies of many companies require that in addition to their own or U.S. FDA approval for sale. Although the Company has employed independent testers and consultants to assure its products, manufacturing methods, tests and procedures are inconformity with ISO 9001, ISO 13485 and other applicable guidelines for such certification, the Company has not yet obtained CE for Airbrush® Liposculptor II and it must obtain such certification for any future products as well to facilitate international sales. This may lead to additional costs and delays before international sales are realized.

### *Customer Base Acceptance*

The Airbrush® Liposculptor II is a Twin Cannula Assisted Liposuction ("TCAL") device that offers particular advantage in the removal of fat from significantly overweight and obese patients. Therefore the typical purchasing surgeon is a board certified plastic surgeon, cosmetic surgeon, otolaryngologist or gynecologist who performs liposuction surgeries in volumes larger than 1,500 to 3,000 gm. (3.3 to 6.6 lbs) per session and does so in suitability inspected and accredited facilities.

While the Company believes it can further develop the existing customer base, and develop a new and broader base through the development and marketing of Airbrush® IIE, an electrical large volume TCAL device, and Airbrush® III which targets the dermatologists and cosmetic surgeons performing small volume liposuctions in less well-equipped offices and spas, the inability of the Company to further develop such a customer base could have a material adverse effect on the Company. Although the Company believes that its product matrix offers advantages over competitive companies and products and will promote its products and methods in a coordinated internet and conventional, trade and lay advertising campaign, no assurance can be given that BioSculpture Technology, Inc's products will attain a degree of market acceptance on a sustained basis or that it will generate revenues sufficient for sustained profitable operations.

### *Competition*

Competition in the Power Assisted Liposuction Market ("PAL") exists from vibrating short stroke single cannula devices such as MicroAire's PAL2000 which currently markets for $14,000 and has captured 2/3 of the market for PAL. Byron Medical (having been acquired by Mentor, now part of the Ethicon Division of Johnson and Johnson) as a non-exclusive license of the earliest patent of Rocin Laboratory, Inc.'s Liposuction portfolio to which the Company now has an exclusive, paid-up, royalty-free, perpetual license, captured 25% of the market with its ARC®II reciprocating device and its now expired license. Our Airbrush® Liposculptor III to be marketed for $9,000 because of it low COGS directly targets the same PAL market as the MicroAire device in particular as it offerings a cheaper device with less vibration because of the stationary barb to which the vacuum tubing is attached. It is highly unlikely that MicroAire will relinquish its market share of the liposuction market willingly but we believe our better design and lower cost of goods will allow us to compete successfully.

Competition also exists from LASER-Assisted Liposuction ("LAL") devices and Ultrasound-Assisted Liposuction devices ("UAL") which market in the range of $100,000 and $40,000 respectively. Both melt the fat, expose the patient to the risk of burns, and require manual or PAL devices to remove the dissolved fat. A recent entry of unproven merit Water-Assisted Liposuction ("WAL") has garnered a few proponents and markets for $60,000.

There are also transcutaneous microwave, LASER and ultrasound devices that may offer limited spot improvements of fatty deposits over multi-visit treatments of select, suitably motivated patients. However, in spite of their overhyped promotions, these non-invasive devices are not appropriate for the two-thirds of the population requiring the more significant and dramatic changes to their bodies that only surgery can provide. Effective or not, there will always be some appeal for the public to try a non-invasive treatment first before resorting to surgery.

If and when we enter the bariatric market with our EVL™ device, it is likely Allergan's Lap-Band® will be our principal competitor. They have an established, albeit declining market share but it is unlikely they will relinquish it without aggressive advertising and promotion. In addition there are brand loyalty and vested interests. We believe our patented procedure and device which does not involve leaving behind a foreign body and the ability for retreatment to avoid a weight loss plateau can confer a substantial market advantage for us and overcome these potential obstacles. There is however no assurance that this will be the case.

Where there does exist some current competition, Management believes that BioSculpture Technology, Inc's products are technologically-advanced, well positioned, top quality, and unique in nature and the advantages they provide. There are currently no other TCAL products on the market and Airbrush® IIE offers an improved electromechanical entry for this large volume sector. However market acceptance cannot be assured. The expertise of Management combined with the innovative nature of its

marketing approach, and the potential strength of its brands set the Company apart from its competitors. However, there is the possibility that new competitors could seize upon BioSculpture Technology, Inc's business model and produce reverse-engineered competing products or services with similar focus in spite of our issued and pending patent, EPO and PCT protection. Although we have multiple pending patent applications for improvements upon it and have obtained patents for its endoscopic use in the removal of visceral fat within the abdomen, twin cannula technology is now off patent for subcutaneous liposuction. New competitors could be better capitalized than BioSculpture Technology, Inc., which could give them a significant advantage. There is the possibility that the competitors could capture market share of BioSculpture Technology, Inc's intended market.

### Our Ability to Succeed Depends on our Ability to Grow our Business and Achieve Profitability

The introduction of new products and services, and expansion of our distribution channels will contribute significantly to our operational results, and we will continue to develop new and innovative ways to manufacture our products and expand our distribution in order to maintain our growth and achieve profitability. Our future operational success and profitability will depend on a number of factors, including, but not limited to:

- Our ability to manage costs;
- The increasing level of competition in the Medical Device and Technology Industry;
- Our ability to continuously offer new and improved products;
- Our ability to maintain efficient, timely and cost-effective production and delivery of our products;
- The efficiency and effectiveness of our sales and marketing efforts in building product and brand awareness;
- Our ability to identify and respond successfully to emerging trends in the Medical Device and Technology Industry;
- The level of consumer acceptance of our products;
- Regulatory compliance costs; and
- General economic conditions and consumer confidence.

We may not be successful in executing our growth strategy, and even if we achieve targeted growth, we may not be able to sustain profitability. Failure to successfully execute any material part of our growth strategy would significantly impair our future growth and our ability to attract and sustain investments in our business.

### Development Stage Business

BioScultpure Technology, Inc. commenced operations in March of 2001 and is organized as a Stock Corporation under the laws of the State of Delaware. Accordingly, the Company has only a limited history upon which an evaluation of its prospects and future performance can be made. The Company's proposed operations are subject to all business risks associated with new enterprises. The likelihood of the Company's success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the expansion of a business, operation in a competitive industry, and the continued development of advertising, promotions and a corresponding customer base. There is a possibility that the Company could sustain losses in the future. There can be no assurances that BioSculpture Technology, Inc. will operate profitably.

### Inadequacy of Funds

Gross offering proceeds of a maximum of $5,000,000 may be realized. Management believes that such proceeds will capitalize and sustain the Company sufficiently to allow for the implementation of the Company's Business Plans. If only a fraction of this Offering is sold, or if certain assumptions contained in Management's business plans prove to be incorrect, the Company may have inadequate funds to fully develop its business.

### Dependence on Management

In the early stages of development the Company's business will be significantly dependent on the Company's management team. The Company's success will be particularly dependent upon the services of Mr. Robert L. Cucin, MD & JD, the Company's Founder, President and Chief Executive Officer.

12

### Risks of Borrowing

Although the Company does not intend to incur any additional debt from the investment commitments provided in this offering, should the company obtain secure bank debt in the future, possible risks could arise. If the Company incurs additional indebtedness, a portion of the Company's cash flow will have to be dedicated to the payment of principal and interest on such new indebtedness. Typical loan agreements also might contain restrictive covenants, which may impair the Company's operating flexibility. Such loan agreements would also provide for default under certain circumstances, such as failure to meet certain financial covenants. A default under a loan agreement could result in the loan becoming immediately due and payable and, if unpaid, a judgment in favor of such lender which would be senior to the rights of members of the Company. A judgment creditor would have the right to foreclose on any of the Company's assets resulting in a material adverse effect on the Company's business, operating results or financial condition.

### Unanticipated Obstacles to Execution of the Business Plan

The Company's business plans may change significantly. Many of the Company's potential business endeavors are capital intensive and may be subject to statutory or regulatory requirements. Management believes that the Company's chosen activities and strategies are achievable in light of current economic and legal conditions with the skills, background, and knowledge of the Company's principals and advisors. Management reserves the right to make significant modifications to the Company's stated strategies depending on future events.

### Management Discretion as to Use of Proceeds

The net proceeds from this Offering will be used for the purposes described under "Use of Proceeds." The Company reserves the right to use the funds obtained from this Offering for other similar purposes not presently contemplated which it deems to be in the best interests of the Company and its Investors in order to address changed circumstances or opportunities. As a result of the foregoing, the success of the Company will be substantially dependent upon the discretion and judgment of Management with respect to application and allocation of the net proceeds of this Offering. Investors for the Units offered hereby will be entrusting their funds to the Company's Management, upon whose judgment and discretion the investors must depend.

### Minimum Amount of Capital to be Raised

The minimum amount of Securities that need to be sold in this offering for the Company to access the investment funds is $250,000. After the Minimum Amount of Capital required to be reached, all Investor funds will be transferred from the Company's Investment Holding Account to the Company. The Company cannot assure you that subscriptions for the entire Offering will be obtained. The Company has the right to terminate this offering of Securities at any time, regardless of the number of Securities that have sold. The Company's ability to meet financial obligations, cash needs, and to achieve objectives, could be adversely affected if the entire offering of Securities is not fully subscribed.

### Management Discretion as to Use of Proceeds

The net proceeds from this Offering will be used for the purposes described under "Use of Proceeds." The Company reserves the right to use the funds obtained from this Offering for other similar purposes not presently contemplated which it deems to be in the best interests of the Company and its Investors in order to address changed circumstances or opportunities. As a result of the foregoing, the success of the Company will be substantially dependent upon the discretion and judgment of Management with respect to application and allocation of the net proceeds of this Offering. Investors for the Units offered hereby will be entrusting their funds to the Company's Management, upon whose judgment and discretion the investors must depend.

### Unanticipated Obstacles to Execution of the Business Plan

The Company's business plans may change significantly. Many of the Company's potential business endeavors are capital intensive and may be subject to statutory or regulatory requirements above and beyond those presently known to or anticipated by management. Management believes that the Company's chosen activities and strategies are achievable in light of current economic and legal conditions with the skills, background, and knowledge of the Company's principals and advisors. Management reserves the right to make significant modifications to the Company's stated strategies depending on future events.

13

### Control by Management

As of April 1st, 2014 the Company's Managers owned approximately 90.4% of the Company's outstanding Common Stock Units and 0% of the Company's Preferred Stock Units. Upon completion of this Offering, The Company's Management will own approximately 55% of the outstanding Common Stock Units of the Company and 0% of the outstanding Preferred Stock Units of the Company. Investors will have the ability to control either a vote of the Company's Managers or any appointed officers. See "COMPANY MANAGERS" section.

### Return of Profits

The Company has never declared or paid any cash dividends on its Common Stock. The Company currently intends to retain future earnings, if any, to finance the expansion of the Company's Operations and Holdings. As a result, the Company does not anticipate paying any cash dividends to its Common Stock Holders for the foreseeable future.

### No Assurances of Protection for Proprietary Rights; Reliance on Trade Secrets

In certain cases, the Company may rely on trade secrets to protect intellectual property, proprietary technology and processes, which the Company has acquired, developed or may develop in the future. There can be no assurances that secrecy obligations will be honored or that others will not independently develop similar or superior products or technology. The protection of intellectual property and/or proprietary technology through claims of trade secret status has been the subject of increasing claims and litigation by various companies both in order to protect proprietary rights as well as for competitive reasons even where proprietary claims are unsubstantiated. The prosecution of proprietary claims or the defense of such claims is costly and uncertain given the uncertainty and rapid development of the principles of law pertaining to this area. The Company, in common with other investment funds, may also be subject to claims by other parties with regard to the use of intellectual property, technology information and data, which may be deemed proprietary to others.

### The Company's Continuing as a Going Concern Depends Upon Financing

If the Company does not raise sufficient working capital and continues to experience pre-operating losses, there will most likely be substantial doubt as to its ability to continue as a going concern. Because the Company has generated no revenue, all expenditures during the development stage have been recorded as pre-operating losses. Revenue operations have not commenced because the Company has not raised the necessary capital.

### Broker - Dealer Sales of Units

The Company's Common Stock Units are not included for trading on any exchange, and there can be no assurances that the Company will ultimately be registered on any exchange. The NASDAQ Stock Market, Inc. has recently enacted certain changes to the entry and maintenance criteria for listing eligibility on the NASDAQ SmallCap Market. The entry standards require at least $4 million in net tangible assets or $750,000 net income in two of the last three years. The proposed entry standards would also require a public float of at least 1 million shares, $5 million value of public float, a minimum bid price of $2.00 per share, at least three market makers, and at least 300 shareholders. The maintenance standards (as opposed to entry standards) require at least $2 million in net tangible assets or $500,000 in net income in two of the last three years, a public float of at least 500,000 shares, a $1 million market value of public float, a minimum bid price of $1.00 per share, at least two market makers, and at least 300 shareholders.

No assurance can be given that the Common Stock Units of the Company will ever qualify for inclusion on the NASDAQ System or any other trading market until such time as the Managing Members deem it necessary. As a result, the Company's Common Stock Units are covered by a Securities and Exchange Commission rule that opposes additional sales practice requirements on broker-dealers who sell such securities to persons other than established customers and qualified investors. For transactions covered by the rule, the broker-dealer must make a special suitability determination for the purchaser and receive the purchaser's written agreement to the transaction prior to the sale. Consequently, the rule may affect the ability of broker-dealers to sell the Company's securities and will also affect the ability of members to sell their units in the secondary market.

### Secondary Market

No application is currently being prepared for the Company's Securities to be admitted to the Official Listing and trading on any regulated market. No application is being prepared to include the Securities to trading on an "Over-the-Counter" or "Open

Market", though the Company intends to submit an S-1 or Form 10 Filing within TWELVE MONTHS of the close of this securities offering. There can be no assurance that a liquid market for the Securities will develop or, if it does develop, that it will continue. If a market does develop, it may not be liquid. Therefore, investors may not be able to sell their Securities easily or at prices that will provide them with yield comparable to similar investments that have a developed secondary market. Illiquidity may have a **severely adverse effect on the market value of the Securities and investors wishing to sell the Securities might therefore suffer losses.**

### Certain Factors Related to Our Common Stock

*Because the Company's Common Stock may be considered a "penny stock," and a shareholder may have difficulty selling shares in the secondary trading market.*

The Company's Common Stock Securities may be subject to certain rules and regulations relating to "penny stock" (generally defined as any equity security that has a price less than $5.00 per share, subject to certain exemptions). Broker-dealers who sell penny stocks are subject to certain "sales practice requirements" for sales in certain nonexempt transactions (i.e., sales to persons other than established customers and institutional "qualified investors"), including requiring delivery of a risk disclosure document relating to the penny stock market and monthly statements disclosing recent price information for the penny stocks held in the account, and certain other restrictions. For as long as the Company's Common Stock is subject to the rules on penny stocks, the market liquidity for such securities could be significantly limited. This lack of liquidity may also make it more difficult for the Company to raise capital in the future through sales of equity in the public or private markets.

*The price of the Company's Common Stock may be volatile, and a shareholder's investment in the Company's Common Stock could suffer a decline in value.*

There could be significant volatility in the volume and market price of the Company's Common Stock, and this volatility may continue in the future. The Company's Common Stock may be listed on the OTCQB, OTCQX, OTCBB, The Bermuda BSX Exchange, the London Stock Exchange's AIM Market, the Canadian TSX Venture Exchange or TMX Exchange, the Irish Stock Exchange, the Frankfurt Stock Exchange and / or the Berlin Stock Exchange, where each has a greater chance for market volatility for securities that trade on these markets as opposed to a national exchange or quotation system. This volatility may be caused by a variety of factors, including the lack of readily available quotations, the absence of consistent administrative supervision of "bid" and "ask" quotations and generally lower trading volume. In addition, factors such as quarterly variations in our operating results, changes in financial estimates by securities analysts or our failure to meet our or their projected financial and operating results, litigation involving us, general trends relating to liposuction and bariatric surgery, the Medical Device and Technology Industry, actions by governmental agencies, national economic and stock market considerations as well as other events and circumstances beyond our control could have a significant impact on the future market price of our Common Stock and the relative volatility of such market price.

### Compliance with Securities Laws

The Company's Securities are being offered for sale in reliance upon certain exemptions from the registration requirements of the Securities Act, applicable Texas Securities Laws, and other applicable state securities laws. If the sale of Securities were to fail to qualify for these exemptions, purchasers may seek rescission of their purchases of Securities. If a number of purchasers were to obtain rescission, we would face significant financial demands, which could adversely affect the Company as a whole, as well as any non-rescinding purchasers.

### Offering Price

The price of the Securities offered has been arbitrarily established by our current Managers, considering such matters as the state of the Company's business development and the general condition of the industry in which it operates. The Offering price bears little relationship to the assets, net worth, or any other objective criteria.

### Lack of Firm Underwriter

The Securities are offered on a "best efforts" basis by the Company Managers, without compensation and on a "best efforts" basis through certain FINRA registered broker-dealers, which enter into Participating Broker-Dealer Agreements with the

Company. Accordingly, there is no assurance that the Company, or any FINRA broker-dealer, will sell the maximum Securities offered or any lesser amount.

### *Projections: Forward Looking Information*

Management has prepared projections regarding anticipated financial performance. The Company's projections are hypothetical and based upon a presumed financial performance of the Company, the addition of a sophisticated and well funded marketing plan, and other factors influencing the business. The projections are based on Management's best estimate of the probable results of operations of the Company and the investments made by management, based on present circumstances, and have not been reviewed by independent accountants and/or auditing counsel. These projections are based on several assumptions, set forth therein, which Management believes are reasonable. Some assumptions, upon which the projections are based, however, invariably will not materialize due the inevitable occurrence of unanticipated events and circumstances beyond Management's control. Therefore, actual results of operations will vary from the projections, and such variances may be material. Assumptions regarding future changes in sales and revenues are necessarily speculative in nature. In addition, projections do not and cannot take into account such factors as general economic conditions, unforeseen regulatory changes, the entry into a market of additional competitors, the terms and conditions of future capitalization, and other risks inherent to the Company's business. While Management believes that the projections accurately reflect possible future results of operations, those results cannot be guaranteed.

**REMAINDER OF PAGE LEFT BLANK INTENTIONALLY**

## ITEM 4.   PLAN OF DISTRIBUTION

A maximum of 2,083,333 Common Stock Units are being offered to the public at $2.40 per Common Stock Unit. A minimum of $250,000 must be invested prior to the Company having access to the Investment Proceeds. A maximum of $5,000,000 will be received from the offering. No Securities are being offered by any selling shareholders. The Company will receive all proceeds from the sale of Securities after the minimum of $250,000 has be reached.

The Offering is on a "Best Efforts" basis and is being offered directly by the Company and its Management.  There are no plans to stabilize the market for the Securities to be offered. Investors can purchase Securities directly from the Company by completing a Subscription Agreement Online at www.AlternativeSecuritiesMarket.com. Securities can be purchased by check, money order, or bank wire transfer. Investors should call the Company for bank wire transfer instructions should they choose that method of payment for Securities.

If an underwriter is selected to assist in this offering, the Company will be required to amend the Form 1-A to include the disclosures required regarding engaging an underwriter to assist in the offering.

Although the Company is not using a selling agent or finder in connection with this Offering, it will use a website as an online portal and information management tool in connection with the Offering. The Website is owned and operated by Alternative Securities Markets Group, a California Stock Corporation), an equity partner of the Company, can be viewed at *http://www.AlternativeSecuritiesMarket.com*.

This Offering Circular will be furnished to prospective Investors upon their request via electronic PDF format and will be available for viewing and download 24 hours per day, 7 days per week on the website.

In order to subscribe to purchase the Securities, a prospective Investor must complete, sign and deliver the executed Subscription Agreement, Investor Questionnaire and Form W-9 to **BioSculpture Technology, Inc.** and either mail or wire funds for its subscription amount in accordance with the instructions included in the Subscription Package.

The Investing Section of the Website Hosting this Offering will be coded to only allow access to invest to those prospective Investors that reside in jurisdictions where the Offering is registered and meet any state-specific Investor suitability standards.

The Company reserves the right to reject any Investor's subscription in whole or in part for any reason. If the Offering terminates or if any prospective Investor's subscription is rejected, all funds received from such Investors will be returned without interest or deduction.

In addition to this Offering Circular, subject to limitations imposed by applicable securities laws, we expect to use additional advertising, sales and other promotional materials in connection with this Offering. These materials may include public advertisements and audio-visual materials, in each case only as authorized by the Company. Although these materials will not contain information in conflict with the information provided by this Offering and will be prepared with a view to presenting a balanced discussion of risk and reward with respect to the Securities, these materials will not give a complete understanding of this Offering, the Company or the Securities and are not to be considered part of this Offering Circular. This Offering is made only by means of this Offering Circular and prospective Investors must read and rely on the information provided in this Offering Circular in connection with their decision to invest in the Securities.

**REMAINDER OF PAGE LEFT BLANK INTENTIONALLY**

## ITEM 5. USE OF PROCEEDS TO ISSUER

The Company seeks to raise maximum gross proceeds of $5,000,000 from the sale of Securities in this Offering.  The Company intends to apply these proceeds substantially as set forth herein, subject only to reallocation by Company Management in the best interests of the Company.

### A.   Sale of Company Common Stock Units

| Category | Maximum Proceeds | Percentage of Total Proceeds | Minimum Proceeds | Percentage of Proceeds |
|---|---|---|---|---|
| Proceeds from Sale of Securities | $5,000,000 | 100% | $250,000 | 5% |

### B.   Offering Expenses

| Category | Maximum Proceeds | Percentage of Total Proceeds | Minimum Proceeds | Percentage of Proceeds |
|---|---|---|---|---|
| Offering Expenses (1) (2) (3). | $250,000 | 5% | $12,500 | 5% |

**Footnotes:**

 (1) Includes estimated memorandum preparation, filing, printing, legal, accounting and other fees and expenses related to the Offering.
 (2) This Offering is being sold by the Managing Members and Directors of the Company.  No compensatory sales fees or related commissions will be paid to such Managing Members.

(3) Units Sold by Approved "Broker Dealers" will receive a commission of 5-10%, and this amount will be added to the "Company's Offering Expense".

REMAINDER OF PAGE LEFT BLANK INTENTIONALLY

## ITEM 6. DESCRIPTION OF BUSINESS

BioSculpture Technology, Inc. (the "Company") was formed on May 18, 2001, as a Delaware Corporation. The Company is in the business of developing, licensing, manufacturing and distributing power assisted liposuction devices and procedures and related medical equipment and technologies.

## OPERATIONS:

The Company addresses the vast liposuction and obesity markets with proprietary medical devices and technologies that have received F.D.A. 510(k) clearance for sale. Its products are fully commercially saleable and the subject of fifteen (15) previously issued and now expired patents. It has three (3) newly allowed patent applications, more than ten (10) pending patent applications, and eight (8) registered and incontestable trademarks to protect pipeline products it plans to bring to market. These include next generation versions of those currently marketed. Liposuction is the most commonly performed elective surgical procedure in the world and the most frequently carried out procedure for obesity. BST's patent-pending technology has dramatic advantages for both patient and doctor that make liposuction less painful and less physically taxing, with better results and shorter convalescence. The highly qualified and experienced physician founder and management team are well equipped to capitalize on these opportunities and build the company toward a rapid exit.

The worldwide liposuction market itself is vast, and the potential scope of application of the large volume liposuction capability of our proprietary and patent-pending technology as an alternative therapy for obesity and associated type II Diabetes mellitus is also enormous. In 2012 ASPS reported 202,000 liposuction procedures, and elective plastic procedures in the U.S. is increased by 5% in 2012 from 2011. The potential market is estimated at $500 million in device sales, and our clinical component taps a $576 million yearly U.S. market in surgical fees for per-(liposuction) procedural consumables and brand-based patient referrals. Europe, South America and Asia each equal or surpass the U.S. market in potential size.

The Company's gentler-by-design technology has a number of substantial advantages for both patient and doctor. In our second generation Airbrush® Liposculptor II twin-cannula system, only the inner cannula, a tube within a tube, moves, eliminating the to-and-fro battering ram trauma of a single unsheathed cannula being shoved many thousands of times into a patient during a single surgery. The Company's design helps reduce patient pain, swelling, bruising, unevenness and waviness, blood loss, and the necessity for repeated procedures and shortens convalescence. For the surgeon, by increasing control and eliminating the surgical drudgery, labor and fatigue of manually stroking a single cannula inside the patient, our second generation Airbrush Liposculpture® System *unleashes the artist in the surgeon®*. By reducing anesthesia time and the necessity of corrective procedures, generally carried out at the surgeon's expense, our system saves the doctor money and pays for itself in the first two years of typical usage.

Airbrush® Liposculptor IIE, already in prototype stage, will be introduced to offer an electrical alternative to pneumatic power and minimize vibration even further with stationary vacuum tubing, utilizing the tube-within-a-tube concept at the back end as well as the front end of the instrument.

Two non-exclusive licenses of the first generation technology have successfully tested the market and brought in approximately $320,000 in royalties. Under one license, NuMed and UAM manufactured a reusable electric, single cannula device. Under a

**19**

second, Byron Medical and Mentor, recently acquired by the Ethicon Division of Johnson and Johnson, manufactured a disposable, air-driven, single cannula device. Those licenses are now expired.

The twin-cannula tissue removal platform has already received pre-market clearance for sale from the FDA under 510(k) #031881 and the company has obtained certificates for export. The Company has opened the Asian market with a pending $1.65 million order from a major Asian distributor for second generation Airbrush® Liposculptor II units, a purchase order the Company anticipates converting to one for the superior Airbrush® Liposculptor IIE units with comparable profitability. Already compliant with ISO 9001/13485 controls in place, and is readied both for inspection to obtain certification for our CE to facilitate further sales to Korea, China, Japan, Europe, and South America and for transition to Airbrush® Liposculptor IIE in those markets. To speed customer readiness to upgrade and regulatory approvals, the company plans to make the Intellimotion® Controller initially backwards compatible with much of the same electronic componentry. Streamlining the manufacturing and the regulatory process, a single Intellimotion® Controller console will be capable of powering and controlling all of our power assisted product offerings.

The Company's twin cannula design and other patent-pending aspects of our technology also confer advantages in potential applications addressing obesity, metabolic syndrome and type II diabetes. Two of these include large volume liposuction and adaptations for laparoscopic removal of the metabolically more harmful visceral fat as potential alternatives to obesity treatments with gastric banding and intestinal bypass.

The company has three (3) newly allowed patents and ten (10) International and U.S. Patent Applications are pending. Eight (8) U.S. registered and incontestable trademarks and strong branding offer a technology and treatment double play as Airbrush Liposculpture® Centers specializing in liposuction surgery using the patent pending method and devices may license the Airbrush® brand and pay BST royalties for patient referral generated through national advertising. Suitably branded Bariatric surgery centers may also be possible given our visceral fat removal procedure patents and the treatment centers may be efficiently combined in a single facility for cost savings and cross sell.

Over $1.3 million has been expended for R&D to acquire significant technologic "know how" for present and future products in our pipeline. Ancillary liposuction surgical devices and consumables, including specialized curved cannulas, bipolar cautery, tumescent cannulas, scroll pump aspirators and pulsed infusers, are in the pipeline. Our multicore quick connect coupler also has other medical device as well as aviation, marine and military applications. BST recently entered into a licensing agreement with Beckman/Colter allowing them to use our connectors in their cell cytometers and related equipment. Airbrush® Liposculptor IIE and EVL™ are scheduled to be introduced in the last quarter of 2014 or the first quarter of 2015. Airbrush® Liposculptor III, scheduled for a launch in the second quarter of 2015, will target small and medium volume liposuction with attractive pricing and profit margin.

**REMAINDER OF PAGE LEFT BLANK INTENTIONALLY**

**BUSINESS PLAN:**

The Company's mission statement is to be the world leading manufacturer of medical devices for the multibillion dollar body sculpturing market in the plastic surgery industry by *Unleashing the Artist in the Surgeon*® and expand its tissue aspiration technology to include devices and methods for entry into the bariatric, fat autograft and stem cell processing markets. The Company was founded by Dr. Robert Cucin, M.D., J.D., a board-certified plastic and reconstructive surgeon who is a Fellow of the American College of Surgeons and the Founder of American Institute of Plastic Surgery, Founder of Rocin Laboratories, Inc. and the Rocin Foundation for Plastic Surgical Research. He is the inventor of the world first single cannula Power Assisted Liposuction (PAL) device based on hands-on clinical experience. This technology was licensed to UAM, NuMed, Byron Medical, and Mentor. His licensee Byron Medical owned 25% of the PAL device market. Byron was acquired by Mentor which was subsequently acquired by the Ethicon Division of Johnson & Johnson. The underlying patent and this license have expired.

PAL technology has since been widely adopted and proliferated to account for approximately 66% of the liposuction device market. Rocin Laboratories possesses extensive patent portfolio on cannula PAL technologies and as patents have expired, pending patents have been filed which migrated to protect the second and third generation of T̲win C̲annula A̲ssisted Liposuction ("TCAL") technology and improvements upon the basic design.

Twenty years ahead of the current reality TV series "Dr. 90210" on plastic surgery of Beverly Hills, Dr. Cucin's syndicated TV show "Keeping Face & Figure" ran for six years as a ground breaking plastic surgical informational series. Dr. Cucin also has Columbia MBA and is an IP Attorney and Registered Research Analyst in the healthcare sector.

An opportunity exists because liposuction is rough on the surgeon as most surgeons find it physically demanding; its strenuous nature induces a tremor precluding subsequent fine surgery. Exertion interferes with surgical excellence. Liposuction is even rougher on the patients as they are swollen and sore for weeks postoperatively. Results compromised by uneven, lumpy, wavy appearance and bruising and discoloration require weeks to resolve. Larger volume liposuction procedures with other devices cause significant blood loss and revisions and touch-ups are common.

The TCAL Target Market is huge. The number of liposuction surgeries increased 200% from 2003 thru 2007 in the U.S. and there were 289,000 liposuction procedures in 2010 in the U.S alone. The liposuction device market is currently estimated to be $500 Million/year in the U.S. with Europe, South America, and Asia each equal or surpassing the U.S. in potential market size. TCAL's unique large volume removal capability represents a significant advantage to expand into The U.S. diabetes market ($200 Billion/year) – One out of every seven dollars on healthcare expense in the U.S. 50 to 60 pounds may be removed under local anesthesia on an outpatient basis in serial liposuctions with TCAL technology in suitable patients in a combined modality procedure involving a non-undermining dermatolipectomy (skin-fat excision) as the last procedure. As single large volume liposuction of 5 liters (11 lbs.) has been shown to convincingly improve metabolic profiles, this degree of targeted weight loss is sufficient to significantly lower blood pressure, improve lipid profile and glucose tolerance. We believe that this is because the fat about the waistline or "rubber tire" is physically closest to the visceral or "belly fat" which drains into the portal circulation and shares certain vascular anastomoses for common drainage. Combined modality therapy using TCAL can effect such weight loss and aggressive reduction of the waist-to-hips ratio in suitable patients in as little as six to eight weeks. This has the potential of becoming an insurance reimbursed procedure.

2/3 is the U.S. population is overweight and a potential candidate for liposuction.  1/3 frankly obese and 43% of the population is forecast to be obese in 10 years.  Liposuction is the most commonly carried out procedure with for a diagnosis of obesity.  TCAL's large volume removal capability is licensed to BST alone and is a treatment-changer "Killer App" as an alternative to GI bariatric surgery.  Liposuction is the most frequent elective procedure carried out in men and the second most frequent carried out in women in the U.S.

What is even more exciting, financially significant, and potentially an even more of a revolutionary treatment than this large volume subcutaneous fat removal is the feasibility of adapting of BST's technology to the direct endoscopic removal of visceral fat or "belly fat", i.e. fat within the abdomen.  Belly fat kills you as it secretes the noxious cytokines (cellular hormones) causing hypertension, type 2 diabetes mellitus, autoimmune diseases and cancer, heart attacks and strokes.  BST has been awarded two U.S. patents for a method and device to accomplish this feat in a minimally invasive procedure and a third patent to allow sampling and processing of the fat thus removed so the most hazardous fat may be targeted for removal.  This is a yearly $1.9 Billion dollar market from which Lap-Band® reported $160 Million in 2013 from a disposable single use kit that sells for $2,500.  We contemplate a similar business model with our EVL™ device and a $1,700 single use consumable that can be sold with an 83% profit margin.  BST's patented procedure does not involve cutting into the bowel as with bypass or restrictive procedures which reducing the size of the stomach ("stapling" or "visceral sleeve") or altering the body's internal intestinal flow as with roux-en-Y bypass procedures.  Nor does it leave behind a foreign body as with Lap-Band®.  These other procedures all are accompanied by significant complications (erosion, infection, fistulas, death, etc.) and life altering sequelae (unavoidable, undesirable consequences) such as diarrhea, fatigue, easy bruising, poor healing, and inability to belch or even eat a normally sized meal in one sitting).  In addition weight loss in any of these other procedures eventually stops or "plateaus."  BST's procedure could also be repeated so there is potentially no limit on the total amount of body fat which would be lost in response to visceral fat removal without any of these sequelae.  It is to be noted that though the animal research to support this treatment is unchallengeable, to date only omental fat has been removed in humans as prior to our twin cannula technology there was no safe, feasible way to remove anything but omental fat.  Omentectomy has been found to improve metabolism in conjunction with Lap-Band® procedures in a large Brazilian study but not convincingly with roux-en-Y in an American one, perhaps because the later has the same mode of action, decrease in ghrelin and neuropeptide-Y secretion or because the omentectomy has to be sufficiently complete.  It is our belief that another and more reason for this is that as surgeons note the obvious fact that omental fat looks different than mesenteric fat (it's more yellow lumpy and less vascularized) and is likely to behave differently physiologically and metabolically as well.  Furthermore a near complete omentectomy is not an altogether benign procedure.  Our fat sampling technology can help ascertain if this is true and help us target the most offending visceral fat.  As body fat is compartmentalized, with only about 15% being visceral, the belief is that, as with other mammals, a small amount of visceral fat removed will result in some significantly larger multiple, seven (7) times or more of body fat being lost and an improved higher energy metabolic state, something we refer to as "unlatching" and "multiplier" effects.  It is our desire and plan to obtain this indication for the use of our devices and ultimately make this claim.  80% of diabetes are obese; diabetes is the leading cause of renal failure leading to dialysis and a frequent cause of blindness.  As 7/10 U.S. healthcare dollars are currently spent on obesity related diseases, any cost-effective, safer therapy that improve the suffering of these 1.9B obese patients about the globe is likely be well received by patients, physicians, governments and insurance companies.  The success of this potential therapy is not only highly significant to the company but to society at large as 2/3 of the U.S. and similar portions in all developed nations are overweight.  Bringing that

therapy to market is the most important, significant and "first money in" earmarked use of funds from this Offering, the existing liposuction market being colloquially described as "low hanging fruit."

Total available physician market in the U.S. for liposuction instruments consists of a total of approximately 24,500 board certified plastic surgeons, otolaryngologists, dermatologists, and 5,500 accredited hospitals, and 1,800 spas. As it was developed for medium and larger volume liposuction procedures in overweight and obese patients, Airbrush® Liposculptor II which is pneumatically powered and Airbrush® Liposculptor IIE which will be introduced as its electric version, are targeted for board-certified plastic surgeons, bariatric surgeons, obstetricians, general surgeons, cosmetic surgeons, accredited operating suites, and hospitals. As it was designed for smaller and medium liposuction procedures in normal to moderately overweight patients, Airbrush® Liposculptor III targets all physicians practicing liposuction in any setting, even a minimally equipped spa. With Europe, South America, and Asia market size each about equal to the U.S., the worldwide market size is quadrupled. Leveraging TCAL's large volume removal capability to tap into the diabetes and obesity markets, the potential market size is many billion dollars.

Airbrush® Liposculptor II and IIE is gentler-by-design than the completion, allows larger volumes to be removed with less effort, more control, less trauma and bleeding, and without the danger of the twin cannulas becoming hot. Curved cannulas and bipolar cautery implementations are possible with price points similar ultrasound devices and lower than LASER alternatives, both of which expose the patient to potential burns by stroking hot "pokers" under the skin. Unlike manual or other power assisted liposuction devices on the market, our implementation of TCAL alone has the safety of magnetic coupling to prevent tissue or surgeon injury.

Airbrush® Liposculptor III targets the small volume liposuction market with integrated fat collection and reinjection consumables. It targets the MicroAire single cannula Power Assisted liposuction market with a simpler, cheaper and more vibration-free device. Generic rather than proprietary suction tubing is affixed to a stationary barb rather than being forced to vibrate with the vibrating cannula, reducing the risk of surgeons' carpal tunnel syndrome or tennis elbow.

Our market model is to offer patent protected products to eliminate surgeon's physical labor to *unleash the artist in the surgeon*® and deliver better results to patients, shorten patient recovery, develop curved cannulas for better body sculpting, and extend usage by licensing into other specialties and the much larger $70 billion medical device market. Our ultimate target is the youth and beauty-conscious baby boomers who are living longer, getting fatter, and spending more money on elective cosmetic surgery procedures.

Airbrush® Liposculptor IIE will replace Airbrush® Liposculptor II targeting larger volume liposuction surgeons and procedures. Our execution strategy is to exploit TCAL large volume removal capability and segment as a Bariatric Surgery alternative offering significant but limited medical improvement to obtain insurance reimbursement until we can have the potentially much more metabolically effective visceral fat removal Bariatric Surgery offering. The company will fast track EVL™ to market to focus on the platform that offers the greatest potential revenue stream. As rapidly as possible we plan to obtain CE for Airbrush® Liposculptor II, IIE and EVL™ to launch worldwide sales. Airbrush® Liposculptor III targets the small and medium volume liposuction device market with lower price points, larger anticipated penetration, and higher profit margin. We will price less than the perceived value premium to penetrate the market and seek ultimate payoff from

23

geometrically-growing consumable residuals ("razor blade" model).  We'll maintain barriers to entry – filing patent continuation s with earlier priority and enforcing our patents.  We'll continue a large R&D budget and employ rapid CAD-CAM prototyping to retain our technical lead and form selective strategic alliances to increase our scale and scope.

BioSculpture Technology, Inc. ("**BST**") will employ recognized industry professionals to design and implement a **COORDINATED MARKETING PROGRAM** geared to create "demand pull" and patient flow.  Sudler and Hennessey ("S&H"), a WPP company with worldwide presence and broad experience in the healthcare sector will orchestrate our campaign.  On August 26, 2013, BST executed an agreement with the Media Funding Group ("MFG") to assure maximal exposure and efficacy of our placements which S&H will schedule and create.  Media Funding Solutions received 5,430 shares of stock as a 15% placement fee for the first $100,000 of advertising (equivalent to $2.81/share) at execution.  MFG will receive 1% of gross revenues up to a maximum of $200,000 until we become fully reporting, public or listed but any cash revenue stream payments it receives be fully credited against any ad placements or placement fees.  In exchange MFS issued us a $2,000,000 media credit for its wide selection of newspaper, glossy magazine, television, radio, internet banner advertising, and bill board advertising inventory.  Discounts will be at or better than the frequency discounts off the media rate cards If and when we use this credit we pay a cash placement fee of 15% and for the advertising itself with common stock (valued at $2.81/share) , with the exception of the first $100,000 of ad placements which is entirely for common stock.  It guarantees BST a prepaid advertising campaign with minimum cash requirements and is an insurance policy against both slow product and stock sales in the first or second year so we can target an aggressive launch budget of approximately 20% of second year (Y2, 2015) revenues pro rata.  Furthermore, exercise of this agreement will be nondilutional to the purchasers of this Offering.

Although our business can move forward with only partial funding on a "boot strap" basis more slowly, properly funded, our launch campaign will be a large scale continuing multimedia event integrating cost-effective internet video, rich and social media with conventional glossy print and regional TV. That program will capitalize on the rifle-barrel marketing efficiencies and academic relationships facilitated by a CEO who is an academically-affiliated and respected plastic surgeon with direct targeted membership and trade show contact. BST will recruit and foster media exposure of prominent podium doctors in select population centers who will conduct training sessions and research.  We will promote the *Cinch It*™ program to exploit the large volume liposuction advantage of our twin-cannula design and use promotional incentives to increase awareness of the *Airbrush*® brand.

We will both exhibit and present at trade show conferences with body sculpting, liposuction, and obesity emphasis – for both those physicians who already perform the procedure and those who are now adding it to their repertoire.  (e.g. **American Society of Plastic Surgeons, American Society of Cosmetic Surgeons, American Society of Bariatric Surgeons, Lipolysis Society, International Society of Cosmetic Gynecology** etc.).  Sudler and Hennessey and our strategic relationship with Media Funding Solutions will allow us to structure and implement a plan aggressively using Press Releases describing the product (e.g. *IPR Wire, Healthy Aging, Cosmetic Surgery Times, Plastic Surgery News*), its safety and effectiveness, release early results from clinical and animal studies, and make extensive use of the internet in targeted direct group membership mailings featuring enriched internet media (video clips, flash media animations, before and after photographs, workshops, etc.).

24

PODIUM DOCTOR & INFLUENTIAL ACADEMICIANS: We will place instruments in the right hands – those of podium doctors in 3-5 already identified centers where the device would be readily accepted, assure viral exposure to other influential surgeons and future surgeons in training, and be used both for treating patients and collecting data. We will support those physicians with publicity and stay in close contact with them to obtain feedback from them, allowing us to tweak and time the introduction of the developed products in our pipeline and release interval clinical experiences.

DIRECT TO THE PUBLIC: We will maintain conventional "Glossy Print" exposure in the "upscale" magazines that target towns, counties or areas that have dozens of ads for plastic surgery and make maximum use of costless news release placements and selected timed advertisements (**Harper's Bazaar, Vogue, Allure, Self, Mademoiselle** in June, September, and December). This exposure will be geared to create a "demand-pull" for the product, patients asking for the procedure and about the device and create a patient flow essential to motivating physicians to make a capital expenditure in a recovering economy by expanding the selection, scope and number of patients they can treat. We'll fully level the internet with promoted landing pages and banner ads, E-mail blasts and follow-ups, and heavy use of the social media.

The key factor to physician adoption is close partnership with prominent podium doctors to establish *Airbrush Liposculpture® Centers* with heavy media exposure and brand prominence in major cities. White papers and clinical studies must flow in a steady stream and advertising must be relentless. Fortunately targeting physicians is much cheaper and easier. Unlike advertising to the lay market, choosing the right physicians to partner with is more a determinant of success than the absolute amount of money spent in reaching the professional audience.

We will Employ "Intel Inside® style" Advertising Incentives to Establish the Airbrush® brand and Promote Sales Purchasing physicians will be enrolled in cooperative advertising programs in which they obtain regional referrals from the web site and from responses to television, radio and fashion magazine advertisements. This "pull" approach has been widely and successfully used by the major pharmaceutical companies and both the LAL and UAL manufacturers to spur sales. Cooperative advertising incentives are highly cost-effective promotional means of increasing brand exposure that worked well for Intel and Microsoft. A 5% promotional incentive rebate on purchase to accredited physicians and those that participate in the *Cinch it*™ program applied towards a physician announcement their practice includes liposuction with the Airbrush® Liposculptor effectively multiples that discount into a media buy 20 times larger.

**BST** will obtain its CE immediately so it can distribute its current FDA cleared twin cannula liposuction platform worldwide and materialize promised Asian sales as well as distribute in South America, the U.K. and Europe. We'll also market our Airbrush® Multicore Quick Connector for its use in robotic, military, aviation, marine, and automotive applications (e.g. Federal CAGE, electrical and pneumatic connector catalogues). Thus far we have entered into a non-exclusive license agreement with Beckman/Colter allowing the use of our multicore connectors in their cell cytometers and related measurement instruments.

RAPID LINE EXPANSION: Introduction of curved cannulas for improved body sculpting and the Airbrush® RadioSurgery Module for bipolar cautery to decrease bleeding and encourage skin contraction, the Airbrush® Liposculptor III and IIE, simpler designs and independence from compressed gas, products adjacent to the core instrument line, including concentrating syringes and inline multi-syringe chambers for fat collection, concentration and activation of adipocyte derived stem cells for-reinjection for wrinkles, disposable cannulas and per-procedure Airbrush® III and IIE actuator consumables, combined scroll pump

25

aspiration pumps and compressors, pressure garments, and vacuum tubing will expand our global markets, deepen our penetration into those markets, and create consumable revenue trains with geometric rather than arithmetic growth.

BST will exploit the advantage of its twin cannula technology in large volume liposuction and capture this one-third and growing frankly obese sector of the population. We will promote the *Cinch It$^{TM}$* Program (combined modality aggressive reduction of the waist-to-hips ratio) to encourage physicians to document results so we may promote the device and method and obtain insurance reimbursement for this faster and safer alternative to bariatric surgery. Currently we are an "on label" cosmetic treatment of obesity and an "off label" metabolic syndrome treatment. Peer-reviewed studies to date strongly suggest anonymized data can be gathered under a class four IRB exemption to allow promotion as a reimbursable "on label" treatment of metabolic syndrome and its associated diabetes, hypertension, and coronary disease.

BST will with continue perfecting its already working prototype of a smaller, simpler, cheaper and more effective single-cannula alternative to UAL, LAL and other single cannula PAL devices. This technology can be expected to obtain FDA clearance for sales under a 510(k); the average approval time for a 510(k) in 2013 was 166 days. As our new entries are substantially equivalent to our own already-cleared device with the same basic controller, we anticipate clearance for sale in that time frame from application or sooner for Airbrush® IIE, EVL™ and Airbrush® III, but nothing can be assured.

Airbrush® Liposculptor III has been designed to improve upon the ARC® II Reciprocating Device offered by Byron and Mentor under their non-exclusive license and to target MicroAire's present small and mid-volume liposuction market and local anesthesia spa-style small and middle volume liposuction facilities spot on. Airbrush® III is simpler, less prone to failure, a more efficient straight-on coaxial rather than a bayonet design, features a stationary barb to which generic rather than proprietary tubing can attach and not vibrate. The only part that might be prone to failure is deliberately made into a single use consumable that will generate a geometrically growing revenue train. This next generation TCAL equipment will widely expand our market as it does not require pressurized gas for use and is suitable for the use in the "shopping mall" and unaccredited spa environment.

A long-stroke twin cannula electrical version of our Airbrush® Liposculptor II is planned to be introduced as Airbrush® Liposculptor IIE to eliminate the need for compressed gas or compressors and widen its market. Many of the mold parts as possible for EVL®, Airbrush® Liposculptor IIE and EVL™ be common and interchangeable to minimize tooling costs and facilitate production. A single Intellimotion® Controller Console will power all devices but Airbrush® III will also be able to function with an adaptor as a simple plug-into-the-wall device without it.

Convenient fat collection and concentration devices that facilitate expedient reinjection without transfer allow the double play of profiting both from the liposuction market and the highly profitable $2B annual U.S. wrinkle treatment market. Given the decreased cost of goods with the use of the patient's own fat rather than other fillers, both BST and the physicians can benefit from increased profit margins both here and abroad.

To create projections we must make certain market assumptions as to costs and milestone achievements that we believe in our best business judgment are likely to prevail. However, given the uncertainties of both the domestic and world markets and unknown production difficulties we may encounter, added to possible regulatory delays, they may or may not prove to be

**26**

accurate. Please see **"RISK FACTORS"** and in particular **"PROJECTIONS: FORWARD LOOKING STATEMENTS"**. Those assumptions are as follows.

We assume a capital injection of at least $10,000,000 ($9,000,000 net) by the end of 2014, a significant portion of to happen in the second quarter, coming in part from this $5,000,000 Regulation A Common Stock offering and a concurrent $5,000,000 from a Regulation S Common Stock offering. As first year's production can only begin after funding, sales would begin at the end of this year subject to a significant cash influx in the second quarter. 2014 earnings are therefore disproportionately affected by delays in funding compared to the subsequent years. List prices for the Airbrush® Liposculptor II will be: $50,000 in 2013, Airbrush® Liposculptor IIE which will replace it in 2014 and debut at $50,000 as will EVL®; Airbrush® Liposculptor IIIE will be marketed at $9,000. Airbrush® II and IIIE Consumables will have a sale price of $100. COGS for Airbrush® Liposculptor II will be approximately $7,406, Airbrush® Liposculptor IIE COGS is estimated at $10,000 but expected to be less. The stand-alone Airbrush® Liposculptor III hand piece COGS is estimated at $1,000 on projections but also expected to be less; and Airbrush® II and IIIE consumables' COGS are both estimated at approximately $30 each.

Sales of the last product batch of Airbrush® II are targeted to begin in October or December. Domestic sales of Airbrush® Liposculptor IIE and EVL® are expected to begin in December 2014 or the first Quarter of 2015. Sales of both Airbrush II and Airbrush IIIE consumables are expected to commence in December 2014 or the First Quarter of 2015. We anticipate obtaining a CE for these additional offerings to allow international sales approximately three months after the commencement of production of each respective device. This should allow us monetize a S. Korean P.O. for Airbrush® II from a major distributor for $1.65M which grew stale in the market downturn with an conversion upsell to Airbrush® IIE, its next generation, improved, electrical successor.

We forecast a conservative 20% growth, a buy/try conversion ratio 31% equivalent to the MicroAire PAL2000, and an international/domestic unit sales ratio of 50% in 2014 growing to 100% in 2017 and beyond as typical of most American device manufacturers.

We conservatively forecast 24 annual liposuctions per surgeon per year. We forecast 6 consumables per liposuction procedure. We envision a combination or independent and salaried representatives but subtract a sales commission of 20% and an additional Cinch It™ Promotional Incentive of 5% (as will be offered only to qualified participating physicians) from every sale; a product liability insurance cost of 5%, and a warranty cost estimated at 2% of gross revenues. Projected income and sales based on those assumptions appear in the following *pro forma* income statements and chart of projected yearly sales.

We assume the likely success of obtaining an FDA 510(k) for substantial equivalence of our Endoscopically Visualized Lipoaspiration EVL™ device to our own predecessors for use in subcutaneous liposuction such as head and neck and abdominal sculpting or "etching." While the device is in use for this indication and generating some revenue we will pursue obtaining the additional indications with a modified or new 510(k) following some "off label" clinicals abroad with or without some additional studies. Although the FDA is generally favorable to expediting approvals of drugs or devices for new procedures and indications offering substantial benefit with less risk than existing ones and management believes this will occur, there is no assurance the FDA will not require a full blown Premarket Approval procedure which takes longer and substantially more costly. Our business plan staging allows us to garner revenue from the device immediately and in the interim with its initial indication and market

27

should we receive less favorable FDA treatment. Other than the specific visceral fat indication discussed above, we anticipate approvals of our 510(k)'s within the 166 day time frame from date of application as was the average in 2013.

**REMAINDER OF PAGE LFT BLANK INTENTIONALLY**

## PROJECTED REVENUES, PREMISED ON A $10M FUNDING BY 12/31/14

| | | | | | | |
|---|---|---|---|---|---|---|
| **Sales:** | | | | | | |
| Airbrush II & IE Units sold (domestic) | 1 | 5 | 75 | 90 | 108 | 130 |
| Airbrush II & IE Units sold (overseas) | 0 | 3 | 49 | 72 | 103 | 130 |
| Total Airbrush II units sold | 1 | 8 | 124 | 162 | 211 | 260 |
| Airbrush II Consumables | 0 | 0 | 17,856 | 23,328 | 30,384 | 37,440 |
| Airbrush III Units sold (domestic) | 0 | 0 | 58 | 138 | 166 | 199 |
| Airbrush III Units sold (overseas) | 0 | 0 | 37 | 110 | 158 | 199 |
| Total Airbrush III units sold | 0 | 0 | 95 | 248 | 324 | 398 |
| Airbrush III Consumables | 0 | 0 | 13,622 | 35,712 | 46,656 | 57,312 |
| EVL Units sold (domestic) | 0 | 7 | 101 | 182 | 328 | 590 |
| EVL Units sold (overseas) | 0 | 4 | 66 | 146 | 312 | 590 |
| Total EVL Units sold | 0 | 11 | 167 | 328 | 640 | 1,180 |
| EVL Consumables | 0 | 252 | 4,252 | 12,114 | 27,464 | 55,784 |
| **Sales Revenue** [a] | $93,700 | $933,077 | $18,956,900 | $53,209,800 | $99,839,480 | $179,890,680 |
| | | | | | | |
| **Cost of Sales:** | | | | | | |
| Beginning Inventory | $56,954 | $48,800 | $13,916 | $372,469 | $757,077 | $1,384,126 |
| Purchases | $0 | $134,425 | $4,890,255 | $9,595,708 | $17,467,249 | $30,818,287 |
| Inventory on hand | $56,954 | $183,225 | $4,904,171 | $9,968,177 | $18,224,326 | $32,202,413 |
| Ending inventory | $48,800 | $13,916 | $372,469 | $757,077 | $1,384,126 | $2,445,753 |
| Cost of Goods Sold (COGS) (LIFO) | $8,154 | $169,309 | $4,531,702 | $9,211,100 | $16,840,200 | $29,756,660 |
| Commissions | $0 | $230,025 | $4,739,225 | $13,302,450 | $24,959,870 | $44,972,670 |
| Inventory & Fulfillment | $1,347 | $9,201 | $189,569 | $532,098 | $998,395 | $1,798,907 |
| Packaging & Documentation | $0 | $1,431 | $18,600 | $24,300 | $31,650 | $39,000 |
| Product Liability | $46,562 | $46,654 | $947,845 | $2,660,490 | $4,991,974 | $8,994,534 |
| Federal Device Excise Tax | $987 | $21,461 | $436,009 | $1,223,825 | $2,296,308 | $4,137,486 |
| Royalty | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Cost of Sales** [b] | $57,050 | $478,081 | $10,862,950 | $26,954,263 | $50,118,397 | $89,699,256 |
| **Gross margin** | $36,649 | $454,996 | $8,093,950 | $26,255,537 | $49,721,083 | $30,191,424 |
| **Operating Expenses:** | | | | | | |
| G&A | $9,271 | $27,992 | $568,707 | $1,596,294 | $2,995,184 | $5,396,720 |
| Legal | $123,392 | $148,070 | $177,684 | $213,221 | $255,865 | $307,038 |
| Payroll | $13,150 | $513,333 | $1,151,000 | $1,410,000 | $1,692,000 | $2,030,400 |
| R&D | $3,348 | $541,177 | $649,412 | $779,294 | $935,153 | $1,122,184 |
| Rent (uncapitalized leases) | $14,574 | $44,574 | $81,000 | $169,200 | $169,200 | $169,200 |
| Travel | $2,421 | $13,996 | $284,354 | $798,147 | $1,497,592 | $2,698,360 |
| Warranty repairs | $0 | $15,552 | $310,000 | $486,000 | $633,000 | $780,000 |
| Employee benefits: | | | | | | |
| Automobile allowances | $0 | $8,400 | $21,600 | $25,920 | $31,104 | $37,325 |
| Executive bonus | $0 | $0 | $0 | $0 | $3,329 | $63,542 |
| Executive education | $0 | $0 | $0 | $0 | $0 | $0 |
| Total employee benefits | $0 | $8,400 | $21,600 | $25,920 | $34,433 | $100,867 |
| Promotional: | | | | | | |
| MFS | $431 | $9,331 | $190,238 | $0 | $0 | $0 |
| Advertising | $51 | $947,845 | $3,791,380 | $10,641,960 | $19,967,896 | $35,978,136 |
| Demo equipment | $0 | $20,000 | $100,000 | $120,000 | $144,000 | $172,800 |
| Investor Relations & Brokerage Fees | $0 | $1,340,000 | $210,000 | $210,000 | $210,000 | $210,000 |
| Seminars & training | $0 | $20,000 | $100,000 | $120,000 | $144,000 | $172,800 |
| Shows | $0 | $20,000 | $100,000 | $120,000 | $144,000 | $172,800 |
| Total promotional | $51 | $2,347,845 | $4,301,380 | $11,211,960 | $20,609,896 | $36,706,536 |
| **Total Operating Expenses** [c] | $166,206 | $3,660,940 | $7,545,136 | $16,690,036 | $28,822,323 | $49,311,305 |
| | | | | | | |
| **Other Income** | $17,881 | $0 | $0 | $0 | $0 | $0 |
| **Net Income before Interest and Taxes (EBITDA)** | ($111,676) | ($3,205,944) | $548,814 | $9,565,501 | $20,898,760 | $40,880,118 |
| Depreciation of Dyes, Tools & Injection Molds | $0 | ($78,220) | ($149,648) | ($185,363) | ($185,363) | ($185,363) |
| Depreciation of Office, Furniture & Fixtures | $0 | ($42,857) | ($64,286) | ($64,286) | ($64,286) | ($64,286) |
| Amortization of Exclusive License | $0 | $0 | $0 | $0 | $0 | $0 |
| **Net Income Before Interest & Taxes (EBIT)** | ($111,676) | ($3,327,021) | $334,880 | $9,315,852 | $20,649,111 | $40,630,470 |
| Less Interest Expense | ($68,412) | ($27,900) | $0 | $0 | $0 | $0 |
| Less Income Tax | ($2,000) | ($3,475) | ($2,000) | ($2,961,609) | ($7,266,807) | ($14,857,223) |
| **Net income** | ($182,088) | ($3,358,395) | $332,880 | $6,354,243 | $13,382,305 | $25,773,247 |

**PROJECTED SALES**

### Yearly Number Sold



**EXIT STRATEGIES**

The term of the Investment detailed in this offering is expected to be at least two years, but no greater than five years, and the final exit of the Company will come through one of the four following methods:

- Become publicly listed:
  - U.S. OTCQB or OTCQX Listing - Summer / Fall 2015
  - Bermuda Stock Exchange Mezzanine Market - Spring / Summer 2015
  - Frankfurt or Berlin Stock Exchange Open Market - Spring / Summer 2015
- Move to a regulated within 24-36 months of Listing
  - U.S. NASDAQ Market - 2016 or 2017
  - Bermuda Stock Exchange Regulated Market - 2016 or 2017
  - Frankfurt Stock Exchange Regulate Market - 2016 or 2017

## C. Summary of Terms

The following is a brief summary of certain terms of the offering described in this offering memorandum. It is not intended to be complete and is qualified by the more detailed information contained elsewhere in this memorandum and in the text of the documents referred to herein.

**Investment Size**

- Target $5,000,000

**Company Structure**

- Private early stage Medical Device and Technology Company.

- Delaware Stock Corporation (Formed June of 2011).

- TWENTY MILLION Shares of Common Stock Authorized, TEN MILLION Shares of Preferred Stock Authorized

- SIX MILLION THIRTEEN THOUSAND THREE HUNDRED EIGHTY-FOUR (6,036,320) Shares of Common Stock Issued and Outstanding at the time of this Registration Statement.

- EIGHT MILLION ONE HUNDRED NINETEEN THOUSAND SIX HUNDRED FIFTY THREE (8,119,653) shares of Common Stock will be issued and Outstanding at the time of the complete capitalization of the current Regulation S Offering.

- TEN MILLION TWO HUNDRED FIVE THOUSAND FOUR HUNDRED AND ONE (10,205,401) shares of Common Stock will be issued and Outstanding at the time of the complete capitalization of this Offering.

- NO CURRENT Shares of Preferred Stock Issued or Outstanding.

**Minimum Equity Commitment**

- One Hundred Common Stock Units.

**Dividend Policy**

- We have never declared or paid cash dividends on our common stock or preferred equity. We currently intend to retain all available funds and future earnings for use in the operation of our business and do not anticipate paying any cash dividends in the foreseeable future. Any future determination to declare dividends will be made at the discretion of our board of directors, and will depend on our financial condition, results of operations, capital requirements, general business conditions and other factors that our Board of Directors may deem relevant.

**31**

### D.  The Offering

The Company is offering a maximum of 2,083,333 Common Stock Units at a price of $2.40 per Common Stock Unit for Units 1 – 2,083,333, with all Units having a par value $0.001.

### E.  Risk Factors

See "RISK FACTORS" section of this Registration for certain factors that could adversely affect an investment in the Securities Offered.  Those factors include, but are not limited to unanticipated obstacles to execution of the Business Plan, General Economic Factors, the Management's Inability to Foresee Exuberant Market Downturns and other unforeseen events.

### F.  Use of Proceeds

Proceeds from the sale of Securities will be used to invest in the growth of the Company's Medical Device and Technology Business Operations.  See "USE OF PROCEEDS" section.

### G.  Minimum Offering Proceeds - Escrow of Subscription Proceeds

The Company has set a minimum offering proceeds figure (the "minimum offering proceeds") for this Offering of $250,000. After the Minimum Offering Proceeds have been reached, all proceeds will be released from the investment account and utilized by the Company. All proceeds from the sale of Units after the Minimum Offering Proceeds has been achieved will be delivered directly to the Company.  See "PLAN OF PLACEMENT" section.

### H.  Common Stock Units

Upon the sale of the maximum number of Common Stock Units from this Offering, the number of issued and outstanding Common Stock Units of the Company's Common stock will be held as follows:

- o   Company Founders&  Current Shareholders            80%
- o   New Shareholders                                   20%

### I.  Company Dividend Policy

The Company has never declared or paid any cash dividends on its common stock. The Company currently intends to retain future earnings, if any, to finance the expansion of the Company. As a result, the Company does not anticipate paying any cash dividends in the foreseeable future to Common Stock Holders.

### J.  Company Share Purchase Warrants

The Company has no outstanding warrants for the purchase of shares of the Company's Common Stock. Additionally, the Company has no outstanding warrants for the purchase of the Company's Stock.

### K. Company Stock Options

An option pool of 872,688 shares, equal to the size of 15% of the common outstanding after conversion of the bond holders principal and interest from the Company's Convertible Note Offering of 2010 was authorized as the Stock Issue / Stock Option Plan of 2011. Options for 643,000 Shares (10.7% of current float) have been issued this far and options remain for the remaining 243,731 shares in the pool. The current option awards, the nature of the option, and its vesting are tabulated below.

| Option Holders* | Grant | Shares | % Float | Vesting | Exercise Price | Type | Class |
|---|---|---|---|---|---|---|---|
| Robert Cucin | 11/16/2011 | 174,000 | 2.9% | 11/16/2012 | $2.18 | Installment | NSO |
| Jack Meskunas | 11/16/2011 | 116,000 | 1.9% | 11/16/2012 | $2.18 | Installment | NSO |
| Jonas Gayer | 11/16/2011 | 58,000 | 1.0% | 11/16/2012 | $2.18 | Installment | NSO |
| Peter Ciriscioli | 11/16/2011 | 58,000 | 1.0% | 11/16/2012 | $2.18 | Installment | NSO |
| Ralph Prosceno | 11/16/2011 | 58,000 | 1.0% | 11/16/2012 | $2.18 | Installment | NSO |
| Debbie Salerno | 11/16/2011 | 58,000 | 1.0% | 11/16/2013 | $2.18 | Installment | NSO |
| Simon Taylor | 11/16/2011 | 58,000 | 1.0% | 11/16/2014 | $2.18 | Installment | NSO |
| Dick Yules | 11/16/2011 | 58,000 | 1.0% | 11/16/2014 | $2.18 | Installment | NSO |
| Tom Guy | 09/20/2013 | 5,000 | 0.1% | 09/20/2018 | $2.18 | Installment | NSO |

(*) Granted under BioSculpture Technology, Inc's 2011 Stock Option / Stock Issue Plan

### L. Company Convertible Securities

The Company has not issued any Convertible Securities.

### M. Stock Option Plan

The Board has adopted a stock option plan in 2011. Under that plan options for 886,731 shares were authorized and to date 701,000 shares have been issued, leaving options for 185,731 authorized but unissued. There are no immediate plans to issue any of those options but the Company reserves the right to issue any or all of those authorized options as needed to attract and motivate suitable personnel as operations are ramped up.

### N. Reporting

The Company will be required to furnish you with quarterly un-audited financial reports and an annual audited financial report through a public listing at www.AlternativeSecuritiesMarket.com. Further, the Company will also voluntarily send you both quarterly un-audited financial reports and an annual audited financial report via electronic mail. After the Filing of SEC Form 10 or an SEC S-1 Registration Statement with the United States Securities and Exchange Commission ("SEC"), the Company will be required to file reports with the SEC under 15(d) of the Securities Act. The reports will be filed electronically. The reports required are forms 10-K, 10-Q and 8-K. You may read copies of any materials the Company files with the SEC at www.AlternativeSecuritiesMarket.com, or at the SEC's Public Reference Room at 100 F Street, N.E., Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet Site that will contain copies of the reports that the Company files electronically. The address for the Internet site is www.sec.gov.

**O.   Stock Transfer Agent**

The Company will serve as its own registrar and transfer agent with respect the Offering.

For the Public Portion of this Offering, the Stock Transfer Agent is:

> ComputerShare
> 250 Royall Street
> Canton, MA (USA) 02021
> Phone (781) 575-2000
> http://cis.computershare.com

**P.   Subscription Period**

The Offering has no date to terminate.

**REMAINDER OF PAGE LEFT BLANK INTENTIONALLY**

## II. TERMS AND CONDITIONS

The following is a summary of the certain principal terms of Stock Ownership in BioSculpture Technology, Inc.

| | |
|---|---|
| **The Company** | BioSculpture Technology, Inc. is a Delaware Stock Corporation. |
| **Investment Objectives** | The Company's objectives are to: |
| | (i) Growth of the Company's Medical Device and Technology |
| | (ii) Maintain a total internal rate of returns of 20%+ per annum. |
| **Company Managers** | Biographies of all Managers can be found starting on Page **33** of this Offering. |
| **Minimum Capital Commitment** | Each investor will be required to make an investment of a minimum of One Hundred Common Stock Units. |
| **The Offering** | The Company is seeking capital commitments of $5,000,000 from Investors. The securities being offered hereby consists of up to 2,083,000 Common Stock Units of the Company, priced at $2.40 per Common Stock Unit for Units 1 to 2,083,333, subject to the Company's discretion to increase the size of the offering. The purchase price for the stock interests is to be paid in cash as called by the Company. |
| **Investment Period** | The investment period will begin upon qualification of this Offering by the United States Securities & Exchange Commission. |
| **Term of the Company** | There is no agreed upon end date of this Offering. Investors can sell their shares back to the Company at current market value, though the Company has no obligation to purchase the Units. Market value shall be determined by the value of each yearly third party valuation of the Company. The Company plans to list the Company's shares on the Bermuda BSX Exchange, the Frankfurt Stock Exchange or Berlin Stock Exchange's Open Market and the United States OTC market in the year 2015 (OTCQB or OTCQX). |
| **Reinvestment** | There may be chances for reinvestment. |
| **Key Event** | The following will constitute a Key Event:<br>• Bankruptcy of the Managing Member<br>• Death or disability to the senior member(s) of BioSculpture Technology, Inc.<br>• Other agreed upon events |
| **Distributions** | The Company has never declared or paid cash dividends on our common stock. We currently intend to retain all available funds and future earnings for use in the operation of our business and do not anticipate paying any cash dividends in the foreseeable future for our Common Stock. Any future determination to declare dividends on our Common Stock will be made at the discretion of our board of directors, and will depend on our financial condition, results of operations, capital requirements, general business conditions and other factors that our board of directors may deem relevant. |
| **Reports to Investors** | The Company's Accounting Firm will furnish to the investors after the close of each fiscal year an annual report containing audited financial statements of the Company prepared in accordance with "Generally Accepted Accounting Principles" (GAAP) and a statement setting forth any distributions to the investors for the fiscal year. The Company will also furnish un-audited quarterly statements to investors. |
| **Valuations** | The Company Managers will, at least once per year, perform an internal valuation of the Company's assets, using accepted valuation techniques, to establish the fair market value of each asset as the end of such year. The fair market value of the assets will be deemed to be the ownership interest in each asset valued at the current capitalization rate for each market. In addition, detailed financial modeling will be performed using |

"current market assumptions" and discounted cash flow analysis.

| | |
|---|---|
| **Indemnification** | The Company will indemnify, defend and hold the Company Managers, the members of the Board of Directors harmless from and against any losses, damages, costs that relate to the operations of the Company, unless the Company Manager(s) acted in an unethical manner related to directing investments. |
| **Listings and Admissions to Trading** | Applications are being prepared and will be made to U.S. OTC Market (OTCQB or OTCQB), the Bermuda Stock Exchange's Mezzanine Market and the Berlin Stock Exchange (though the Company may choose to list on the Frankfurt Stock Exchange instead of the Berlin Stock Exchange) for the Securities to be admitted to the Exchange's Official List and for Trading. Submission for listing is expected in 2015. |

## ITEM 7.  DESCRIPTION OF PROPERTY.

The Company does not own any real estate. The Company currently utilizes administrative office space at 1701 South Flagler Drive, Suite 607, West Palm Beach, Florida 33401 and Research and Development flex space at 1550-4 Latham Road, West Palm Beach, Florida 33409.  The Company currently has no policy with respect to investments or interests in real estate, real estate mortgages or securities of, or interests in, persons primarily engaged in real estate activities.

## ITEM 8. DIRECTORS, EXECUTIVE OFFICERS, AND SIGNIFICANT EMPLOYEES

0.   *Directors and Executive Officers.*

0.   Directors and Executive Officers.  The current directors will serve for one year or until his or her respective successor(s) are elected and qualified.  Dr. Cucin has a 3 year employment contract effective as of the successful raise of this Offering minimum.

| Name | Position |
|---|---|
| *Robert L. Cucin, MD JD* | *Founder, President & Chief Executive Officer, Chairman of the Board* |
| *Deborah Salerno* | *C.F.O., Director* |
| *Jonas Gayer, CPA* | *Treasurer, Director* |
| *Julia Cucin* | *Secretary, Director* |
| *Ralph Prosceno* | *Director, NE Sales Manager* |

**Robert L. Cucin, MD JD MBA**                **Founder, President & Chief Executive Officer, Chairman**

Dr. Cucin is a practicing surgeon in Manhattan and the Palm Beaches affiliated with the Presbyterian – New York and New York University Downtown Hospitals. He received his undergraduate training from Cornell University where he received his B.A. and graduated *magna cum laude* in Chemistry and with distinction in all subjects. He was granted his M.D. from Cornell Medical College and did both his General Surgery and Plastic & Reconstructive Surgery Residences at the New York Hospital – Cornell University Medical Center.  He is a diplomat of the American Board of Surgery, the American Board of Plastic Surgery, and has a teaching appointment at Weill Cornell Medical College.

He received a Juris Doctorate from Fordham Law School and is duly admitted to the New York, New Jersey and D.C. Bars and the American Trial Lawyers Association. His original research has been the subject of numerous contributions to the medical literature and he has published books in the fields of both medicine and law. Dr. Cucin founded the Rocin Foundation for Plastic Surgical Research to support his academic research and employs his combined degrees and experience in heading a Biotechnology Analysis and Advisory Service to assist new and established companies developing and either manufacturing or licensing their biomedical intellectual property and to perform due diligence for investors interested in providing the start-up funds for ventures based upon new technology. Concentrating in finance, Dr. Cucin obtained an M.B.A. from Columbia Business School and is a member of Mensa.

36

Twenty years ago Dr. Cucin set up Rocin Laboratories, Inc. as a Research and Development Company to perfect biomedical dermatologicals and devices. That Company now has an extensive international pending patent portfolio and it is from that portfolio that first Lipotome™ Sales, then the Surgeons Tools Division, and ultimately the separate company BioSculpture Technology, Inc. was funded to concentrate on the further refinement, manufacture and worldwide distribution of the most advanced body contouring and tissue sculpting art of that portfolio.

**Ms. Deborah Salerno**                              **Chief Financial Officer, Director**

Ms. Salerno's has more than thirty years experience in finance and the security industry. In 1980, Ms. Salerno joined Bodkin Securities where she became a Senior Registered Option Principal. She was a licensed registered representative with an NASD Series 4 (registered Option Principal), NASD Series 7 (General Securities Representative), and NASD Series 24 (General Securities Principal) registrations, and was accepted as an Allied Member of the NYSE.

In 1985, Ms. Salerno joined Yves Hentic & Co., as Syndicate Manager, where she syndicated fifteen (15) new issue and secondary offerings and arranged the firm's participation in more than fifty (50) offerings.

In 1987, Ms. Salerno became a partner at Magna Securities, a New-York based broker-dealer. Ms. Salerno helped expand the firm to include two offices in Florida, Boca Raton and Sarasota with the acquisition of Welshire Securities. Following the crash of 1987, focused on a more tailored approach and higher quality standards as an investment banker. She became the principal in a dozen blind pool/blank check offerings. Using knowledge acquired over a decade, she became successful with a dozen offerings underwritten by Westminster Securities Corporation and was finding merger partners for the offerings .

The 1990's provided exciting market opportunities requiring full time attention, and Ms. Salerno accordingly spent the last fourteen years involved in capitalizing on current trends, becoming particularly active in the PIPE (Private Investments in Public Equity) market.

In October 2009, Ms. Salerno joined the banking department of Global Arena Capital, where she provided expertise in the Alternative Public Offerings market, as well as traditional banking.

**Mr. Jonas Gayer**                              **Treasurer, Director**

Mr. Jonas Gayer was educated at Brooklyn College and New York University, earning a BS Degree in Accounting, and an MBA in Economics and Business Administration, and an MBA in Taxation.

Mr. Gayer worked for the Internal Revenue Service in various capacities for ten years (1972-7982) before joining the prestigious CPA firm of Weinick Sander and Company, located in New York City.

In 1990, he established his own firm of Gayer Associates Tax Consulting Company where he has been retained by many prominent New York businesses and Clients. He has been BioSculpture Technology, Inc's Treasurer since its founding in 2001.

**Ms. Julia Cucin**                              **Secretary, Director**

Ms. Julia Cucin was educated at CUNY earning a BA. She worked as a paralegal at several New York Law Firms and as Personal Supervisor at the New York World's Fair.

Ms. Julia Cucin worked with her Husband and Son as Vice President and Chief Financial Officer of Esquire Cadillac Limousine Company from 1965 until its sale to Carey Limousine in 1991. Active in several charities and community functions, she has been corporate secretary since BioSculpture Technology, Inc's founding in 2001

37

*Mr. Ralph Prosceno*                          *Director, N.E. Sales Manager*

Mr. Ralph Prosceno began with three years as a Group President for the Ophthalmology Division of the Squibb Corporation. He then spent two years as National Sales Manager for a Manufacturer of Dental Products.

For the last twenty-five years he has been a Sales Manager and Sales Representative for the McGhan Medical Corporation in Plastic Surgery and Ophthalmology Divisions. From his frequent appearances on the trade shows, physician offices and hospitals, he has a personal relationship with an enormous number of plastic surgeons, particularly those in California and the North East States.

For the last ten years he has manufactured and distributed products for the operating room and plastic surgery profession both domestically and internationally through his own Company, SurgiCare. He is well respected as Marketing Consultant to the medical industry on bringing products to the market and especially in the field of plastic surgery and ophthalmology.

0   *Significant Employees:   All Members of BioSculpture Technology, Inc. as listed above are each considered "Significant Employees", and are each "Executive Officers" of the Company. The Company would be materially adversely affected if it were to lose the services of any member of BioSculpture Technology, Inc. listed above as each he has provided significant leadership and direction to the Company.*

0   *Family Relationships.  Julia Cucin is Dr. Cucin's mother.*

D. *Involvement in Certain Legal Proceedings.* There have been no events under any bankruptcy act, any criminal proceedings and any judgments, injunctions, orders or decrees material to the evaluation of the ability and integrity of any director, executive officer, promoter or control person of Registrant during the past three years.

E. *Legal proceedings.* Other than the isolated trademark Opposition Proceeding discussed below, the Company and its Managers have no lawsuits pending, no legal actions pending or judgments entered against the Company or Managers and, to the best knowledge of the Company, no legal actions are contemplated against the Company and/or its Managers.

BioSculpture Technology applied for the plain text "CINCH IT" trademark (Serial Number: #77506004) to protect and brand "liposuction and surgical body shaping services" performed with its Twin Cannula Assisted Liposuction (TCAL) technology in 6/26/08. Shaklee filed an Opposition proceeding (#91200110) to this registration.

Shaklee owns the senior "CINCH" and the "CINCH COACH" marks which protect a variety of nutritional supplements and diet aids it makes and multiple informational publications. These trademarks are different on their face and are in different fields of goods/

BST withdrew the application and instead filed a new "Cinch It" trademark application (Serial Number #85647811) for the more narrow and specific class of goods and services, International Class 035, "Advertising, promotion, and marketing services in the nature of promotional materials, sales guides, and product instructions for doctors in the field of liposuction surgery."

Shaklee persisted in filing another Opposition to the new application. Although we are confident we could win against this bully in this area glutted with over 250 "CINCH" entries, as we apply for different goods and services and have a two word mark unlikely to be confused with their single word mark, it would be a Pyrrhic victory. We have not spent any money establishing the brand, have nothing to protect, and have no need to register it. We employ the mark exclusively as a shorthand, descriptive label for a combined modality procedure which effectively cinches a patient's beltline by aggressive reduction of the waist-to-hips ratio, something you don't need a registered trademark to do. Rather than waste money in pointless motion practice with a moneyed Opposer for a trademark of marginal value to us when we have already have eight (8) incontestable strong trademarks marks for the marketing our products, BST does not plan to respond to the Opposition and the Application will ultimately be denied.

38

## ITEM 9.  EXECUTIVE COMPENSATION.

*In April of 2014, the Company adopted a compensation program for Company Management. Accordingly, Management of BioSculpture Technology, Inc. will be entitled to receive an annual salary of:*

| | |
|---|---|
| *Mr. Robert Cucin, President & Chief Executive Officer* | *$200,000* |
| *Estimated Annual Bonus when profitable, 1% of net income.* | *$0 in 2014* |
| *Ms. Deborah Salerno, Chief Financial Officer* | *$125,000* |
| *\*Estimated Semiannual Bonus* | *$25,000* |
| *Mr. Ralph Prosceno, N.E. Sales Manager* | *15% Commission on Sales* |
| *\*Estimated Semiannual Bonus* | *$25,000* |
| *Mr. Tim Adler, West Coast Sales Manager* | *15% Commission on Sales* |
| *\*Estimated Semiannual Bonus* | *$25,000* |

**Officer Compensation**

The Company does not currently pay any salaries, bonuses or cash fees to any Officer of the Company beyond those listed above.

**Directors and Advisors Compensation**

The Company does not currently pay any cash fees to any Director or Advisor of the Company or any member or employee of the Company beyond those listed above.

**Remainder of Page Left Blank Intentionally**

**Stock Option Grants**

An option pool of 872,688 shares, equal to the size of 15% of the common outstanding after conversion of the bond holders principal and interest from the Company's Convertible Note Offering of 2010 was authorized as the Stock Issue / Stock Option Plan of 2011. Options for 643,000 Shares (10.7% of current float) have been issued this far and options remain for the remaining 243,731 shares in the pool. The current option awards, the nature of the option and its vesting are tabulated below. NSO means a non-statutory option class.

| Option Holders* | Grant | Shares | % Float | Vesting | Exercise Price | Type | Class |
|---|---|---|---|---|---|---|---|
| Robert Cucin | 11/16/2011 | 174,000 | 2.9% | 11/16/2012 | $2.18 | Installment | NSO |
| Jack Meskunas | 11/16/2011 | 116,000 | 1.9% | 11/16/2012 | $2.18 | Installment | NSO |
| Jonas Gayer | 11/16/2011 | 58,000 | 1.0% | 11/16/2012 | $2.18 | Installment | NSO |
| Peter Ciriscioli | 11/16/2011 | 58,000 | 1.0% | 11/16/2012 | $2.18 | Installment | NSO |
| Ralph Prosceno | 11/16/2011 | 58,000 | 1.0% | 11/16/2012 | $2.18 | Installment | NSO |
| Debbie Salerno | 11/16/2011 | 58,000 | 1.0% | 11/16/2013 | $2.18 | Installment | NSO |
| Simon Taylor | 11/16/2011 | 58,000 | 1.0% | 11/16/2014 | $2.18 | Installment | NSO |
| Dick Yules | 11/16/2011 | 58,000 | 1.0% | 11/16/2014 | $2.18 | Installment | NSO |
| Tom Guy | 09/20/2013 | 5,000 | 0.1% | 09/20/2018 | $2.18 | Installment | NSO |

(*) Granted under BioSculpture Technology, Inc's 2011 Stock Option / Stock Issue Plan

**Significant Employees**

The Company presently has no significant employees other than the Company Officers and Managers named in this prospectus.

**REMAINDER OF PAGE LEFT BLANK INTENTIONALLY**

## ITEM 10. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.

(2)   Security ownership of certain beneficial owners.

The following table sets forth, as of the date of this Registration Statement, the number of shares of Preferred Stock and Common Stock owned of record and beneficially by executive officers, directors and persons who hold **5% or more of the outstanding Common Stock of the Company**.  Also included are the shares held by all executive officers and directors as a group.

| Name and Address | Amount and nature of Beneficial Ownership | Number of shares and (Percentage) of Class |
|---|---|---|
| Robert Cucin, MD & JD | Direct | Preferred Shares (0%) Common Shares (90.3%) |

(3)   Nominal Ownership

| | |
|---|---|
| Total Held by Executive Officers and Directors | Preferred Shares (0%) Common Shares (90.3%) |

## REMAINDER OF PAGE LEFT BLANK INTENTIONALLY

41

## ITEM 11. SECURITIES BEING OFFERED.

**Common Stock Units**

A maximum of TWO MILLION EIGHTY THREE THOUSAND THREE HUNDRED AND THIRTY-THREE Common Stock Units are being offered to the public at $2.40 per Common Stock Unit for Units 1 to 2,083,333. A Minimum of $250,000 will need to be received from this Offering for the Company to receive proceeds from the Sale of any Securities of this Offering. A maximum of $5,000,000 will be received from the offering. All Securities being offered by the Company through this offering, and no Securities are being offered by any selling shareholders of the Company. The Company will receive all proceeds from the sale of its Securities after the Company has secured $250,000 from the sale of Securities through this Offering.

(a) *Description of Company Common Stock.*

The Company is authorized by its Certificate of Incorporation to issue an aggregate of 20,000,000 shares of Common stock, $0.001 par value per share (the "Common Stock") and 10,000,000 shares of Preferred Stock. As of May 1st, 2014 – 6,036,320 shares of Common Stock were issued and outstanding; NO SHARES of Preferred Stock have been issued or are outstanding. Upon the completion of this Offering and the Current Regulation S Offering detailed in this registration statement, 10,205,401 shares of Common Stock will be issued and outstanding.

All outstanding shares of Common Stock are of the same class and have equal rights and attributes. The holders of Common Stock are entitled to one vote per share on all matters submitted to a vote of stockholders of the Company. All stockholders are entitled to share equally in dividends, if any, as may be declared from time to time by the Board of Directors out of funds legally available. In the event of liquidation, the holders of Common Stock are entitled to share ratably in all assets remaining after payment of all liabilities. The stockholders do not have cumulative or preemptive rights.

The description of certain matters relating to the securities of the Company is a summary and is qualified in its entirety by the provisions of the Company's Certificate of Incorporation and By-Laws, copies of which have been filed as exhibits to this Form 1-A. No Common Stock is being offered in the Offering Circular.

(b) *Background Information on the Preferred Stock.* None

(c) Other *Debt Securities.* $404,000 bondholder principal and $45,320 bondholder interest of the Convertible Bond Offering of 2010 was converted into common shares at $2.18 / share on 8/26/13. There are now no outstanding bonds.

There is a Demand Note currently outstanding to Robert Cucin from the Company totaling $426,502.29. This mainly represents his Personal Guarantee on three interest bearing bank Lines of Credit. His Personal Guarantee allows the Company to draw upon those Credit Lines with a low effective interest rate of approximately 4.31%. The breakdown of this Debt is as follows:

| | |
|---|---|
| CHASE Line of Credit (5.0%), Personally Guaranteed | $208,786.00 |
| CITIBANK Line of Credit (3.5%), Personally Guaranteed | $99,854.44 |
| BANK OF AMERICA Line of Credit (3.99%), Personally Guaranteed | $32,424.68 |
| Non-interest bearing Demand Note (0%) | $85,437.17 |
| Total Note due Dr. Cucin | $426,502.29 |

Our business plan envisions paying down these three lines of credit and removing Dr. Cucin's Personal Guarantee. This Offering is large enough to obviate their need. However given the Company's favorable payment history with them, the banks are likely to be willing to maintain the lines albeit with an anticipated slightly higher interest rate.

Dr. Cucin has also Personally Guaranteed the Tooling Financed by VGM; the balance due on that financing is approximately $77,881 and any accrued interest. Dr. Cucin is will equitize a matching portion of the $85,437.18 non-interest bearing remainder of his Note at this Offering's common stock price of $2.40/share when the remainder of that VGM financing is paid off. This equitization, nondilutional to any Investor in this Offering, will increase Dr. Cucin's cash investment in the company from $1,900,000 to at least $1,977,881. Our business plan contemplates having our tooling free and clear of financing. The combined effect is the eradication of the Cucin Note and Tooling Financing Liabilities, a non-dilutional increase in Corporate Equity with very little, if any actual payment being a received by Dr. Cucin, only the appropriate removal of his Personal Guarantees.

(d) *Other Securities to Be Registered.* None.

**Security Holders**

As of May 1st, 2014, there were 6,036,320 shares of our Common Stock outstanding, which were held of record by approximately 14 stockholders, not including persons or entities that hold the stock in nominee or "street" name through various brokerage firms.

As of May 1st, 2014, there were NO shares of our Preferred Stock outstanding, which were held of record by approximately 0 preferred stockholders.

**Dividends**

The Company has never declared or paid cash dividends on its Common Stock Units. The Company currently intends to retain all available funds and future earnings for use in the operation of Company business and does not anticipate paying any cash dividends in the foreseeable future to holders of our Common Stock. Any future determination to declare dividends for the Company's Common Stock Units will be made at the discretion of our board of directors, and will depend on our financial condition, results of operations, capital requirements, general business conditions and other factors that our board of directors may deem relevant.

**Indemnification of Directors and Officers:**

The Company is incorporated under the laws of Delaware. Delaware General Corporation Law provides that a corporation may indemnify directors and officers as well as other employees and individuals against expenses including attorneys' fees, judgments, fines and amounts paid in settlement in connection with various actions, suits or proceedings, whether civil, criminal, administrative or investigative other than an action by or in the right of the corporation, a derivative action, if they acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, if they had no reasonable cause to believe their conduct was unlawful. A similar standard is applicable in the case of derivative actions, except that indemnification only extends to expenses including attorneys' fees incurred in connection with the defense or settlement of such actions and the statute requires court approval before there can be any indemnification where the person seeking indemnification has been found liable to the corporation. The statute provides that it is not exclusive of other indemnification that may be granted by a corporation's certificate of incorporation, bylaws, agreement, and a vote of stockholders or disinterested directors or otherwise.

The Company's Certificate of Incorporation provides that it will indemnify and hold harmless, to the fullest extent permitted by Delaware's General Corporation Law, as amended from time to time, each person that such section grants us the power to indemnify.

Delaware General Corporation Law permits a corporation to provide in its Certificate of Incorporation that a director of the corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability for:

- any breach of the director's duty of loyalty to the corporation or its stockholders;
- acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law;
- payments of unlawful dividends or unlawful stock repurchases or redemptions; or
- any transaction from which the director derived an improper personal benefit.

The Company's Certificate of Incorporation provides that, to the fullest extent permitted by applicable law, none of our directors will be personally liable to us or our stockholders for monetary damages for breach of fiduciary duty as a director. Any repeal or modification of this provision will be prospective only and will not adversely affect any limitation, right or protection of a director of our company existing at the time of such repeal or modification.

**FINANCIAL STATEMENT:**

| BioSculpture Technology, Inc. | | 2013 P&L | | Pg. 1/2 |
|---|---|---|---|---|

| | | | | Jan - Dec 13 |
|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | |
| | **Income** | | | |
| | | refund of charge | | 17,575.68 |
| | | reimbursement of expense outlay | | 299.46 |
| | | **Sales** | | |
| | | | **Retail** | 43,299.50 |
| | | | **Sales - Other** | 1,050.00 |
| | | **Total Sales** | | 44,349.50 |
| | **Total Income** | | | 62,324.64 |
| | **Cost of Goods Sold** | | | |
| | | **Cost of Goods Sold** | | 8,154.00 |
| | **Total COGS** | | | 8,154.00 |
| **Gross Profit** | | | | 54,170.64 |
| | **Expense** | | | |
| | | **Bank Service Charges** | | 168.00 |
| | | **Contract Labor** | | 13,150.00 |
| | | **Dues and Subscriptions** | | 467.07 |
| | | **Electric** | | 960.57 |
| | | **Equipment** | | 984.62 |
| | | **Equipment Rental** | | 276.66 |
| | | **Insurance** | | |
| | | | **Liability Insurance** | 46,705.79 |
| | | **Total Insurance** | | 46,705.79 |
| | | **Interest Expense** | | |
| | | | **Bond Interest** | 45,320.00 |
| | | | **Loan Interest** | 22,127.99 |
| | | | **Interest Expense - Other** | 75.67 |
| | | **Total Interest Expense** | | 67,523.66 |
| | | **Licenses and Permits** | | 3,313.00 |
| | | **Payroll Expenses** | | -17.31 |
| | | **Postage and Delivery** | | 1,130.49 |
| | | **Printing and Reproduction** | | 481.00 |
| | | **Professional Fees** | | |
| | | | **Accounting** | 150.00 |
| | | | **Legal Fees** | 120,358.53 |
| | | **Total Professional Fees** | | 120,508.53 |
| | | **Purchase Discount** | | 901.06 |
| | | **Rent** | | 14,574.36 |
| | | **Repairs** | | 486.32 |
| | | **Supplies** | | |
| | | | **Office** | 1,020.81 |
| | | | **Supplies - Other** | 468.41 |
| | | **Total Supplies** | | 1,489.22 |
| | | **Taxes** | | |

Pg. 2/3

| | | |
|---|---|---:|
| | State | 50.00 |
| | Total Taxes | 50.00 |
| | Telephone | 2,799.49 |
| | Travel & Ent | |
| | Meals | 197.68 |
| | Travel | 2,203.20 |
| | Travel & Ent - Other | 383.46 |
| | Total Travel & Ent | 2,784.34 |
| | Utilities | |
| | Gas and Electric | 302.33 |
| | Total Utilities | 302.33 |
| | Total Expense | 279,039.20 |
| Net Ordinary Income | | -224,868.56 |
| Other Income/Expense | | |
| Other Income | | |
| | Crowd Funding Donation | 44.00 |
| | Other Income | 0.00 |
| | Total Other Income | 44.00 |
| | Other Expense | |
| | Other Expenses | 977.41 |
| | Promotional | |
| | Advertising | 50.50 |
| | Total Promotional | 50.50 |
| | Research & Development | 3,348.31 |
| | Total Other Expense | 4,376.22 |
| Net Other Income | | -4,332.22 |
| Net Income | | -229,200.78 |

**REMAINDER OF PAGE LEFT BLANK INTENTIONALLY**

45

4:41 PM
04/29/14
Accrual Basis

# BioSculpture Technology, Inc.
# Profit & Loss
## January 1 through April 1, 2014

Q1 2014 P&L

| | Jan 1 - Apr 1, 14 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| reimbursement of expense outlay | 230.61 |
| **Sales** | |
| Retail | 12,977.00 |
| **Total Sales** | 12,977.00 |
| | |
| **Total Income** | 13,207.61 |
| | |
| **Cost of Goods Sold** | |
| Cost of Goods Sold | 739.23 |
| **Total COGS** | 739.23 |
| | |
| **Gross Profit** | 12,468.38 |
| | |
| **Expense** | |
| Equipment | 92.22 |
| Insurance | |
| Liability Insurance | 16,655.04 |
| **Total Insurance** | 16,655.04 |
| | |
| Interest Expense | |
| Finance Charge | 513.83 |
| Loan Interest | 3,893.55 |
| **Total Interest Expense** | 4,407.38 |
| | |
| Postage and Delivery | 1,007.97 |
| Professional Fees | |
| Accounting | 350.00 |
| Legal Fees | 1,100.00 |
| **Total Professional Fees** | 1,450.00 |
| | |
| Rent | 3,643.59 |
| Repairs | 165.94 |
| Supplies | |
| Office | 125.30 |
| **Total Supplies** | 125.30 |
| | |
| Taxes | |
| State | 1,475.00 |
| **Total Taxes** | 1,475.00 |
| | |
| Telephone | 874.86 |
| Travel & Ent | |
| Travel | 1,117.31 |

46

4:41 PM
04/29/14
Accrual Basis

# BioSculpture Technology, Inc.
## Profit & Loss
January 1 through April 1, 2014

|  | Jan 1 - Apr 1, 14 |
|---|---|
| **Total Travel & Ent** | 1,117.31 |
|  |  |
| **Utilities** |  |
| Gas and Electric | 218.78 |
| **Total Utilities** | 218.78 |
|  |  |
| **Total Expense** | 31,233.39 |
|  |  |
| **Net Ordinary Income** | -18,765.01 |
|  |  |
| **Other Income/Expense** |  |
| **Other Expense** |  |
| Other Expenses | 561.73 |
| Research & Development | 6,969.44 |
| **Total Other Expense** | 7,531.17 |
|  |  |
| **Net Other Income** | -7,531.17 |
|  |  |
| **Net Income** | -26,296.18 |

**REMAINDER OF PAGE LEFT BLANK INTENTIONALLY**

3:33 PM
03/31/14
Accrual Basis

# BioSculpture Technology, Inc.
## Balance Sheet
### As of April 1, 2014

|  | 1-Apr-14 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| CHASE business checking | 35.18 |
| **Total Checking/Savings** | 35.18 |
| | |
| **Other Current Assets** | |
| Inventory Asset | 48,061.12 |
| Prepaid Media Credit | 15,550.12 |
| Rent Security Deposit | 1,250.00 |
| **Total Other Current Assets** | 64,861.24 |
| | |
| **Total Current Assets** | 64,896.42 |
| | |
| **Fixed Assets** | |
| Dyes, Tools & Molds | 263,524.00 |
| Furniture & Fixtures | 47,539.03 |
| **Total Fixed Assets** | 311,063.03 |
| | |
| **Other Assets** | |
| Exclusive License | 500,000.00 |
| **Total Other Assets** | 500,000.00 |
| | |
| **TOTAL ASSETS** | 875,959.45 |
| | |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Credit Cards** | |
| Amex Business Purchase Acct.2 | 2,057.31 |
| **Total Credit Cards** | 2,057.31 |
| Thomas J. Perkowski, Esq. | 49,872.40 |
| Simon Taylor, Esq. | 5,000.00 |
| | |
| **Total Current Liabilities** | 56,929.71 |
| | |
| **Long Term Liabilities** | |
| Note payable J. Cucin | 125.00 |
| Note payable R. Cucin | 422,889.72 |
| VGM Financial Services | 73,345.48 |
| **Total Long Term Liabilities** | 496,360.20 |
| | |
| **Total Liabilities** | 553,289.91 |

48

3:33 PM
03/31/14
Accrual Basis

**BioSculpture Technology, Inc.**
**Balance Sheet**
As of April 1, 2014
1-Apr-14

| | |
|---|---|
| **Equity** | |
| **Capital Stock** | 2,589,620.53 |
| **Retained Earnings** | -2,240,654.81 |
| **Net Income** | -26,296.18 |
| **Total Equity** | 322,669.54 |
| | |
| **TOTAL LIABILITIES & EQUITY** | 875,959.45 |

I certify these financial statements to be true and accurate.

*Robert L. Cucin, M.D.*

Robert L. Cucin, M.D.
CEO

4/29/2014

**REMAINDER OF PAGE LFET BLANK INTENTIONALLY**

**Reports to security holders:**

(1)  The Company will be a non-reporting company until such time as the company files quarterly and audited financial statements, and complies with the requirements of the Securities Exchange Act of 1934, as amended. The Company will be filing the following reports for shareholder review at www.AlternativeSecuritiesMarket.com

1.  **Quarterly Un-Audited Financial Statements:** Company to furnish all Investors and Alternative Securities Markets Group a complete set of un-audited financial statements within 30 days of the close of each business quarter. Company's Quarterly Financial Statements to also be posted for public view on the Company's page at www.AlternativeSecuritiesMarket.com.

2.  **Annual Audited Financial Statements:** Company to furnish to all Investors and Alternative Securities Markets Group a complete set of third party audited financial statements within 60 days of the close of each business year. Company's Annual Financial Statement to be posted for public view on the Company's page at www.AlternativeSecuritiesMarket.com.

3.  **Monthly State of the Company Letter to Investors:** The CEO will issue to all Investors and to Alternative Securities Markets Group, a "Monthly State of the Company" letter detailing the current state of all business operations for the Company. Letter to be posted for public view on the Company's page at www.AlternativeSecuritiesMarket.com.

4.  **Quarterly Conference Call:** The CEO or Executive of the Company will hold a quarterly video / telephone conference call with investors no sooner than 10 days, but no greater than 30 days, after the posting of the Company's quarterly financial report. The recorded Conference call will also be made available for public listen and/or viewing on the Company's Page at www.AlternativeSecuritiesMarket.com.

5.  **Corporate Actions:** Company must disclose to all Investors and to Alternative Securities Markets Group all: Dividends, Stock Splits, New Stock Issues, Reverse Splits, Name Changes, Mergers, Acquisitions, Dissolutions, Bankruptcies or Liquidations. All must be reported to Investors and to Alternative Securities Markets Group no less than TEN CALENDAR DAYS prior to the record date.

# REMAINDER OF PAGE LEFT BLANK INTENTIONALLY

**SIGNATURES**

**The Issuer has duly caused this Offering Statement to be signed on its behalf by the undersigned, thereunto duly authorized.**

**BioSculpture Technology, Inc.**

**By: Mr. Robert L. Cucin, MD & JD**

By: _____

Name: Mr. Robert L. Cucin, MD & JD
Title: Founder, President, Chief Executive Officer & Senior Shareholder

**By: Mr. Steven J. Muehler**

By: _____

Name: Mr. Steven J. Muehler, Alternative Securities Markets Group
Title: Advisor & Drafter of this Securities Registration Statement

51

# Signature Certificate

🔒 Document Reference:  J4L9NVJSB3J5TRFCFDFLKL


Easy Online Document Signing



**BioSculpture Technology**
Party ID: N3XKKIJJ8K5MJ6GZVFYX8A
IP Address: 174.61.17.208
VERIFIED EMAIL: robert@cucin.com

Electronic Signature


Multi-Factor
Digital Fingerprint Checksum    c2c923d9e74a93a0c4fbb1aba55e6d6a313ca8dd



**Alternative Securities Markets Group**
Party ID: SV6WVVI2SIW8ZRZ9FVR3ZI
IP Address: 75.82.187.226
VERIFIED EMAIL: legal@asmmarketsgroup.com

Electronic Signature


Multi-Factor
Digital Fingerprint Checksum    f5145cdfa1bb3acdce3dc2afc4cee8cb8e8c7e30

| Timestamp | Audit |
|---|---|
| 2014-05-01 08:58:50 -0700 | All parties have signed document. Signed copies sent to: BioSculpture Technology and Alternative Securities Markets Group. |
| 2014-05-01 08:58:50 -0700 | Document signed by BioSculpture Technology (robert@cucin.com) with drawn signature. - 174.61.17.208 |
| 2014-05-01 08:50:45 -0700 | Document viewed by BioSculpture Technology (robert@cucin.com). - 174.61.17.208 |
| 2014-05-01 08:43:24 -0700 | Document signed by Alternative Securities Markets Group (legal@asmmarketsgroup.com) with drawn signature. - 75.82.187.226 |
| 2014-05-01 08:42:53 -0700 | Document viewed by Alternative Securities Markets Group (legal@asmmarketsgroup.com). - 75.82.187.226 |
| 2014-05-01 08:42:53 -0700 | Document created by Alternative Securities Markets Group (legal@asmmarketsgroup.com). - 75.82.187.226 |



This signature page provides a record of the online activity executing this contract.

**Page 1 of 1**

Exhibit "E"

Entire exhibit
redacted