UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
THE LAW OFFICE OF RICHARD E. LERNER,
P.C.,

                            Plaintiff,                              REPORT AND
                                                                   RECOMMENDATION

              -against-                                            18-CV-113 (ENV)

JUDI GHEDINI a/k/a JUDITH GHEDINI, and
JONAS GAYER,

                            Defendants.
-----------------------------------------------------------------x

ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE:

          The Law Office of Richard E. Lerner, P.C. (the "Firm") commenced this proceeding

in the Supreme Court of New York, Queens County, against defendant Judi Ghedini

("Ghedini") in *quantum meruit* to recover attorneys' fees, and against defendant Jonas Gayer

("Gayer") (collectively, "defendants") for tortious interference with contract and with business

relations. See Summons With Notice (Jan. 8, 2018), Electronic Case Filing ("ECF") Docket

Entry ("DE") #1-2. Ghedini timely removed the action to this Court, with Gayer's consent, on

the ground that Gayer had been improperly joined in order to defeat diversity jurisdiction and

thereby prevent Ghedini from removing the action to federal court. See Notice of Removal

(Jan. 8, 2018) ¶ 16, DE #1. Currently before this Court is the Firm's motion to remand. See

Motion to Remand (Feb. 7, 2018), DE #13-1 (unredacted version filed under seal), DE #14

(publicly filed redacted version).

          For the reasons that follow, this Court respectfully recommends that the Firm's motion

to remand be denied, and that the claims against Gayer be dismissed.

## BACKGROUND

In October 2017, the Firm commenced a special proceeding in Supreme Court, Queens County, against Ghedini, seeking to fix a charging lien for attorneys' fees incurred in an earlier state court action, Judi Ghedini v. Arthur Shapolsky, Index No. 653461/13 (Supreme Court, New York County). See Verified Petition ¶ 1, DE #1-4. On November 15, 2017, Ghedini timely removed the special proceeding to this Court. See Notice of Removal (Nov. 15, 2017), DE #1 in The Law Office of Richard E. Lerner, P.C. v. Judi Ghedini, 17-cv-6664 (NGG)(VMS) ("17-cv-6664"). However, before Ghedini responded to the petition, the Firm voluntarily discontinued that action. See Notice of Voluntary Dismissal (Nov. 27, 2017), DE #5 in 17-cv-6664. Shortly thereafter, the Firm, by way of a summons with notice, commenced a second, similar special proceeding, again in Queens County Supreme Court, this time against Ghedini and Gayer. See Summons With Notice. On January 8, 2018, Ghedini removed the matter to this Court.

The Firm alleges that it had been retained by Ghedini, pursuant to a one-third contingency fee arrangement, to sue Arthur Shapolsky ("Shapolsky") on her behalf, in order to recover $500,000, plus interest, owed to her on a loan. See Summons With Notice at 2; Proposed Complaint ("Prop. Compl.") ¶¶ 6, 9 (attached to Motion to Remand as Ex. 1).[1] In

---

[1] The allegations discussed herein are drawn from the Summons With Notice filed by the Firm in state court and supplemented by the Firm's Proposed Complaint, submitted to the Court by the Firm in connection with the instant motion. In addition, the parties have submitted their contemporaneous email communications, which are discussed in this opinion. Most are attached to the Firm's Proposed Complaint, see DE #13-1 at 105-20, and some are attached to a declaration filed by defendant Gayer, see DE #25-2 through #25-4. For ease of reference, citations in this opinion to emails include page

2016, the Firm obtained a judgment of $500,000, plus interest, in favor of Ghedini against Shapolsky, which currently amounts to "close to $1,000,000 . . . ." <u>See</u> Summons With Notice at 2; Prop. Compl. ¶ 7.

On or about May 16, 2017, in the course of collection efforts on Ghedini's behalf, Ghedini expressly authorized the Firm's co-counsel, Frederick M. Oberlander, to attempt to reach a structured settlement with Shapolsky. <u>See</u> Prop. Compl. ¶ 15. Several days later, Shapolsky offered a structured settlement with a (then) present value of $625,000 to $650,000. <u>See</u> <u>id.</u> ¶ 16. Ghedini rejected that proposal, based on what the Firm characterizes as a misapprehension as to Shapolsky's ability to pay. <u>See</u> <u>id.</u> ¶¶ 17-18. Shortly thereafter, Ghedini discharged the Firm without cause, accusing it of "siding" with Shapolsky, in part, for participating in discussions with Shapolsky regarding reaching a structured settlement. <u>See</u> <u>id.</u> ¶¶ 27-28, 70. The Firm alleges that Gayer induced this discharge by impugning the Firm's competence and by falsely holding himself out to Ghedini as an IRS agent with access to Shapolsky's confidential tax information. <u>See</u>, <u>e.g.</u>, <u>id.</u> ¶¶ 55-57, 59, 61-62, 68-70, 72-74.

Ghedini mistakenly believed that Shapolsky was about to receive money from an unrelated litigation, which, the Firm contends, had ended years earlier with no recovery, according to court records. <u>See</u> <u>id.</u> ¶ 18. Ghedini also insisted that Shapolsky had recently sold a multi-million-dollar townhouse in Manhattan. <u>See</u> <u>id.</u> ¶ 19. In fact, according to the Firm, public records confirm that Shapolsky had sold the property in 2008 for $8 million, <u>see</u>

---

numbers imprinted by the ECF system.

3

id. ¶ 21, and that the buyer re-sold the property in 2016 for $10 million, see id. ¶ 22.

Ghedini apparently believed that Shapolsky had sold the property to a nominee in 2008 to hide

the property from his creditors, see id. ¶¶ 23-24, and she blamed the Firm for not stopping the

2016 sale or obtaining the proceeds of that sale for her benefit, see id. ¶ 25.

    The Firm alleges that Ghedini's misapprehensions stemmed from fraudulent

misrepresentations made by Gayer to Ghedini.   See id. ¶ 55.   For example, Gayer falsely told

Ghedini that he was an IRS agent.   See id. ¶¶ 57, 59.   Indeed, Ghedini had told Oberlander

that she was being advised by an IRS agent who was a friend of hers.   See id. ¶ 67.

According to the Firm's proposed pleading, Gayer told Ghedini that she should have been able

to collect her judgment from the proceeds of the townhouse sale and/or that if judgment had

been timely entered, her lien would have prevented the sale.   See id. ¶¶ 56, 68(7).   By lying

to Ghedini about the townhouse sale, Gayer essentially disparaged the Firm as incompetent.

See id. ¶ 56.   Gayer further falsely represented to Ghedini that he, along with the IRS, could

audit Shapolsky if he failed to report a capital gain on the sale of the townhouse, but they

would have to wait because Shapolsky had requested an extension to file his 2016 return.   See

id. ¶ 61.   The Firm alleges that Gayer caused or induced its discharge in order to protect

Gayer's fraudulent scheme to obtain money from Ghedini.   See id. ¶¶ 54, 72.

    The Firm claims that Ghedini is liable to it in *quantum meruit* for discharging it without

cause and that Gayer is jointly and severally liable for inducing Ghedini to breach her

obligation to pay the Firm.   See id. ¶¶ 36, 72-73, 76-77.

    In opposing the instant motion for a remand, defendants Ghedini and Gayer submitted

4

their own sworn statements.   In her affidavit, Ghedini explains that she discharged the Firm in

May 2017 after learning that her attorneys, Richard Lerner and co-counsel Oberlander, had

met with Shapolsky and his lawyer to discuss a structured settlement that she had already

rejected.[2]   See Affidavit of Judith Ghedini (Apr. 23, 2018) ("Ghedini Aff.") ¶ 2, DE #26-1

(unredacted version filed under seal), DE #21 (publicly filed redacted version); see also id.

¶ 13.   In addition, Ghedini had been dissatisfied with what she described as the Firm's "lax

collection efforts" and its "disrespectful, arrogant and demeaning conduct" towards her.   See

id. ¶ 10.   Gayer never advised Ghedini to discharge the Firm, either directly or indirectly.

See id. ¶ 20.   In fact, Ghedini states that Gayer, her former tax preparer, see id. ¶ 14, "had

absolutely nothing to do with th[e] decision" to discharge the Firm, and that Gayer learned

about the discharge after the fact, when Ghedini asked whether he could recommend new

counsel, see id. ¶¶ 3, 20; see also id. ¶ 18.   Moreover, to the extent that she misunderstood

Gayer's affiliation with the IRS, it was not due to any misrepresentation or omission by Gayer.

See id. ¶ 14.   Ghedini further explains that her belief that Shapolsky had sold a New York

City townhouse originated from an advertisement she had seen announcing the sale or rental of

the townhouse by Shapolsky, rather than from any information provided by Gayer.   See id.

¶ 15.

    In turn, Gayer avers that the emails proffered to the Court constitute the entire universe

_____

[2] The affidavit of Frederick Oberlander, submitted in reply, asserts that Ghedini had authorized the
Firm to meet with Shapolsky to discuss settlement.   See Affidavit of Frederick M. Oberlander (May
14, 2018) ¶¶ 12, 14, DE #31-1 (unredacted version filed under seal), DE #29-1 (publicly filed redacted
version).

of emails he exchanged with Ghedini in 2017 and that he does not believe that they spoke on the phone during that period.  See Declaration of Jonas Gayer (Apr. 13, 2018) ¶ 9, DE #25 (unredacted version filed under seal), DE #19 (publicly filed redacted version).   In response to the Firm's allegations, he further states that Ghedini knew that Gayer was a private tax consultant since she had previously hired him to prepare her taxes, and that it is "inconceivable" that she believed that he worked for the IRS.  See id. ¶ 11.  He has not had any contact with Ghedini since she informed him on May 30, 2017 that she had discharged the Firm.  See id. ¶ 8.

## DISCUSSION

Ghedini removed this action from state court based upon diversity of citizenship (see 28 U.S.C. § 1322) between the Firm (a New York citizen) and Ghedini (a citizen of Florida), claiming that the presence of Gayer, a New York citizen, should be disregarded under the doctrine of "fraudulent joinder."  See Notice of Removal ¶¶ 11-16, 27.  If the Court determines that Gayer has been properly joined as a party to this action, his presence destroys diversity of citizenship between the parties and deprives the Court of subject matter jurisdiction.

## I.    Legal Principles Governing Motions to Remand

"[A] plaintiff may not defeat a federal court's diversity jurisdiction and a defendant's right to removal by merely joining as defendants parties with no real connection with the controversy."  Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 460-61 (2d Cir. 1998).  "In order to show that naming a non-diverse defendant is a 'fraudulent joinder' effected to defeat

diversity, the defendant must demonstrate, by clear and convincing evidence, either that there

has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility,

based on the pleadings, that plaintiff can state a cause of action against the non-diverse

defendant in state court."[3]  Id. at 461; see Whitaker v. Am. Telecasting, Inc., 261 F.3d 196,

207 (2d Cir. 2001) (quoting Allied Programs Corp. v. Puritan Ins. Co., 592 F.Supp. 1274,

1276 (S.D.N.Y. 1984)) ("'Joinder will be considered fraudulent when it is established that

there can be no recovery [against the defendant] under the law of the state on the cause

alleged.'").  "[A]part from fraud, the plaintiff's motive in joining the non-diverse party is

irrelevant[.]"  Kuperstein v. Hoffman-Laroche, Inc., 457 F.Supp.2d 467, 470 (S.D.N.Y.

2006). "'[F]raudulent joinder is not shown if the plaintiff does in fact have a valid claim

---

[3] The Firm contends that the federal circuits have applied "three dissimilar standards" in assessing a charge of fraudulent joinder (i.e., "(1) the no-reasonable-basis standard; (2) the no-reasonable-possibility-of-recovery standard; and (3) the no-possibility-of-recovery standard"), and that, "[u]nfortunately for Ghedini, the Second Circuit sits in the third camp . . . ."  Memorandum in Support of Motion to Remand (Feb. 7, 2018) ("Pl. Mem.") at 9, DE #13-1 (unredacted version filed under seal), DE #14 (publicly filed redacted version).  In fact, an analysis of the case law reveals that most courts have tended to use the aforesaid formulations interchangeably, and that the "no possibility" language in Pampillonia "cannot be taken literally."  In re Rezulin Prods. Liab. Litig., 133 F.Supp.2d 272, 280 n.4 (S.D.N.Y. 2001).  Hence, the governing standard "more accurately is described as requiring a showing that there is 'no reasonable basis' for predicting liability on the claims alleged." See id. (citing cases); see also Kuperstein v. Hoffman-Laroche, Inc., 457 F.Supp.2d 467, 470-72 (S.D.N.Y. 2006) (quoting "no-possibility" language from Pampillonia but also stating that "[i]f state authority suggests that there is a reasonable possibility that New York would permit the Kupersteins' causes of action against the [non-diverse] Defendants to proceed, then this case must be remanded."); but cf. In re Consol. Fen-Phen Cases, No. 03 CV 3081(JG), 2003 WL 22682440, at *3 (E.D.N.Y. Nov. 12, 2003) (citing split in S.D.N.Y. cases).  Significantly, the Second Circuit in Pampillonia cited decisions of "other circuits [that] have adopted similar tests to determine whether a party has been fraudulently joined in an action[,]" Pampillonia, 138 F.3d at 461 n.3, including the Third Circuit's opinion in Boyer v. Snap-on Tools Corp., 913 F.2d 108 (3d Cir. 1990), which held "that joinder is fraudulent where there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant[,]" id. at 111 (internal quotation marks omitted).  Thus, the Firm is mistaken in arguing that the various formulations of the test represent "three dissimilar standards."

7

against the non-diverse defendants.'" MBIA Ins. Corp. v. Royal Bank of Canada, 706

F.Supp.2d 380, 393 (S.D.N.Y. 2009) (quoting In re Zyprexa Prods. Liab. Litig., No. 04-MD-

01596 (JBW), 2008 WL 4561628, at *3 (E.D.N.Y. Oct. 10, 2008)).

      "The defendant seeking removal bears a heavy burden of proving fraudulent joinder,

and all factual and legal issues must be resolved in favor of the plaintiff." Pampillonia, 138

F.3d at 461. "[T]he complaint is subjected to 'less searching scrutiny than on a motion to

dismiss for failure to state a claim.'" DNJ Logistic Grp., Inc. v. DHL Exp. (USA), Inc., 727

F.Supp.2d 160, 164 (E.D.N.Y. 2010) (quoting Campisi v. Swissport Cargo Servs., LP, 09-

CV-1507, 2010 WL 375878, at *2 (E.D.N.Y. Jan. 26, 2010)). In evaluating the pleading, the

court must apply state pleading rules, rather than the federal pleading standard. See id. at

165; MBIA Ins., 706 F.Supp.2d at 394.

      Although the right to remove a case to federal court ordinarily is evaluated as of the

time the removal notice was filed, see Vera v. Sacks & Co., 335 F.3d 109, 116 n.2 (2d Cir.

2003) (per curiam), a court addressing fraudulent joinder "is permitted to look beyond the

pleadings to resolve this jurisdictional question[,]" Audi of Smithtown, Inc. v. Volkswagen of

Am., Inc., No. 08-CV-1773 (JFB)(AKT), 2009 WL 385541, at *3 (E.D.N.Y. Feb. 11, 2009)

(quoting Building & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev.,

Inc., 448 F.3d 138, 150 (2d Cir. 2006)); see Pampillonia, 138 F.3d at 461-62; MBIA, 706

F.Supp.2d at 395. Documents outside the pleadings may be considered "'only to the extent

that the factual allegations . . . clarify or amplify the claims actually alleged[,]'" MBIA Ins.,

706 F.Supp.2d at 395-96 (quoting Griggs v. State Farm Lloyds, 181 F.3d 694, 700 (5th Cir.

1999)), and may not be used to inject "new theories of liability not asserted in the complaint[,]" id. at 395 (citing *In re* Consol. Fen-Phen Cases, No. 03 CV 3081(JG), 2003 WL 22682440, at *5 n.9 (E.D.N.Y. Nov. 12, 2003)); see also DNJ Logistic, 727 F.Supp.2d at 165 ("[A] complaint amended post-removal cannot divest a federal court of jurisdiction.") (internal quotation marks omitted).

Judged by these standards (and in the absence of an objection from any of the parties, see, e.g., Pl. Mem. at 14-15), the Court may consider the Firm's Proposed Complaint (along with the emails appended as Exhibit E), since the proposed pleading and its attachments merely amplify the claims described in the Summons With Notice, see MBIA Ins., 706 F.Supp.2d at 396.[4]   In any event, the law is clear that on a motion to remand a case to state court for lack of subject matter jurisdiction, courts can look beyond the pleadings to affidavits and other evidence in order to determine if the pleadings state a cause of action.   See Pampillonia, 138 F.3d at 461-62 (considering affidavits to determine if plaintiff's complaint alleged a sufficient factual foundation to support claims against non-diverse defendant); Pondexter v. Oruzio, 15-CV-5617 (CBA)(MDG), 2017 WL 1079974, at *1-2, *3 (E.D.N.Y. Mar. 21, 2017)

---

[4] The Firm now contends that the allegations in its Summons With Notice "support a claim for defamation . . . ." Plaintiff's Reply Memorandum in Support (May 14, 2018) ("Pl. Reply") at 11, DE #31 (unredacted version filed under seal), DE #29 (publicly filed redacted version).   However, whether or not the Firm could have alleged a cause of action for defamation, the fact remains that it did not do so.   See Summons With Notice at 2 (stating that "[t]he nature of this action is for money damages for [Gayer's] (1) interference with prospective advantage, and (2) interference with contract[,]" and identifying two corresponding counts); MBIA, 706 F.Supp.2d at 396 (refusing to "consider any new causes of action not alleged in the Summons with Notice"); *In re* Consol. Fen-Phen Cases, 2003 WL 22682440, at *5 n.9 ("Plaintiffs failed to assert this theory in their complaint, which I find fatal to their claim.").

(considering affidavits and deposition transcripts); <u>Audi of Smithtown</u>, 2009 WL 385541, at *3 (collecting cases); <u>Arseneault v. Congoleum Corp.</u>, No. 01 Civ. 10657(LMM), 2002 WL 472256, at *6-7 (S.D.N.Y. Mar. 26, 2002) (considering deposition transcripts and interrogatory responses); <u>In re</u> <u>Consol. Fen-Phen Cases</u>, 2003 WL 22682440, at *3, *4-5 (collecting cases and considering affidavits, deposition testimony and documentary evidence); <u>In re</u> <u>Rezulin Prods. Liab. Litig.</u> 133 F.Supp.2d 272, 281 (S.D.N.Y. 2001) (considering affidavits); <u>Trumps v. Harley of N.Y. Assocs.</u>, No. 94 Civ. 7080 (CSH), 1995 WL 656983, at *3 (S.D.N.Y. Nov. 8, 1995) ("This Court sees no reason to treat unchallenged assertions in an affidavit any differently" than unchallenged assertions in a removal petition, which "should be presumed true."); <u>Arno v. Costa Line, Inc.</u>, 589 F.Supp. 1576, 1578-79, 1580 (E.D.N.Y. 1984) (considering affidavits).[5]

## II.    <u>The Firm's Claims Against The Non-Diverse Defendant</u>

Defendants argue that joinder here was improper because there is no possibility that the Firm can state a viable cause of action against Gayer for tortious interference with contract or

---

[5] While conceding that courts may consider submissions outside the pleadings, <u>see</u> Pl. Mem. at 11, 14-15, the Firm cites several out-of-circuit decisions for the proposition that "[t]he papers submitted by non-diverse defendant Gayer should [ ] be struck, *in toto,* as the Court lacks subject matter jurisdiction to consider them[,]" Pl. Reply at 8.   However, the cited decisions merely observe that "a non-diverse defendant who claims to be fraudulently joined may not remove an action to federal court." <u>Andrews v. Amerco</u>, 920 F.Supp.2d 696, 703 (E.D. La. 2013).   Here, in contrast, Ghedini (not Gayer) filed the Notice of Removal.   The Firm cites no decision from within this Circuit (and this Court is aware of none) that even intimates that a non-diverse defendant is precluded from opposing remand in submissions arguing fraudulent joinder.   Therefore, the District Court should deny the Firm's motion to strike Gayer's submissions, and should reject the Firm's contention that by purporting to adopt the arguments advanced by Gayer, Ghedini "adopted **nothing**[,]" as his papers "don't *legally* exist."   Pl. Reply at 7 (emphasis in original); <u>see, e.g.</u>, <u>Sacay v. Research Found. of the City Univ. of N.Y.</u>, 44 F.Supp.2d 505, 510 (E.D.N.Y. 1999) (allowing adoption of arguments advanced by another party).

tortious interference with business relations, the two counts set forth in the Summons With

Notice and, at least by implication, in the Proposed Complaint.   See Defendant Jonas Gayer's

Memorandum of Law in Opposition to Plaintiff's Motion for Remand (Apr. 13, 2018) ("Gayer

Mem.") at 6, 10-11, DE #24 (unredacted version filed under seal), DE #18 (publicly filed

redacted version).   As a preliminary matter, this Court rejects the Firm's suggestion that

"interference with contract" and "tortious interference with prospective economic advantage"

are "different nomenclature" for the same wrong.   See Pl. Reply at 9; see also id. at 5

("[T]hose are mere labels, and it doesn't matter what label you use . . . ."); id. at 4 ("Breach

of what? Again, it doesn't matter.").   On the contrary, as New York's Court of Appeals has

repeatedly emphasized, "the elements of the two torts are not the same."   Carvel Corp. v.

Noonan, 3 N.Y.3d 182, 189 (2004).   Simply put, "'[w]here there has been no breach of an

existing contract, but only interference with prospective contract rights, . . . plaintiff must

show more culpable conduct on the part of the defendant.'"   Id. at 190 (quoting NBT Bancorp

Inc. v. Fleet/Norstar Fin. Grp. Inc., 87 N.Y.2d 614, 621 (1996)); see Guard-Life Corp. v. S.

Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 190-91 (1980).

### A.   Tortious Interference with Contract

The Firm's claim for tortious interference with contract may be swiftly rejected.

Agreements that are terminable at will are considered to be prospective contractual or business

relations, and thus cannot support a claim for tortious interference with an existing, binding

contact.   See Guzik v. Albright, 16-CV-2257 (JPO), 2018 WL 4386084, at *6 (S.D.N.Y.

Sept. 14, 2018); Guard-Life Corp., 50 N.Y.2d at 193-94; Miller v. Mt. Sinai Med. Ctr., 288

A.D.2d 72, 72 (1st Dep't 2001); Snyder v. Sony Music Entm't, Inc., 252 A.D.2d 294, 299 (1st Dep't 1999). An attorney's retainer agreement is a contract that is terminable at will by the client, with or without cause. See Demov, Morris, Levine & Shein v. Glantz, 53 N.Y.2d 553, 557 (1981); accord In re Cooperman, 83 N.Y.2d 465, 472-73 (1994). As a contract terminable at will, an attorney's retainer agreement cannot form the basis for a claim of tortious interference with contract, even where the client's discharge of counsel was without cause.[6] Therefore, the Firm has no possibility of recovery against Gayer on its claim for tortious interference with contract.

**B.      Tortious Interference With Business Relations**

The Second Count in the Summons With Notice charges Gayer with tortious interference with business relations, also referred to as tortious interference with prospective economic relations. "Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with

---

[6] The Firm unpersuasively argues that the opinions in Realuyo v. Diaz, No. 98 CIV. 7684(JGK), 2000 WL 307407 (S.D.N.Y. Mar. 23, 2000), and Lurie v. New Amsterdam Casualty Co., 270 N.Y. 379 (1936), "confirm that New York applies the tort of interference with contract to third parties who induce a client to breach her attorney contingency-fee engagement[.]" Pl. Reply at 5. In Realuyo, the court, in discussing Lurie, Guard-Life, NBT, and other tortious interference cases, made clear that where the contract breached is one terminable at will, the tortious interference claim requires proof that "the means employed to induce the breach were 'wrongful.'" 2000 WL 307407, at *4. In other words, the claim for tortious interference of a retainer agreement is properly analyzed as tortious interference with business relations (which requires that the defendant's conduct must amount to a crime or independent tort or be for the "sole purpose of inflicting harm on plaintiffs"), as opposed to tortious interference with a binding contract (for which the means employed may be entirely lawful). See Carvel Corp., 3 N.Y.3d at 189-90; Guzik, 2018 WL 4386084, at *6 ("[B]ecause such a claim is subject to an extra element[,] . . . it should be treated as a claim for 'interference with prospective contractual relations[.]'").

it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006) (quoting Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003)). As discussed below, there is no possibility that the Firm can satisfy the second and fourth elements of its claim for tortious interference with business relations.[7]

> i.    *Second Element: Gayer's Intent*

"It is axiomatic that, in order to prevail on [a tortious interference] claim, the [plaintiff] would have to show that the [defendant] intentionally caused the [third-party] not to enter into [or maintain] a contractual relation with them." G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 768 (2d Cir. 1995) (affirming dismissal of tortious interference claim); see High Falls Brewing Co., LLC v. Boston Beer Corp., 513 F.App'x 12, 13 (2d Cir. 2013) (affirming denial of leave to amend tortious interference counterclaim because proposed pleading failed to allege that party intentionally procured breach): Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 425 (1996) (affirming dismissal where there was no allegation that defendant intentionally procured third-party's breach); Kirk v. Schindler Elevator Corp., 49 A.D.3d 300, 301 (1st Dep't 2008) ("Defendant was not shown to have acted intentionally with malice toward plaintiff, nor to have targeted any improper conduct at plaintiff's new employer with the intention of interfering with that employment.").

The Firm's "vague and conclusory allegations [regarding Gayer's intent to interfere] do

---

[7] For purposes of this motion, the Court assumes that Ghedini's discharge of the Firm was without cause, see Pl. Mem. at 3, and that Gayer falsely held himself out as an IRS agent with access to confidential tax information.

not provide any possibility of success under state law[.]"    Pampillonia, 138 F.3d at 462 n.5.

The Firm alleges only that Gayer "(1) knew, intended, or both, that; or (2) was recklessly

indifferent to or deliberately put his head in the sand to 'ignore,' the substantial likelihood that;

or (3) was grossly inattentive, or 'ordinarily' inattentive, to the foreseeable outcome that, as a

proximate result of his actions, Ghedini would discharge plaintiff without cause" and "refuse

to pay plaintiff[.]"    Prop. Compl. ¶¶ 74, 75.    In other words, even the Firm's own pleading

muddies the waters as to whether Gayer *intended* to cause Ghedini to discharge the Firm.

Moreover, in arguing that "[f]acts pled in the complaint are presumed to be true[,]" Pl. Mem.

at 11, the Firm ignores firmly established New York law that "allegations consisting of bare

legal conclusions as well as factual claims flatly contradicted by documentary evidence are not

entitled to any such consideration," Maas v. Cornell Univ., 94 N.Y.2d 87, 91 (1999) (internal

quotation marks and citation omitted); accord Myers v. Schneiderman, 30 N.Y.3d 1, 11

(2017); Simkin v. Blank, 19 N.Y.3d 46, 52 (2012).    The Firm's speculation that Gayer

induced Ghedini to discharge the Firm in order to cover up either her "victimization" by Gayer

or her "collusion" with him, see Prop. Compl. ¶ 72, is "flatly contradicted by documentary

evidence" -- the email exchanges between Gayer and Ghedini, and between Ghedini and the

Firm.[8]

---

[8] In her opposition brief, Ghedini primarily argues that the Firm cannot rely on communications exchanged
between Ghedini and Lerner and/or Oberlander because the Firm is "bound by law to maintain the confidentiality
of those communications[.]"    Response in Opposition (Apr. 23, 2018) at 4, DE #26 (unredacted version filed
under seal), DE #20 (publicly filed redacted version).    However, it is well established that "a lawyer may
disclose confidential information to the extent that information is reasonably necessary to his ability to establish or
collect a fee."    Guzik, 2018 WL 4386084, at *11 (former counsel's disclosures of confidential information in
summary judgment brief were proper because they were relevant to determining whether counsel was entitled to

On April 24, 2017, roughly one month before Ghedini terminated her relationship with the Firm, Ghedini reached out to Gayer by email and informed him that her efforts to collect on a judgment from Shapolsky were ongoing and that, based on her own "Google" search, she believed that Shapolsky was hiding the sale of real property; she assumed that "an IRS Agent" "could check this sale." See Email from Judith Ghedini to Jonas Gayer dated April 24, 2017 at 11:06 a.m., DE #13-1 at 107. Gayer responded by email: "I am really surprised that this is not settled, it seems that your lien should have existed so that at the sales closing You would be paid. It is very difficult to have the IRS audit this transaction unless the sale was not reported." Email from Jonas Gayer to Judith Ghedini dated April 24, 2017 at 1:04 p.m., DE #13-1 at 106. Undeterred by Gayer's noncommittal response, Ghedini again emailed Gayer the following day, stating that she had "no idea" if Shapolsky had reported the sale of a townhouse to the IRS; she asked Gayer to "check to see if he did report the sale to the IRS[,]" adding that, if Shapolsky had failed to do so, "we could receive an award from the IRS!" Email from Judith Ghedini to Jonas Gayer dated April 25, 2017 at 10:02 a.m., DE #13-1 at 106; see also Email from Judith Ghedini to Jonas Gayer dated April 25, 2017 at 10:46 a.m., DE #25-2 at 8 (asking Gayer not to advise IRS of any unreported transaction right away, since

---

collect legal fees); see Galpern v. De Vos & Co. PLLC, No. 10-CV-1952 (CBA)(JMA), 2011 WL 4597491, at *8 (E.D.N.Y. Sept. 30, 2011); Balestriere PLLC v. BanxCorp., 96 A.D.3d 497, 498 (1st Dep't 2012) (law firm seeking to collect legal fees did not improperly divulge confidential information because it was "necessary to the current litigation"). Indeed, Rule 1.6(b)(5)(i) of the New York Rules of Professional Responsibility provides that "[a] lawyer may reveal or use confidential information to the extent that the lawyer reasonably believes necessary . . . (i) to defend the lawyer or the lawyer's employees and associates against an accusation of wrongful conduct; or (ii) to establish or collect a fee[.]" 22 N.Y. Comp. Codes R & Regs. § 1200.0. Here, the Firm's entitlement to collect legal fees turns on whether the Firm was discharged for cause. The emails cited in the parties' briefs and described in this Report and Recommendation are highly probative of the reason for the Firm's discharge.

there was a scheduled order-to-show-cause hearing in her case coming up in May, and "I want to be paid first."). After Gayer replied that reporting the sale to the IRS "would be a major undertaking" and "a lot of trouble[,]" Email from Jonas Gayer to Judith Ghedini dated April 25, 2017 at 10:36 a.m., DE #25-2 at 4; see also Email from Jonas Gayer to Judith Ghedini dated April 25, 2017 at 10:43 a.m., DE #13-1 at 106, Ghedini sent Gayer several emails over the next few weeks, with information on the townhouse transaction, see Email from Judith Ghedini to Jonas Gayer dated April 25, 2017 at 3:03 p.m., DE #13-1 at 105-06; Email from Judith Ghedini to Jonas Gayer dated May 15, 2017, at 10:57 a.m., DE #13-1 at 105. On May 15, 2017, when Ghedini provided Gayer with a link to a website with information concerning the townhouse, see Email from Judith Ghedini to Jonas Gayer on May 15, 2017 at 7:31 p.m., DE #13-1 at 105, Gayer replied the following evening: "I found the sale that was made but unless the sale was not reported by Shapolsky we cannot audit him. He filed an extension till October 2017 so no action can be taken." Email from Jonas Gayer to Judith Ghedini dated May 16, 2017 at 8:08 a.m., DE #13-1 at 105.

Meanwhile, also on May 16, 2017, Ghedini forwarded her email exchanges with Gayer to attorney Richard Lerner and requested that he secure an affidavit from the new owner of the townhouse. See Email from Judith Ghedini to Richard Lerner on May 16, 2017 at 5:01 p.m., DE #13-1 at 105. It was co-counsel Oberlander who first responded, warning Ghedini that Gayer was a "twice-convicted felon[.]" Email from Frederick M. Oberlander to Judith Ghedini on May 19, 2017 at 11:34 a.m. ("5/19/17 at 11:34 a.m. Oberlander Email"), DE #13-1 at 112-13; see Email from Frederick Oberlander to Judith Ghedini dated May 19, 2017 at

9:05 a.m., DE #13-1 at 113. Ghedini in turn forwarded to Lerner copies of Oberlander's emails, expressing her diminishing confidence in the legal representation she was receiving and reminding Lerner that he still had not responded to a question she had posed about pursuing the full judgment, "[n]ot a discounted version[.]" She concluded: "I WOULD STILL LIKE AN ANSWER." Email from Judith Ghedini to Richard Lerner dated May 19, 2017, DE #13-1 at 112. Lerner answered that Gayer "probably committed very serious crimes" and that his information "is mostly false or useless." After informing Ghedini that "[w]e are adjourning the order to show cause [contempt hearing against Shapolsky] for several weeks[,]" Lerner concluded: "Please do not expect me to respond immediately to any email you send. I will respond when I can, and if a response is warranted." Email from Richard Lerner to Judith Ghedini dated May 19, 2017 at 5:47 p.m. ("5/19/17 at 5:47 p.m. Lerner Email"), DE #13-1 at 111-12. Ghedini replied: "NO NEED –You're fired. When I present this to the court, there will be little doubt as to which side you're on." Email from Judith Ghedini to Richard Lerner dated May 19, 2017, DE #13-1 at 111; see also [Second] Email from Judith Ghedini to Richard Lerner dated May 19, 2017, DE #13-1 at 111 ("You may receive your formal letter of dismissal by next week.").

That evening, Lerner forwarded the above email thread to co-counsel Oberlander, see DE #13-1 at 111, who within minutes emailed Ghedini, asserting that, "[i]f you intend to discharge me as well, it will not be for cause"; again describing Gayer's criminal background; advising that the Firm would be disclosing "the communication with your friend" to the court, with or without Ghedini's consent; and stating that "[a]ll retaining liens will be asserted."

Email from Frederick M. Oberlander to Judith Ghedini dated May 19, 2017 at 7:55 p.m., DE #13-1 at 116-17.

Two weeks later, on May 30, 2017, Ghedini, citing the Firm's seven-month delay in filing the judgment, informed Gayer by email that "I have dismissed my lawyer for cause." She asked if Gayer's tax lawyer would "be willing to represent me to conclusion?" <u>See</u> Email from Judith Ghedini to Jonas Gayer dated May 30, 2017 at 12:23 p.m., DE #25-4 at 2. Gayer responded:

> Dear Judith,
> I am so sorry about this lawyer, totally wrong. I do not have anyone right now someone who would take you on, but I think that you should see and meet some attorney in person where you live to show the[m] the entire case so they will be comfortable in representing you. This sounds like a total malpractice case. Maybe it would be wise to find a criminal lawyer not a tax lawyer since now this is beyond what should have been a year ago.
> Very best
> Jonas

Email from Jonas Gayer to Judith Ghedini dated May 30, 2017 at 12:46 p.m., DE #25-4 at 2. Ghedini, while noting that she lived in Florida but her case was pending in New York, nevertheless thanked Gayer, agreeing that "a criminal lawyer makes sense." Email from Judith Ghedini to Jonas Gayer dated May 30, 2017 at 4:04 p.m., DE #25-4 at 3. That was their final communication. <u>See</u> Gayer Decl. ¶ 8.

Contrary to the Firm's contention that Gayer "tortiously insinuated himself into the contractual relationship between Lerner and Ghedini," Pl. Mem. at 17, <u>see id</u>. at 15; Prop. Compl. ¶ 54, "with the intent of benefiting himself, by then stepping in and taking control of the corpus of her recovery[,]" <u>see</u> Pl. Reply at 11, Gayer's responses to his former client's

18

series of emailed entreaties clearly and convincingly reflect an individual who was decidedly reluctant to be drawn into Ghedini's ongoing legal travails and who did nothing to oust the Firm in order to take control of Ghedini's lawsuit.   Thus, when Ghedini first reached out to Gayer on April 24, 2017, he expressed surprise that her case had not been resolved and he downplayed the possibility of an IRS audit.   In response to Ghedini's repeated requests for assistance in investigating the townhouse sale that she believed should have funded her judgment against Shapolsky, Gayer emphasized the difficulties in getting the IRS involved. And when Ghedini informed Gayer on May 30, 2017 that she had discharged her attorneys and inquired whether his tax attorney would be willing to represent her, Gayer again declined to take the bait: he responded by email that that she should look for counsel near her home.   The entire email thread thus belies the Firm's theory that Gayer intended to disrupt Ghedini's relationship with the Firm in order to advance his own interests.[9]   To the extent that Gayer may have played an incidental role in the termination of the relationship between Ghedini and the Firm, nothing in the documentary evidence suggests that Gayer intentionally targeted that relationship.[10]

In its reply brief, the Firm contends that in order to induce Ghedini to discharge the

---

[9] The Firm points to Gayer's suggestion, in his final email to Ghedini, on May 30, 2017, that she consult with a criminal attorney.   See Pl. Reply at 10.   As that email was sent *after* Ghedini discharged the Firm, it does not somehow demonstrate that Gayer caused its discharge.   See *infra* pp. 20, 21 n.13.

[10] Ironically, if anything, the email exchanges submitted by the parties demonstrate that it was *the Firm* that urged Ghedini to distance herself from *Gayer*.   Richard Lerner and co-counsel Fred Oberlander sent Ghedini emails stating that Gayer had a criminal record and that the information Gayer provided to Ghedini was "mostly false or useless."   See 5/19/17 at 5:47 p.m. Lerner Email; 5/19/17 at 11:34 a.m. Oberlander Email.

Firm, Gayer told her that "Lerner was incompetent if not in criminal collusion with" Shapolsky. <u>See</u> Pl. Reply at 1; <u>see also id.</u> at 6 (claiming that Gayer told Ghedini "that Lerner may have been in criminal conspiracy with Shapolsky"). However, not even the Proposed Complaint contains that allegation. On the contrary, while the proposed pleading alleges that Ghedini falsely accused the Firm of colluding with Shapolsky and demonstrating disloyalty, it contains no allegation that she did so at Gayer's urging or that Ghedini was repeating what Gayer had told her. <u>See</u> Prop. Compl. ¶ 71. In any event, Gayer's only criticism of the Firm occurred in his final email ("This sounds like a total malpractice case"), which was prompted by Ghedini's announcement to him on May 30, 2017 that she had discharged her attorneys; therefore, Gayer's comment does not evince an intent on his part to rupture an already severed relationship.[11]

ii.    *Fourth Element: Causation*

Nor do the Firm's allegations permit an inference that Gayer was the cause of the injury to the relationship between Ghedini and her counsel. <u>See generally</u> <u>Highland Capital Mgmt. LP v. Schneider</u>, 198 F.App'x 41, 46 (2d Cir. 2006) (plaintiff waived challenge to district court's finding that defendant's alleged tortious conduct did not cause termination of

---

[11] In a footnote to its reply memorandum, the Firm notes that three days after Ghedini fired counsel via her email of May 19, 2017, she asked Lerner to send her an affidavit for a Florida broker to sign. <u>See</u> Pl. Reply at 13 n.10; Email from Judith Ghedini to Richard Lerner dated May 22, 2017 at 10:09 p.m., DE #13-1 at 118. That Ghedini sought to secure from her discharged counsel a document that apparently had been the subject of prior communications between them does not signify a reversal of the termination notice. Indeed, the Firm acknowledges that it failed to communicate to Ghedini a settlement offer from Shapolsky that the Firm received on May 18, 2017: "[B]efore it was communicated to Ghedini, she notified Lerner that he was being discharged, making it pointless to communicate to her the judgment debtor's proposed terms of settlement." Pl. Reply at 19.

relationship). The Firm contends that Gayer induced Ghedini to repudiate the retainer agreement "by holding himself out to be an IRS agent who could (unlawfully) cause an audit of Shapolsky's tax returns to help her get money from him." Pl. Reply at 6. Nevertheless, the Firm does not explain how Gayer's alleged assertion caused Ghedini to discharge her attorneys. None of Gayer's emails to Ghedini suggested that he was willing or able to play an active role in her collection efforts. Rather, the only reasonable inference from the email exchanges proffered by the parties is that counsel's disparaging comments about Gayer and his checkered past, coupled with their dismissive treatment of Ghedini's concerns,[12] prompted Ghedini to discharge the Firm.[13] Indeed, the Proposed Complaint concedes as much: "When Ghedini was told of the apparent criminality [on the part of Gayer], her reaction was to discharge [the Firm] and notify Judge Ramos that [it] had been discharged 'for cause.'" Prop. Compl. ¶ 70. Thus, the Firm has alleged no facts to support the inference that any conduct by Gayer caused the Firm's discharge. See generally Mallek v. Allstate Indem. Co., 17-CV-

---

[12] See, e.g., Email from Richard Lerner to Judith Ghedini dated April 21, 2017 at 1:42 p.m., DE #13-1 at 119 ("I'm busy, so I'll thank you in advance for not expecting me to respond to any more emails today."); Email from Richard Lerner to Judith Ghedini dated April 21, 2017 at 4:57 p.m., DE #13-1 at 118 ("I told you I was busy. Don't bother me with nonsense."); Email from Richard Lerner to Judith Ghedini dated May 19, 2017 at 4:57 p.m., DE #13-1 at 111 ("Please do not expect me to respond immediately to any emails you send. I will respond when I can, and if a response is warranted."). In addition, the Firm agreed to adjourn an order-to-show-cause contempt hearing against Shapolsky without Ghedini's knowledge or approval. Compare 5/19/17 at 5:47 p.m. Lerner Email ("We are adjourning the order to show cause for several weeks . . . ."), with Ghedini Aff. ¶ 13 (". . . I was dumbfounded when Lerner advised me on May 19, 2017 that the Firm had adjourned the contempt motion without date . . . .").

[13] The Firm's contention that Gayer wrongfully induced Ghedini to terminate her relationship with her counsel by telling her that they were incompetent (see Pl. Reply at 1, 9) ignores the fact that Gayer criticized the Firm *after* Ghedini had already ended the relationship. See *supra* pp. 19 n.9, 20.

5949-KAM-SJB, 2018 WL 3635060, at *5 (E.D.N.Y. Mar. 12, 2018) (finding fraudulent

joinder in light of "the absence of specific facts" from which to infer liability of non-diverse

defendant), adopted, 2018 WL 3629596 (E.D.N.Y. July 31, 2018).

The affidavits submitted by defendants confirm that the Firm's allegations against

Gayer are entirely conclusory and speculative and that there is no possibility of recovery

against Gayer on the Firm's tortious interference claims.   See Pampillonia, 138 F.3d at 462

(relying on defendants' affidavit in finding that there was no possibility that non-diverse

corporate parent could be liable as plaintiff's employer); Pondexter, 2017 WL 1079974, at *3

(after reviewing affidavits and other evidence, court finds that "there is no possibility that a

claim can be stated against [non-diverse defendant, which thus] has been fraudulently joined");

In re Consol. Fen-Phen Cases, 2003 WL 22682440, at *4 (proffered affidavits constituted

"clear and convincing" evidence that "there is no possible recovery" against non-diverse

defendant); In re Rezulin Prods. Liab. Litig., 133 F.Supp.2d at 281 (finding that joinder of

non-diverse sales representatives "lacked any reasonable basis in fact" based on their

affidavits); Trumps, 1995 WL 656983, at *2, *3 (relying on affidavit of a representative of

two of the corporate defendants in finding fraudulent joinder, where plaintiff vigorously

contested factual assertions therein but provided "no concrete evidence to rebut them").

Ghedini avers that Gayer "had absolutely nothing to do with th[e] decision" to discharge the

Firm and did not advise her to do so, either directly or indirectly.   See Ghedini Aff. ¶¶ 3, 20;

see also id. ¶ 18.   The Firm has identified no contrary facts, resorting instead to attacks on

Gayer's character.   See Pl. Reply at 11-12; see also Prop. Compl. ¶¶ 38-44, 49-54 (accusing

22

Gayer of being "controller of a Mafia criminal enterprise" and a "serially convicted fraudster, and con man"). In short, as amply demonstrated by the aforesaid cases, defendants have met their burden, which, while heavy, "is not impossible of satisfaction." _In re_ Rezulin Prods. Liab. Litig., 133 F.Supp.2d at 280.

Moreover, the Firm has failed to cite a single case sustaining a claim for interfering in an attorney-client relationship under similar circumstances. The cases relied on by the Firm are readily distinguishable from the circumstances here. In Lurie v. New Amsterdam Casualty Co., 270 N.Y. 379 (1936), the plaintiff-attorney had represented a client injured in an automobile accident by someone who was insured by the defendant insurance company. The plaintiff-attorney alleged that the insurance company had threatened the attorney's client into repudiating the retainer agreement, made a payment to the client, and obtained a general release. See id. at 380-81. The New York Court of Appeals concluded that the plaintiff-attorney had stated a cause of action against the insurance company for wrongfully inducing the breach. See id. at 381. In contrast, here, as discussed above, there are no factual allegations that suggest that Gayer targeted for disruption the relationship between Ghedini and her attorneys. Even if Gayer provided Ghedini with bad advice, whether intentionally or negligently, it cannot be said that this advice was for the purpose of interfering with her relationship with the Firm or caused its demise.

Similarly, in Realuyo v. Diaz, No. 98 CIV. 7684(JGK), 2000 WL 307407 (S.D.N.Y. Mar. 23, 2000), the plaintiff was an attorney who had represented a client seeking to collect unpaid consulting fees. The client was alleged to have been coerced by his adversary into

23

discharging the plaintiff-attorney and dropping his intended lawsuit so that the parties could enter into a secret settlement. In <u>Realuyo</u>, the court found that the plaintiff-attorney successfully stated a claim for tortious interference because a third-party induced the attorney's client to repudiate a retainer agreement as a precondition to negotiating a settlement. <u>See id</u>. at *4. There, again, as in <u>Lurie</u>, the defendant was alleged to have directly targeted the attorney-client relationship in order to coerce the client to terminate her attorney and accept a settlement without the benefit of counsel. The facts at issue in the instant case bear no resemblance to that fact pattern.

In sum, there is no basis to expect that a state court would find Gayer liable for tortious interference. As Gayer thus was fraudulently joined as a defendant, his citizenship may be disregarded, resulting in complete diversity among the remaining parties. Accordingly, this Court recommends that the Firm's motion to remand be denied, and that the claims against Gayer be dismissed pursuant to Rule 21 of the Federal Rules of Civil Procedure. <u>See</u> Fed. R. Civ. P. 21 ("Parties may be dropped or added by order of the Court on motion of any party or of its own initiative at any stage of the action and on such terms as are just . . . ."); <u>Whitaker</u>, 261 F.3d at 207 (affirming dismissal of non-diverse defendant under Rule 21 based on fraudulent joinder); <u>Trumps</u>, 1995 WL 656983, at *4 (dismissing fraudulently joined defendants under Rule 21); <u>Arno</u>, 589 F.Supp. at 1580-81 (Glasser, J.).

## CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that the Firm's motion to remand be denied, and that the claims against Gayer be dismissed pursuant to Rule

21.

Any objections to this Report and Recommendation must be filed with the Honorable

Eric N. Vitaliano by **October 8, 2018.** Failure to file timely objections may waive the right

to appeal the District Court's Order. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; <u>Caidor</u>

<u>v. Onondaga Cty.</u>, 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is requested to docket this Report and Recommendation into the ECF

system.

**SO ORDERED.**

**Dated:** **Brooklyn, New York**
**September 24, 2018**

*Roanne L. Mann*
_____
**ROANNE L. MANN**
**CHIEF UNITED STATES MAGISTRATE JUDGE**